**TEXAS WORKERS' COMPENSATION COMMISSION, et al., Appellants,**

v.

**Hector GARCIA, Jr., et al., Appellees.**

No. 04–91–00565–CV.

Court of Appeals of Texas, San Antonio.

Aug. 11, 1993.

Rehearing Denied Sept. 16, 1993.

Scott Moore, Shannon Ratliff, Marc O. Knisely, Carolyn Porter Simione, McGinnis, Lochridge & Kilgore, Joseph A. Pitner, Carey E. Smith, Delmar Cain, Harry G. Potter, III, Asst. Atty. Gen., Gen. Litigation Div., Austin, for appellants.

David R. Richards, Gray & Becker, Bill Whitehurst, Whitehurst, Harkness & Watson, Austin, Robert R. Puente, Law Offices of Robert R. Puente, San Antonio, for appellees.

## OPINION

REEVES, Chief Justice.

In this declaratory judgment action, the trial court declared the 1989 Workers' Compensation Act (the Act[1]) unconstitutional. We are called upon in this appeal to review that decision. Before we reach the constitutional issues, we must decide whether a justiciable controversy exists. We must also determine whether plaintiffs' suit against the state defendants is barred by sovereign immunity. We find that a justiciable controversy exists at least as to some of the plaintiffs, and that the suit is not barred by sovereign immunity. We further hold that the Act is unconstitutional.

Plaintiffs filed suit in Maverick County on November 30, 1990 seeking declaratory and injunctive relief. The Act took effect January 1, 1991. Defendants are Eagle Pass Auto Electric,[2] the Texas Workers' Compensation Commission, and George Chapman in his capacity as executive director of the commission. The Texas Association of Compensation Consumers, Inc., Klinck Globe, Inc., Klinck Drug Store, Inc., and La Esquina were added to the suit as intervenors on the side of the defendants.

---

1. The new Act is found at Tex.Rev.Civ.Stat.Ann. art. 8308–1.01 through 8308–11.10 (Vernon Supp.1992). All citations to statutory sections are to the Act unless otherwise noted.

2. Eagle Pass Auto Electric presented no defense and has not appealed the judgment.

Following a temporary injunction hearing in December, 1990, the trial court granted temporary injunctive relief against defendants on the ground that certain provisions of the Act were unconstitutional. The merits were tried without a jury. The court signed the final judgment on May 22, 1991, declaring large portions of the Act unconstitutional. The court found that the unconstitutional portions could not be severed from the Act in its entirety, and accordingly declared the entire Act unconstitutional. Findings of fact and conclusions of law were filed.

Defendants sought to perfect a direct appeal to the supreme court, but the supreme court dismissed the appeal for want of jurisdiction. Defendants then perfected their appeal to this court.

## I. STANDING

Defendants' initial argument is that none of the plaintiffs have standing because none have suffered an injury under the Act. They argue, therefore, that the trial court's opinion is advisory and that that court, and this one, lack jurisdiction of this suit.

 It is fundamental that a court has no jurisdiction to render an advisory opinion on a controversy that is not yet ripe, or to decide a case on speculative, hypothetical, or contingent fact situations. *Camarena v. Texas Employment Comm'n,* 754 S.W.2d 149, 151 (Tex.1988). Standing requires some interest peculiar to the person individually and not as a member of the general public. *Hunt v. Bass,* 664 S.W.2d 323, 324 (Tex. 1984). As an aspect of justiciability, the standing question is whether the plaintiff has such a personal stake in the outcome of the controversy as to warrant his invocation of the court's jurisdiction and to justify the exercise of the court's remedial powers on his behalf. *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

The purpose of a declaratory judgment "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered." TEX. CIV.PRAC. & REM.CODE ANN. § 37.002(b) (Ver-

non 1986). A person whose rights, status, or other legal relations are affected by a statute "may have determined any question of construction or validity arising under the statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV.PRAC. & REM.CODE ANN. § 37.004(a) (Vernon 1986). A declaratory judgment "is an instrumentality to be wielded in the interest of preventative justice and its scope should be kept wide and liberal, and should not be hedged about by technicalities." *Cobb v. Harrington,* 144 Tex. 360, 190 S.W.2d 709, 713 (1945). It "is intended as a speedy and effective remedy for the determination of the rights of the parties when a real controversy has arisen and even before the wrong has actually been committed." *Id.*

> The essential difference between the declaratory judgment and the purely advisory opinion lies in the fact that the former is a binding adjudication of the contested rights of the litigants, though unaccompanied by consequential relief; whereas, the latter is merely the opinion of the judges or court, adjudicates nothing, and is binding on no one.

*Douglas Oil Co. v. State,* 81 S.W.2d 1064, 1077 (Tex.Civ.App.—Austin 1935), *rev'd on other grounds sub nom. Federal Royalty Co. v. State,* 128 Tex. 324, 98 S.W.2d 993 (1936).

 As a prerequisite to the declaratory judgment process, there must be a real controversy between the parties, which will be actually determined by the judicial declaration sought. *Board of Water Eng'rs v. City of San Antonio,* 155 Tex. 111, 283 S.W.2d 722, 724 (1955). Chief Justice Hughes set out what is perhaps the classic definition of "controversy" in *Aetna Life Ins. Co. v. Haworth:*

> A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be

upon a hypothetical state of facts. Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages.

300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1936) (citations omitted).

[A]t an irreducible minimum, Art. III [of the United States Constitution] requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted).

With these rules in mind, we will review the situation of each plaintiff in turn.

### A. Garcia

■ Hector Garcia, Jr. is an employee of Eagle Pass Auto Electric in Eagle Pass, Texas. Eagle Pass was a subscriber under the former Act, and Garcia is currently covered by the company's workers' compensation carrier. Garcia testified that he does not wish to be covered by the Act. He is not claiming a compensable injury. The court found that Garcia "will be immediately and irreparably harmed on and after January 1, 1991 by losing his rights to workers' compensation benefit coverage under the old workers' compensation law; by not having similar rights under the [new] Act; and by having no right of election except by resigning his job with Defendant Eagle Pass." (citations omitted).

Defendants assert that Garcia has failed to establish standing because he has not yet been injured. They indicate he may have a complaint regarding coverage under the Act "if and when he is injured." Because we find that as an employee working for a subscribing employer that elected to continue purchasing workers' compensation coverage after January 1, 1991, Garcia has no right to elect common law rights and remedies, he has been injured in this respect by the provisions of the Act. We hold that Garcia has standing to bring this challenge to the constitutionality of the Act.

### B. Fuller

■ John Ira Fuller was employed by General Motors in Arlington, Texas, although at the time of the hearings the plant was temporarily shut down. He is a member of the United Auto Workers union, a union affiliated with the Texas AFL–CIO. He suffers from an occupational disease to his knees caused by repetitious physical trauma. He alleged that under the terms of the Act, the period during which he must report his injury and file a claim for compensation has already elapsed, and he is ineligible to recover any benefits under the Act, even though his occupational disease will eventually disable him.

Fuller had surgery on both knees in 1983 or 1984. His doctor told him that he could no longer perform his job, but Fuller said he was refused medical retirement by General Motors and had to return to work. His medical condition will continue to be aggravated by the type of work he does. He filed a claim on the injury under the former Act and settled it in 1986. He has approximately four years of future medical benefits remaining under the settlement.

The court found that under the Act the period during which Fuller "must file a claim for compensation has already elapsed, and he will be potentially ineligible to recover any benefits when his repetitive trauma disables him." The court found that Fuller's injury will "in all likelihood disable him from performing his ordinary tasks as a worker for General Motors" and that he "probably will have no right to obtain medical benefits, disability benefits, or impairment benefits under the Act."

Defendants attack Fuller's standing by asserting that Fuller settled his injury claim

under the former Act, and that he was not employed at the time of the hearings. They argue that any claim of future injury due to the deterioration of his physical condition is hypothetical or contingent.

We find that Fuller lacks standing. While the times to file notice of his occupational disease and to file a claim for compensation have elapsed, the Act excuses untimely filings under certain circumstances. §§ 5.02–.03. Fuller's complaint is premature. It may be that if he files a claim under the Act, his tardiness will be excused under these sections and his future claim for compensation will be considered on its merits. His complaint will only become ripe if his failures to timely notify and to timely file a claim result in the denial of benefits.

### C. Rivero

■ Osvaldo S. Rivero is a resident of Val Verde County, Texas who suffered an on-the-job injury on January 2, 1991. He makes less than $8.50 per hour. His employer is a subscriber to workers' compensation insurance, and Rivero filed a compensation claim. He began receiving a weekly benefit check higher than his salary while working, and greater than his benefits would have been under the former Act.

Rivero alleged that the Act discriminates against him because of his hourly wage, the nature of his injury, his nationality, and the nature of his employment. He also alleged that the Act unreasonably denies him resort to his common law remedies and to a meaningful jury trial.

The court found that although Rivero's injury "may prove to be permanently disabling ... it is highly doubtful that, given the operation of the Impairment Guidelines under the [new] Act, that Plaintiff Rivero will receive significant benefits or ever become eligible for supplemental income benefits under the [new] Act." The court also found that "a significant number of workers, including potentially the Plaintiff Rivero, who sustain disabling injuries will have less that 15% impairment based on the *Guides* ..."

Defendants attack Rivero's standing by arguing that he is estopped from challenging the constitutionality of the Act because he has accepted benefits under that act. We agree. One cannot retain the benefits of an act while attacking the constitutionality of one or more of its important provisions. *Fahey v. Mallonee*, 332 U.S. 245, 255, 67 S.Ct. 1552, 1557, 91 L.Ed. 2030 (1947); *Walker v. Employees Retirement Sys.*, 753 S.W.2d 796, 799 (Tex.App.—Austin 1988, writ denied).

### D. Union Plaintiffs

■ We will discuss the union plaintiffs together. The Texas AFL–CIO is a voluntary association consisting of approximately 800 affiliated local unions and approximately 215,000 affiliated individual union members. It is organized to promote the rights of working people through collective bargaining and other lawful activities. Its members are employed in a wide variety of occupations including industrial, office, agricultural, and building trades. Some members are permanent employees, and some are seasonal. A large number of the affiliated union members are covered by workers' compensation insurance.

Joe D. Gunn, the Texas AFL–CIO's president, testified that one of its purposes is to serve as a voice for workers in general. The AFL–CIO has traditionally participated in lawsuits that affect workers' rights in Texas, and it also lobbies the legislature on behalf of Texas workers. The quality and character of the workers' compensation act is an issue of paramount concern to the AFL–CIO. Gunn asserted that the Act threatens to reduce substantially the legal rights and protections of the Texas AFL–CIO's employees and of members and employees represented by affiliated unions.

The court found that the AFL–CIO has standing to bring this suit on behalf of its members because its members would otherwise have standing to sue in their own right, the interests the AFL–CIO seeks to protect by this suit are germane to its purpose, and neither the claim asserted nor the relief requested require the participation of individual members in this lawsuit inasmuch as the Act threatens to deprive the AFL–CIO's membership of protections secured under the Texas constitution and threatens irreparable

harm to the workers who are represented by the AFL–CIO. The court also found that the AFL–CIO has standing to maintain this action in its capacity as an employer that is a subscriber under the former Act.

Texas Legal Services Union, Local No. 2 ("Local 2"), is a labor union whose 73 to 75 members are employed in the Texas Rural Legal Aid (TRLA) offices as attorneys, paralegals, legal secretaries, and receptionists. Local 2 is affiliated with the Texas AFL–CIO. Local 2 is organized to promote the rights of working people through collective bargaining and other lawful activities, and it negotiates collective bargaining contracts with TRLA. The current collective bargaining agreement requires TRLA to provide workers' compensation coverage for its employees and a wage continuation supplement to employees' workers' compensation payments. It brought this action on behalf of itself and on behalf of its members who are directly and immediately affected by the Act.

The trial court found that Local 2 has standing to sue on behalf of its members. The court also found that Local 2 has standing as a party to a collective bargaining contract that is impaired or potentially impaired by the Act.

Defendants argue that standing is lacking because the unions have presented no evidence that any of its members have suffered a compensable injury after the Act took effect.

This state has recognized a labor union's standing to sue on behalf of its members. In *El Paso Bldg. & Constr. Trades Council v. Texas Highway Comm'n*, 231 S.W.2d 533 (Tex.Civ.App.—Austin), *rev'd on other grounds*, 149 Tex. 457, 234 S.W.2d 857 (1950), a labor union brought suit against the Highway Commission, its individual members, and the state highway engineer seeking a declaratory judgment that the defendants' prevailing wage rate determination for El Paso County was substandard, unlawful, and void. The court held that the union, seeking to be the mouthpiece for union labor in the El Paso locality, had a sufficient interest in the subject matter to enable it to institute and maintain the proceedings. *Id.* at 536.

In *Texas State AFL–CIO v. Brown*, 378 S.W.2d 917 (Tex.Civ.App.—Austin 1964, writ ref'd n.r.e.), the union complained that the employers' representative on the Texas Employment Commission used his official position to secure and to attempt to secure passage of amendments to the Texas Unemployment Compensation Act detrimental to the interests of working men and women who are or might become claimants for benefits under the act. The union brought an action for declaratory judgment as an employer covered by the Unemployment Compensation Act, and as a " 'mouthpiece' of the hundreds of thousands of working men and women in the State of Texas who belong to labor organizations." *Id.* at 919. While rejecting the union's claim of standing as an employer, *Id.* at 921, the court did assume jurisdiction to rule on the issues presented by the union. *Id.* at 922. *See also International Union, UAW v. Johnson Controls, Inc.*, 813 S.W.2d 558 (Tex.App.—Dallas 1991, writ denied) (employee and his union, on behalf of other employees similarly situated, challenged an employer's practice as violative of the workers' compensation act; union's standing was not questioned).

■ Even in the absence of injury to itself, an association may have standing solely as the representative of its members. Our supreme court in *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (1993) has recently adopted the test for associational standing set out by the Supreme Court in *International Union, UAW v. Brock*, 477 U.S. 274, 281, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (1986); and *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

[A]n association has standing to bring suit on behalf of its members when:

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Brock*, 477 U.S. at 282, 106 S.Ct. at 2523; *Hunt*, 432 U.S. at 343, 97 S.Ct. at 244.

These are the precise findings made by the trial court in this case.

 As part of the first prong of the three-prong test set out in *Brock* and *Hunt,* the association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the kind that would make a justiciable case if the members had brought suit in their own right. *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211–12. *See also Schweiker v. Gray Panthers,* 453 U.S. 34, 40 n. 8, 101 S.Ct. 2633, 2638 n. 8, 69 L.Ed.2d 460 (1981) (organization dedicated to helping elderly had standing to challenge Medicaid regulations that "adversely affected" some of its members). A substantial risk of injury is sufficient. *Texas Ass'n of Business,* 852 S.W.2d at 447. *See also Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (association of landlords had standing based on pleadings that members would likely be harmed by rent ordinance). The Supreme Court noted in *Pennell* that "[t]he likelihood of enforcement [of the ordinance], with the concomitant probability that a landlord's rent will be reduced below what he or she would otherwise be able to obtain in the absence of the Ordinance, is a sufficient threat of actual injury to satisfy Art. III's requirement that '[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.' " *Id.* at 8, 108 S.Ct. at 855 (quoting *Babbitt v. Farm Workers,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979)).

Likewise, it is not speculative to conclude that the Act will be enforced against the members of the associated unions of the AFL–CIO and of Local 2. If the Act is unconstitutional in the respects urged by the unions, its application to union workers by the state defendants will surely injure them by the reduction of the amount of their benefits, the denial of their right to a jury trial, and so on. We are not dealing with a hypothetical act. It is not an act under contemplation that may or may not be enacted in the future by the Legislature.[3] It is in effect. It applies to the members of Local 2 and to many of the workers represented by the AFL–CIO and its affiliated unions. Despite the fact that the union plaintiffs have not named a union worker who has filed a claim under the Act, we conclude that there is a sufficient threat of actual injury to the unions' membership to satisfy the justiciable issue requirement. *Texas Ass'n of Business,* 852 S.W.2d at 447 (some of association's members had been assessed the administrative penalties the association challenges, and other members remain at a substantial risk of penalty). An injury shared by a large number of people is nonetheless an injury. *See Center for Auto Safety v. National Highway Traffic Safety Admin.,* 793 F.2d 1322, 1331 (D.C.Cir.1986).

 It is undisputed that the unions satisfy the second and third prongs of the *Hunt* and *Brock* test. The unions are seeking to protect their members' interests in the quality and character of the workers' compensation act. They alleged that the Act threatens to reduce substantially the legal rights and protections of their members. These interests are germane to the unions' purposes, which include promoting the rights of workers. In addition, there is no reason to require individual members of the unions to participate in this case. Individual participation is required when there are conflicts of interest within the organization, when there is need for specific factual information to illuminate the basis for the decision, or when there are damage determinations to be made. 13 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3531.9 (1984). "If in the proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441 (quoting *Warth,* 422 U.S. at 515, 95 S.Ct. at 2213).

---

**3.** *See Coalson v. City Council of Victoria,* 610 S.W.2d 744, 747 (Tex.1980) (declaratory judgment suit to determine constitutionality of proposed charter amendment was premature since the amendment might be defeated at the election; if it passed, then declaratory judgment would be proper).

Because we hold that the unions have standing to bring suit on behalf of their members, we need not decide whether they also have standing to bring suit on their own behalves.

Garcia, the AFL–CIO,[4] and Local 2 have standing to bring this action.

## II. SOVEREIGN IMMUNITY

■ We turn now from the parties plaintiff to the parties defendant—to the question of sovereign immunity. The Commission and Chapman, the state defendants, complain that the doctrine of sovereign immunity bars this proceeding against them as postured by plaintiffs.

The original basis for the doctrine of sovereign immunity was that the sovereign could not be sued in its own courts without its consent. "The rule is founded undoubtedly upon the old Anglo Saxon maxim, 'The King can do no wrong,' a phrase as false in many cases as it is ancient." *Buchanan v. State,* 89 S.W.2d 239, 239–40 (Tex.Civ.App.—Amarillo 1935, writ ref'd). This principle was recognized in Texas as early as 1847. *Hosner v. DeYoung,* 1 Tex. 764, 769 (1847).

> Because "the King can do no wrong," any "wrongdoing" must be the act of the King's agents. Since the King never authorized his agents to act "wrongfully," a suit to control such activities is not considered "against" the sovereign itself. This applies to the enforcement of unconstitutional law and acting outside of lawful authority.

Smith, *Suits Against the State—Differences Between Immunity Against Suit and Immunity From Liability,* in STATE BAR OF TEXAS, SUING AND DEFENDING GOVERNMENTAL ENTITIES AND OFFICIALS U–3 (July, 1991) (parentheses omitted).

■ Thus it is well settled that one whose rights have been violated by the unlawful action of a state official may bring a suit to remedy or prevent the violation, and that that suit is not a suit against the state requiring legislative or statutory authorization. *Director of the Dep't of Agric. & Env't v. Printing Indus. Ass'n,* 600 S.W.2d 264, 265–66 (Tex.1980); *Cobb,* 190 S.W.2d at 712. *See also Bullock v. Marathon Oil Co.,* 798 S.W.2d 353, 361 (Tex.App.—Austin 1990, no writ) (suit challenging an agency's action as being outside the scope of its authority is not suit against the state requiring legislative or statutory authority). Accordingly, a suit seeking a declaratory judgment that the state's agents are acting pursuant to an unconstitutional law is not an action against the state within the rule of sovereign immunity, *Bullock v. Texas Skating Ass'n,* 583 S.W.2d 888, 895 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.); *Majestic Indus., Inc. v. St. Clair,* 537 S.W.2d 297, 300 (Tex.Civ.App.—Austin 1976, writ ref'd n.r.e.), even though the judgment is binding on the state, *American Fed'n of Labor v. Mann,* 188 S.W.2d 276, 279–80 (Tex.Civ.App.—Austin 1945, no writ).

The Commission and Chapman argue that even if the activities complained of are unauthorized (such as, the enforcement of an unconstitutional law), according to *Director* the suit may be brought only against the workers' compensation commissioners individually, who were not made parties to this suit. Significantly, in *Director* suit was brought against the director of the Department of Agriculture and Environment and others to enjoin that department "and other State

---

4. The defendants point out that the AFL–CIO is an association of local labor unions, not workers. They argue that to recognize the associational standing of the AFL–CIO requires us to "reach down through two layers of association to find live individuals who may or may not someday have claims compensable under the new act." This is a non-issue. We have already seen how the AFL–CIO has been recognized as having standing in this state to bring suit on behalf of its members. Further, as we have also seen, some of the purposes of the AFL–CIO are to serve as a voice for workers, to lobby for legislation favorable to workers (and against legislation it considers detrimental to workers), and to participate in lawsuits affecting workers' rights. It is fallacious to suggest that the AFL–CIO is somehow insulated from the concerns and needs of working men and women, or that it does not represent them merely because it is an association of local labor unions rather than of individual workers. Even if the concerns of the AFL–CIO were limited strictly to the best interests of its associated local unions, which we do not find, defendants do not argue that the local unions do not represent the interests of their member workers. By advancing the interests of the local unions, the AFL–CIO thereby advances the concerns of the locals' members.

agencies...." *Director*, 600 S.W.2d at 265. No question was raised as to proper defendants. In the present case, plaintiffs brought their suit against the Commission and its executive director.

The state defendants cite *Bagg v. University of Texas Medical Branch*, 726 S.W.2d 582 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). That case holds only that when one seeks injunctive relief involving the activity of a state agency, the plaintiff must sue some individual in authority at the agency rather than the agency itself. *Id.* at 584–85. Yet even *Bagg* states that traditionally, the individuals in authority sued include the directors of the agencies. *Id.* at 585 n. 2.

The state defendants have cited to us no authority, and we know of none, that states that only commission members, and not the commission's executive director or the commission itself, must be sued in a declaratory judgment action seeking to establish the unconstitutionality of a state law. In fact, the authority is to the contrary. An example is *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391 (Tex.1989), in which the supreme court affirmed a trial court's declaratory judgment that the public school financing system violates the Texas constitution. The defendants in that suit were the Commissioner of Education, the State Board of Education, other state officials, and a number of school districts. *Kirby v. Edgewood Indep. Sch. Dist.*, 761 S.W.2d 859, 860 n. 1 (Tex. App.—Austin 1988), *rev'd*, 777 S.W.2d 391 (Tex.1989). While it may make practical sense to bring an injunction suit against specific individuals, the same practicality *does* not compel the conclusion that an agency may not be a party to a declaratory judgment suit challenging the constitutionality of the law the agency enforces.

We conclude that the doctrine of sovereign immunity does not bar this suit against the state defendants.

### III. TEXAS CONSTITUTION

Plaintiffs contend that several features of the Act violate the open courts, due course of law, equal protection, right to jury trial, and impairment of contracts provisions of the Texas Constitution. We will examine the first three of these provisions in order to set out the tests for their violation. In section IV of the opinion, we will then spend some time addressing the specifics of the challenged portions of the Act. In section V we will apply the tests we have articulated for violations of the open courts, due course of law, and equal protection provisions of our constitution to the challenged provisions of the Act to determine whether the Act passes constitutional muster. We will follow that with a discussion of whether the Act has violated the right to trial by jury and the *impairment of contracts* provision of the Texas Constitution. Closely connected with the jury trial discussion will be an examination of the Act's provisions relating to attorney involvement and fees. We will also discuss plaintiffs' cross points—that the Act provides an unconstitutional hybrid method of judicial review, and that it discriminates against low wage and seasonal workers. We will then consider the Act's severability clause in section VI, and finally, in section VII, we will address the intervenors' points that certain evidence was erroneously excluded and that leave to file a pleading was erroneously denied.

### A. Constitutional Construction

 In assessing the constitutionality of a statute, a strong presumption exists in favor of the statute's validity. *Vinson v. Burgess*, 773 S.W.2d 263, 266 (Tex.1989). It is presumed that the legislature has not acted unreasonably or arbitrarily. *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex.1968). The wisdom and expediency of the law is the legislature's prerogative, not ours. *Id.* A party challenging the constitutionality of a statute has the burden of proof to establish its invalidity. *Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556, 558 (Tex. 1985), *appeal dism'd*, 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986).

 Plaintiffs urge us to grant the trial court's findings of fact and conclusions of law the same level of deference as any finding by the trier of fact. We decline to do so. In reviewing the constitutionality of a legislative act, we are not bound by the findings of the

trial court except when they include an evaluation of the credibility of the witnesses. *Retail Merchants Ass'n v. Handy Dan Hardware, Inc.*, 696 S.W.2d 44, 54–55 (Tex.App.—Houston [1st Dist.] 1985, no writ). We must independently review all the evidence. *Id.* at 55.

When reviewing the provisions of our Bill of Rights, the admonition of its final section should be borne in mind:

> To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.

TEX.CONST. art. I, § 29.

## B. Open Courts

■ The Texas Constitution contains two separate due process provisions, which, although they both guarantee due process, are not coterminous. *Nelson v. Krusen*, 678 S.W.2d 918, 921 (Tex.1984). Article I, section 19, states: "No citizen of this state shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Article I, section 13 provides, in part: "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." This last provision, known as the open courts provision, is a due process guarantee. *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex.1983). It specifically guarantees that the courts will be open so that individuals may seek a remedy according to due course of law. 1 G. BRADEN, THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 50 (1977). There is no comparable federal constitutional provision. The open courts guarantee is "embodied in the Magna Carta and has been a part of our constitutional law since our republic." *Lucas v. United States*, 757 S.W.2d 687, 690 (Tex. 1988).

■ In order to establish an open courts violation, the litigant must show that the statute restricts a cognizable common law cause of action and that this restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute. *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 355 (Tex.1990); *Lucas*, 757 S.W.2d at 690; *Sax*, 648 S.W.2d at 666. The legislature has the power to abolish or abridge common law actions, but it must also provide an "adequate substitute" or "reasonable alternative." *Sax*, 648 S.W.2d at 667. *Accord Moreno*, 787 S.W.2d at 355; *Lucas*, 757 S.W.2d at 690. This substitute is an individualized equivalent rather than a general or societal quid pro quo. *Lucas*, 757 S.W.2d at 690. "When individual rights guaranteed by the state constitution are involved, an individual rights perspective is used." *LeCroy v. Hanlon*, 713 S.W.2d 335, 342 (Tex.1986).

## C. Due Course of Law

■ Section 19, quoted above, is the traditional due process guarantee. It roughly parallels the due process clauses of the fifth and fourteenth amendments to the United States Constitution. *Sax*, 648 S.W.2d at 661; 1 G. BRADEN, *supra* at 68. It includes both procedural and substantive protection. TEX. CONST. art. I, § 19, interpretative commentary. It differs from the fourteenth amendment in two important respects. First, it grants affirmative rights directly to the people. Second, it expands due process protection beyond "life, liberty, or property" to protect privileges, immunities, and any other manner in which citizens may be disenfranchised. Every Texas bill of rights has had a due course of law provision. 1 G. BRADEN, *supra* at 67.

The Supreme Court has recognized that section 19 may afford significantly broader protection than the federal constitution. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152 (1982). In that decision the Supreme Court also pointed out that states are free to read their own constitutions more broadly than they read the federal constitution and to reject its analysis in favor of their own analyses of corresponding constitutional guarantees. *Id.*

The federal courts apply a rational relationship test when fundamental rights or interests are not affected. In such a case, a statute will be upheld if it bears a rational relationship to a legitimate state interest. *See Moore v. City of East Cleveland*, 431 U.S. 494, 499–500, 97 S.Ct. 1932, 1935–36, 52 L.Ed.2d 531 (1977). In contrast to the federal constitution, substantive due process remains a vital doctrine under the Texas constitution. *See Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140–41 (Tex.1977). Our supreme court has fashioned a test for the application of section 19 more rigorous than the federal rational basis test.

> The line where the police power of the state encounters the barrier of substantive due process is not susceptible of exact definition. As a general rule the power is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort and convenience as consistently as may be with private property rights. The guarantee of due process does not deprive the state of the right to take private property by the exercise of such power in a proper and lawful manner, *but it is essential that the power be used for the purpose of accomplishing, and in a manner appropriate to the accomplishment of, the purposes for which it exists.* A large discretion is necessarily vested in the Legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests. *If there is room for a fair difference of opinion as to the necessity and reasonableness of a legislative enactment on a subject which lies within the domain of the police power, the courts will not hold it void.*

*State v. Richards*, 157 Tex. 166, 301 S.W.2d 597, 602 (1957) (emphasis added) (citations omitted).

■ The test we apply today is a distillation of the *Richards* test and the tests used in other Texas cases involving section 19. (1) The object of the law must be within the scope of the legislature's police power; (2) the means used must be appropriate and reasonably necessary to accomplish that object; and (3) the law must not operate in an arbitrary or unjust manner, or be unduly harsh in proportion to the end sought. *See Thompson v. Calvert*, 489 S.W.2d 95, 99 (Tex. 1972); *Wylie v. Hays*, 114 Tex. 46, 263 S.W. 563, 565 (1924); *City of Houston v. Johnny Frank's Auto Parts Co.*, 480 S.W.2d 774, 779 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.); *Humble Oil & Ref. Co. v. City of Georgetown*, 428 S.W.2d 405, 413 (Tex.Civ.App.—Austin 1968, no writ); *City of Coleman v. Rhone*, 222 S.W.2d 646, 649 (Tex. Civ.App.—Eastland 1949, writ ref'd). The critical factor in the second and third prongs is reasonableness. *Richards*, 301 S.W.2d at 602; *Humble Oil*, 428 S.W.2d at 413; *Rhone*, 222 S.W.2d at 649.

## D. Equal Protection

The equal protection clause of the Texas Constitution provides: "All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." TEX.CONST. art. I, § 3. This clause should be read in conjunction with the equal rights amendment, which provides: "Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. This amendment is self-operative." TEX.CONST. art. I, § 3a.

■ The test for a section 3 equal protection violation is set out in *Whitworth v. Bynum*, 699 S.W.2d 194, 197 (Tex.1985). The supreme court, relying on *Sullivan v. University Interscholastic League*, 616 S.W.2d 170, 172 (Tex.1981), held that the purpose of the statute must be related to a legitimate state interest and the classifications drawn by the statute must be rationally related to the statute's purpose. Similarly situated individuals must be treated equally under the statutory classification unless there is a rational basis for not doing so. *Whitworth*, 699 S.W.2d at 197. The statute must not be overbroad or overinclusive, or create unreasonable and irrebuttable presumptions. *Id.*[5]

---

**5.** There is some debate over whether Texas has

fashioned a stricter test for section 3 than the

## IV. Discussion of the Act

The trial court found that several portions of the Act violated one or more of the constitutional provisions just discussed. It is appropriate at this point to discuss the provisions of the Act called into question. We will not attempt to discuss every particular of the Act. Rather, we will confine our discussion to the two areas in which major changes have occurred and in which the challenged provisions are located: the benefits and adjudication systems.

### A. Benefits System

The Act brings dramatic changes to the system of benefits, creating a multi-tiered scheme of benefits that follow one after the other.

### 1. Temporary Income Benefits

The first tier is designated "temporary income benefits," which accrue eight days after disability begins until the worker achieves "maximum medical improvement." § 4.23. Maximum medical improvement is "the point after which further material recovery from or lasting improvement to an injury can no longer reasonably be anticipated, based on reasonable medical probability" or the expiration of 104 weeks from the date income benefits begin to accrue, whichever occurs first. § 1.03(32). "Disability" is defined as "the inability to obtain and retain employment at wages equivalent to the pre-injury wage because of a compensable injury." § 1.03(16). The Act presumes that every worker has reached maximum medical improvement by the end of the 104th week. The 104-week period for temporary income benefits is the shortest in the nation.

Temporary income benefits are 70 percent of the difference between the worker's average weekly wage before the injury and the worker's weekly earnings after injury, within the limits of the maximum and minimum weekly benefits. The minimum weekly benefit for all tiers is 15 percent of the state average weekly wage. The maximum weekly benefit for temporary income benefits is 100 percent of the state average weekly wage. These benefits are paid weekly and are similar to the former Act's temporary disability payments.

For workers earning less than $8.50 per hour, temporary income benefits are 75 percent of the difference for the first 26 weeks, and 70 percent thereafter, with the limit that the weekly temporary income benefits cannot be more than 100 percent of the worker's actual earnings for a year divided by 52.

If there is a dispute about whether the worker has achieved maximum medical improvement, the worker must be seen by a "designated doctor." The designated doctor is picked by agreement of the parties or, if they do not agree, by the Texas Workers' Compensation Commission. The report of the designated doctor has "presumptive weight." The commission must base its ruling on this report "unless the great weight of the other medical evidence is to the contrary." § 4.25.

### 2. Impairment Income Benefits

The next two tiers, impairment income benefits (§ 4.26) and supplemental income benefits (§ 4.28), are designed for longer term impairments. Recovery of benefits in the second two tiers is based solely on the percentage impairment ratings found in the

federal "rational basis" test. *Cf. Lucas*, 757 S.W.2d at 707 (Phillips, C.J., dissenting) *with* Harrington, *The Texas Bill of Rights and Civil Liberties*, 17 Texas Tech L.Rev. 1487, 1519 (1986). *Whitworth* emphasized its reliance on *Sullivan*. *Whitworth*, 699 S.W.2d at 197, and n. 5. *Sullivan*, decided under the fourteenth amendment, purported to apply the minimal scrutiny rational basis test. It struck down a rule barring an underclass transfer student from participating in varsity sports for one year because its irrebuttable classifications made it overbroad. *Sullivan*, 616 S.W.2d at 173. As Chief Justice Phillips pointed out, the " 'strict equal protection analy-

sis' of *Sullivan* is reminiscent of intermediate scrutiny." *Lucas*, 757 S.W.2d at 707, n. 5 (Phillips, C.J., dissenting) (citation omitted). The *Whitworth* court, while noting that *Sullivan* was decided under the fourteenth amendment, said *Sullivan* "articulate[s] factors that are important to interpreting art. I, § 3, which is the constitutional basis for this opinion." *Whitworth*, 699 S.W.2d at 197 n. 5. We believe that the *Whitworth* test is stricter than the minimal scrutiny rational basis test because it is intolerant of overbroad and overinclusive legislation and irrebuttable presumptions. *See Whitworth*, 699 S.W.2d at 197; *Sullivan*, 616 S.W.2d at 173.

"second printing, dated February, 1989, of the Guides to the Evaluation of Permanent Impairment, third edition, published by the American Medical Association...." ("the *Guides*"). § 4.24. "All determinations of impairment under this Act, whether before the commission or in court, must be made in accordance with the above-named guide." *Id.*

Impairment income benefits begin if the worker has impairment after achieving maximum medical improvement. They continue until the earlier of the expiration of 401 weeks from the date of injury, the end of a period computed at the rate of three weeks for each percentage point of impairment (thus, a worker with a 100 percent impairment would receive 300 weeks of impairment income benefits), or the worker's death. § 4.26(c). Impairment benefits are paid weekly at a rate of 70 percent of the worker's average weekly wage, subject to a maximum of 70 percent of the state average weekly wage. § 4.26(b).

If the impairment rating is disputed, the worker must be seen by a "designated doctor." A designated doctor is one chosen by agreement of the parties or, if they cannot agree, by the commission. If the designated doctor is one chosen by the parties, the commission must adopt the impairment rating found by this doctor. On the other hand, if the doctor is chosen by the commission, the doctor's report has "presumptive weight." The commission's ruling must be based on the designated doctor's report "unless the great weight of the other medical evidence is to the contrary, in which case the commission shall adopt the impairment rating of one of the other doctors." § 4.26(g).

The worker can get the impairment income benefits in a lump sum if the worker has returned to work for at least three months, and is earning at least 80 percent of the worker's average weekly wage. No other benefits under the Act can be paid in a lump sum. A worker accepting lump-sum benefits cannot get supplemental income benefits.

### 3. Supplemental Income Benefits

Supplemental income benefits are payable to an eligible worker who is no longer eligible for impairment income benefits and can continue until 401 weeks from the date of injury. With the exception of lifetime benefits, which will be discussed below, supplemental income benefits are the only long-term benefits provided by the Act. However, workers who received the maximum duration of temporary benefits (104 weeks) and the maximum duration of impairment income benefits (300 weeks), would not be entitled to supplemental income benefits. § 4.29. The 401-week maximum duration of benefits provided by the Act is the shortest in the nation.

To qualify for supplemental income benefits, the worker must meet four criteria: (1) the worker's impairment rating from the *Guides* must be 15 percent or more; (2) the worker must not have returned to work or is earning less than 80 percent of the worker's average weekly wage "as a direct result of the impairment;" (3) the worker has not received a lump sum from the impairment income benefits; and (4) the worker has "in good faith attempted to obtain employment commensurate with the employee's ability to work." § 4.28(b). If the worker is not entitled to supplemental benefits for 12 consecutive months, the worker ceases to be entitled to any additional income benefits for the injury. § 4.28(f).

Supplemental income benefits are 80 percent of the difference between 80 percent of the worker's average weekly wage and current earnings, subject to the same maximum and minimum as impairment income benefits. § 4.28(n). Entitlement must be established quarterly by a statement filed by the worker with the insurance carrier. § 4.28(k). Failure to file the statement relieves the carrier of liability for supplemental income benefits for the period during which a statement is not filed. *Id.*

### 4. Lifetime Income Benefits and Death Benefits

The last two tiers of benefits are "lifetime income benefits" (§ 4.31) and "death benefits" (§ 4.41). Lifetime benefits are 75 percent of the worker's average weekly wage, not to exceed the maximum weekly benefit limit of 100 percent of the state average

weekly wage, except that benefits increase three percent per year regardless of the limit. Lifetime income benefits are paid until the worker's death for loss of both eyes; both feet; both hands; a foot and a hand; a spinal injury causing paralysis of both arms, both legs, or an arm and a leg; or a skull injury "resulting in incurable insanity or imbecility."

Death benefits are paid at the rate of 75 percent of the worker's average weekly wage, subject to the maximum weekly benefits limit of 100 percent of the state average weekly wage. They are paid to the legal beneficiaries of a worker who dies from a compensable injury. The duration of death benefits is controlled by section 4.43.

### B. Adjudication System

The Act also makes significant changes in the adjudication system. The former Act's informal administrative system with trial de novo in the courts has been replaced with a more formal and elaborate system with limited judicial review. The goal, clearly, is to resolve conflicts at the administrative level.

### 1. Ombudsman Program. §§ 5.41–.42.

The Act creates an ombudsman program to assist injured workers and persons claiming death benefits in obtaining benefits. The ombudsmen are employees of the commission. The ombudsmen's duties are set out in section 5.41(b):

> Ombudsmen shall meet with or otherwise provide information to injured workers, investigate complaints, and communicate with employers, insurance carriers, and health care providers on behalf of injured workers. An ombudsman shall otherwise assist unrepresented claimants, employers, and other parties to enable them to protect their rights in the workers' compensation system. At least one specially qualified employee in each office shall be designated an ombudsman, and duties under this chapter shall be that person's primary responsibility.

### 2. Benefit Review Conference. §§ 6.11–.15.

The first step in the dispute resolution process is the benefit review conference, described by the Act as a "nonadversarial, informal dispute resolution proceeding." § 6.11. It is presided over by a benefit review officer, an employee of the commission. The review officer tries to settle disputes, informs the parties of their rights, and ensures that the commission's file contains all medical, wage, and other pertinent information. No formal testimony is taken or recorded, and the conference is not subject to the rules of evidence or procedure. Normally, unless a benefit review conference is held, the parties may not proceed to other administrative hearings.

Any issues not raised at the benefit review conference are waived and cannot be presented in subsequent proceedings, both before the commission and the courts, unless the commission determines good cause exists for not raising them or the parties agree that they may be raised. § 6.31(a). Further, issues presented at a previous stage may be waived if not presented at each subsequent stage. §§ 6.42(a)(1), 6.62(b).

If the case is not settled, the review officer prepares a written report of all disputed issues with the officer's recommendations. The review officer has the power to issue an interlocutory order to pay or not to pay benefits. § 6.15(e). The insurance carrier is to be reimbursed from the subsequent injury fund for any overpayments made pursuant to this order. *Id.* If no agreement has been reached, the parties can either go to arbitration or to a contested case hearing, but not to both. § 6.21(a).

### 3. Arbitration. §§ 6.21–.28.

The parties may agree to go to arbitration. Arbitrators are also employees of the commission who must meet state and federal qualifications. Arbitrators are randomly assigned. Each party may reject one arbitrator. Arbitration is held within 30 days of the arbitrator's assignment. Testimony is under oath if required by the arbitrator or requested by a party. An electronic recording of the hearing must be made, and stenographic

recording is permitted at the expense of the party requesting it. The arbitrator is the judge of the relevance and materiality of the evidence offered, but conformity to the rules of evidence is not required.

The arbitrator must enter his or her award within seven days after the last day of the arbitration. The award is a final order of the commission and binding on all parties. An arbitrator's award can only be vacated if it was procured by corruption, fraud, or misrepresentation; it was arbitrary and capricious; or it was outside the commission's jurisdiction. The suit to vacate the award must be filed in a court of competent jurisdiction within 30 days of the award or within 30 days of the date the appealing party knew or should have known of a basis for suit, but not later than 12 months after an order denying compensation or after the expiration of the income or death benefit period. If an award is vacated, the case is sent back to the commission for another arbitration proceeding.

### 4. Contested Case Hearing. §§ 6.31–.34.

If arbitration is not elected, the parties are entitled to a contested case hearing. The hearing is an administrative trial of the disputed issues in the case. Issues not raised at the benefit review conference may not be considered in a contested case hearing unless the parties consent or the commission finds good cause for failure to raise the issues earlier.

When a benefit review conference is scheduled, a contested case hearing is automatically set within 60 days of the conference. § 6.12(b). At the hearing, an electronic recording is made, and a stenographic recording may be made at the requesting party's expense. The hearing officer presides, swears witnesses, controls the admission of evidence, and is the finder of fact. The officer is the sole judge of the relevance and materiality of the evidence, and of the weight and credibility to be given the evidence. Rules of evidence need not be followed.

Discovery is limited to depositions on written questions to any health care provider, depositions of other witnesses as permitted by the hearing officer for good cause shown, and form interrogatories prescribed by the commission. Prior to the hearing the parties shall exchange all medical reports, testifying expert witness reports, medical records, witness statements, the identity and location of any witness known to the parties to have knowledge of relevant facts, and all photographs and documentary evidence that a party intends to offer into evidence. Failure to disclose any evidence known to a party precludes its introduction at a subsequent hearing before the commission or a court unless good cause is shown for the failure to disclose.

After the hearing, the hearing officer must issue a written decision that includes findings of fact and conclusions of law, a determination whether benefits are due, and an award of benefits due. The hearing officer shall make a separate, written decision on attorney's fees. The officer's decision is final unless appealed to an appeals panel. If appealed, the decision is binding pending appeal.

### 5. Appeals Panel. §§ 6.41–.45.

The purpose of the appeals panel is to review the decisions of contested case hearing officers. A party desiring to appeal the hearing officer's decision must file a written appeal with the appeals panel within 15 days of the receipt of the decision. The other party has 15 days to file a written response. The request for appeal and response are in the nature of written briefs that either rebut or support the hearing officer's decision.

The appeals panel shall consider only the record developed at the contested case hearing, and the briefs. The panel's decision must be in writing and issued not later than 30 days after the written response is filed. The decision may affirm the hearing officer's decision, reverse that decision and render a new one, or reverse that decision and remand no more than one time to the hearing officer for further consideration and development of the evidence. The decision is final in the absence of a timely appeal for judicial review.

### 6. Judicial Review. §§ 6.61–.64.

A party that has exhausted all administrative remedies may seek judicial review of the

appeals panel decision by filing suit within 40 days of that decision. Trial is limited to the issues of compensability or eligibility for or the amount of income or death benefits. It is further limited to issues decided by the appeals panel and on which judicial review is sought. The party appealing a particular issue, rather than the claimant as in the former law, has the burden of proof by a preponderance of the evidence on that issue. In contrast with the former Act, the court must tell the jury the decision of the appeals panel on all disputed issues submitted to the jury, and in a trial without a jury, the court must consider the decision of the appeals panel.

Evidence of the extent of impairment is limited to the evidence presented to the commission, and the jury must adopt one of the impairment ratings made according to section 4.26. § 6.62(d). The only exception to this rule is when the court, after a hearing, finds a substantial change of the worker's condition has occurred since the commission proceedings. § 6.62(e). Evidence of a substantial change of condition must be from the same doctors who appeared before the commission, it must be new evidence or evidence that could not have been discovered earlier with due diligence, and it must be evidence that would probably produce a different result. *Id.* If substantial change of condition is disputed, the designated doctor must verify the change, and again his or her findings are presumed to be correct "unless the preponderance of the other medical evidence [which must come from only the doctors who appeared before the commission] is to the contrary." § 6.62(f). If, after review of this evidence, the court finds a substantial change of condition, new medical evidence of the extent of impairment is taken. § 6.62(h). This evidence must be from and is limited to the same doctor or doctors who made impairment ratings before the commission. *Id.*

The court's finding of substantial change in condition may not be disclosed to the jury. § 6.62(i). The fact finder, in its determination of the extent of impairment, must adopt one of the new impairment ratings given by the doctors after the finding of a substantial change of condition. § 6.62(j).

Judicial review of issues other than compensability or eligibility for or the amount of income or death benefits is governed by the substantial evidence rule, and is conducted in the manner provided for judicial review of a contested case under section 19 of the Administrative Procedure and Texas Register Act.[6]

## 7. Attorney's Fees. §§ 4.09–.091.

Attorney's fees must be approved by the commission or a court. They are based on the attorney's time and expenses as presented by written evidence to the commission or court. The fee is subject to a maximum of 25 percent of the worker's recovery. The commission or court must consider the following factors in approving an attorney's fee: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly; (2) the fee customarily charged in the locality for similar legal services; (3) the amount involved in the controversy; (4) the benefits to the claimant that the attorney is responsible for securing; and (5) the experience and ability of the attorney performing the services.

Defense counsel must also have their fees approved by the commission or the court. The same factors that apply to workers' lawyers apply to defense lawyers.

## V. CONSTITUTIONALITY OF THE ACT

We now apply the constitutional standards previously discussed to the challenged provisions of the Act.

### A. A.M.A. *Guides*

The trial court found that the Act's use of the *Guides* as a basis for awarding compensation was unconstitutional in at least five respects: (1) the *Guides* do not include percentage impairment ratings for many disabling injuries, including mental trauma and chronic pain syndrome, which disable thousands of workers annually, thereby depriving those workers of a remedy for their injuries;

6. TEX.REV.CIV.STAT.ANN. art. 6252–13a (Vernon Supp.1992).

(2) the legislature's use of the *Guides* to determine benefits when they were never intended for such purpose is unreasonable and arbitrary and not reasonably related to any individual or societal interest of the State; (3) the *Guides* are used to determine the extent of a worker's medical impairment, which has no relevance to that worker's ability to obtain and retain employment—in other words, workers can be significantly compromised in their abilities to function in the labor force but have minimal or nonexistent impairment ratings, thus depriving them of their right to compensation as compared to past law and the common law; (4) the impairment ratings used in the *Guides* have no adequate medical or scientific basis; and (5) "because of the method of evaluation of average weekly wage, and the use of the *Guides*, the Act will effectively reduce benefits for the majority of Texas Workers."

The court found that the Act's utilization of the *Guides* violates the open courts, due course of law, equal protection, and right to jury trial provisions of the Texas Constitution. Jury trial in relation to the *Guides* will be discussed in subsection "E" below.

The *Guides* are 250 pages of complicated and technical medical material. They were designed to be used by doctors and trained medical personnel. They define impairments to the following bodily systems: extremities; spine and pelvis; nervous system; respiratory system; cardiovascular system; hematopoietic system; visual system; ear, nose, throat, and related structures; digestive system; urinary and reproductive systems; endocrine system; skin; and mental and behavioral disorders. At the time the Act took effect, the edition of the *Guides* it specified was no longer in print and had been superseded by a subsequent edition.[7]

Doctors Alan L. Engleberg and George Smith, two editors of the *Guides*, testified at trial. Dr. Engleberg, the chief editor, testified that the Act is unreasonable and arbitrary in the way it utilizes the *Guides*, that it does not use the *Guides* fairly, that it was irrational to base a benefit system on the impairment numbers generated by the *Guides*, and that the use of the *Guides* mandated by the Act abuses the physician's role in the process of making disability evaluations.

Dr. Smith also testified that the Act utilizes the *Guides* in an arbitrary manner. He testified that the *Guides* "state very specifically that the impairment rating number is not to be put into a one-to-one correspondence with disability or any other concept under which money is to be paid." The Act uses the impairment rating from the *Guides* as a percentage factor in computing the amount to be paid, a method specifically disapproved by the *Guides*.

Other medical expert testimony echoed those views. Dr. Nortin Marvin Hadler of the University of North Carolina School of Medicine testified that the impairment rating produced by the *Guides* is not relevant to disability, is unreliable, and is an inadequate measure of the concept of injury. Dr. John Gunn, Fuller's physician and former orthopedic surgeon for the Dallas Cowboys, testified that the *Guides* do not consider any of the changes that have occurred in the treatment of injuries of the lower extremities since 1958. He testified that the *Guides* could not be used to obtain a true measure of impairment.

Defendants argue that the open courts provision has not been violated because no common law right has been restricted. They assert that all plaintiffs had coverage under the former Act and therefore have waived their common law rights. They contend that the Act replaced the former statutory workers' compensation scheme, rather than a cognizable common law remedy and, therefore, is not subject to an open courts challenge. Both *Moreno*, 787 S.W.2d at 357, and *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 845 (Tex.1990) held that the open courts provision does not apply to statutory claims.

7. In fact, the *Guides* are continually evolving. For instance, ratings for hernias and anatomic diagnoses of the knees, which are not present in the statutorily-mandated third edition of the *Guides*, have been added in the most recent edition. Further, workers cannot seek redress for injuries such a chronic pain syndrome, mental trauma, occupational asthma, hyperextension of the knee, and crepitus of a joint solely because they are not addressed by the *Guides*.

The claim at issue in those cases was the statutorily created wrongful death action. *See* TEX.CIV.PRAC. & REM.CODE ANN. §§ 71.-001–.011 (Vernon 1986). As the *Rose* court noted, the potential negligence action would have died with the decedent had it not been preserved by the legislature in the wrongful death statute. 801 S.W.2d at 845.

In contrast, the workers' compensation law did not create a new cause of action where one had never existed at common law. Instead, it "change[d] the common law rule of liability" for accidental injuries in the workplace. *Middleton v. Texas Power & Light Co.*, 108 Tex. 96, 185 S.W. 556, 561 (1916), *aff'd*, 249 U.S. 152, 39 S.Ct. 227, 63 L.Ed. 527 (1919). Thus, it is not true to say plaintiffs never had a cognizable common law·cause of action. But for the existence of the former Act, and now the new Act, the common law negligence action would be theirs to employ. In other words, because the legislature has once restricted workers' common law negligence actions, it does not mean that they have forever disappeared. The legislature could as easily eliminate workers' compensation laws altogether, in which case injured workers would be left with their pre-existing common law remedies. Both acts restrict cognizable common law causes of action and are therefore subject to open courts scrutiny.

The second part of the open courts test is whether the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute.

> [T]he right to bring a well-established common law cause of action cannot be effectively abrogated by the legislature absent a showing that the legislative basis for the statute outweighs the denial of the constitutionally-guaranteed right of redress. In applying this test, we consider both the general purpose of the statute and the extent to which the litigant's right to redress is affected.

*Sax*, 648 S.W.2d at 665–66.

The purpose of the Act, as reflected in its own language, is "to provide adequate, equitable and timely benefits to injured workers, at a reasonable cost to employers...." § 2.51(g)(2). This purpose is reflected throughout the legislative history of the Act;

the Legislature sought to achieve the seemingly conflicting goals of increasing benefits to workers while lowering premiums for employers.

In July 1987, the 70th Legislature created the Joint Select Committee on Workers' Compensation Insurance "because the state's workers' compensation system was poorly understood and perceived to be out of control." Joint Select Committee on Workers' Compensation Insurance, A Report to the 71st Texas Legislature, December 9, 1988 at 1 (hereinafter, "Joint Select Committee Report"). Indeed, some perceived that the system was in crisis and nearing collapse.

> Large employers asserted that high workers' compensation costs impeded business growth and were a factor in management's decisions to expand operations in other states. Small employers said profit margins were reduced or eliminated, forcing many to choose between lay-offs, cessation of business operations, or cancellation of insurance policies and assumption of the attendant risks. At the same time, labor interests argued that Texas benefits were among the lowest in the nation. Thus, runaway insurance rates and a perception of high costs and low benefits were the puzzling premises underlying the creation of the Joint Select Committee.

*Id.*

The purpose of the Act, as set out in the Senate Bill Analysis is as follows:

> This bill proposes new law to reform the workers' compensation laws of Texas by restructuring the workers' compensation agency of Texas, giving the agency the ability to more adequately administer and enforce the workers' compensation laws of this state, providing a more rational and effective mechanism for adjudicating claims, providing more consistency to the decision-making process, and providing for the ongoing data collection and monitoring of the system to ensure its continued effectiveness. This reform of the workers' compensation system to provide a more understandable and reasonable mechanism for compensating injured workers is *intended to bring Texas a more fair, just,*

*and equitable workers' compensation system in terms of costs to employers and benefits to injured employees.*

Senate Bill Analysis, S.B. 1, Second Called Session, December 15, 1989 (emphasis added).

Senator Glasgow, a member of the Joint Select Committee, expressed the goals as follows:

Members, when we started this system I think it was the goal of everyone that what we wanted to do is come up with an objective standard for benefits for injured workers. To increase the benefits for injured workers. To come up with an efficient system for delivering those benefits. To have medical cost containment. To have safety and safety regulation in the workplace. To control the litigation cost and get a handle on rising rates. That's what our goals were.

Debate on Tex.S.B. 1 on the Floor of the Senate, 71st Leg., 2d C.S., Tape 5 at 18 (Nov. 20, 1989) (transcript available from Senate Staff Services Office).

Thus, the legislature sought to accomplish several goals in the new Act. Our review of the Act's extensive legislative history convinces us that the two primary goals the legislature sought to achieve were lowering the costs of the system and increasing the benefits to injured workers. The goals to make the system more efficient, consistent, rational, and objective; to contain medical and litigation costs; and to implement stronger safety regulations, are laudable and legitimate in and of themselves. It can also be fairly argued that these goals, if achieved, will help to contain costs. Whether the legislature met its goal of lowering costs remains to be seen. The legislature itself was unsure whether that goal would be met, and the record in this case is inconclusive because it is too early for any empirical data to have been collected. Our review of the Act convinces us, however, that the legislature failed to meet its second primary goal, that of increasing benefits to workers.

The objective standard mentioned by Senator Glasgow is most readily apparent in the second- and third-tier benefits. For impairment and supplemental income benefits the legislature adopted a pure impairment system in the Act. The impairment system was adopted because the legislature wanted a more objective system; one subject to less dispute and more accuracy in prediction than a wage loss system or a disability system. *Hearings on Tex.H.B. 1 Before the Legislative Oversight Committee on Workers' Compensation,* 71st Leg., 2d C.S., Tape 1, at 9 (April 19, 1989) (transcript available from Senate Staff Services Office). The legislature's purpose in adopting the *Guides* was to control the rising costs of workers' compensation insurance by the adoption of an "objective" injury-evaluation system.

There is a fundamental difference between "impairment" and "disability." The *Guides* themselves, in the first chapter, are unequivocal on this.

The accurate and proper use of medical information to assess impairment in connection with disability determinations depends on the recognition that, **whereas impairment is a medical matter, disability arises out of the interaction between impairment and external demands.** Consequently, as used in the *Guides,* "impairment" means an alteration of an individual's health status that is *assessed by medical means;* "disability," which is *assessed by nonmedical means,* means an alteration of an individual's capacity to meet personal, social, or occupational demands, or to meet statutory or regulatory requirements. **Simply stated, "impairment" is what is wrong with the health of an individual; "disability" is the gap between what the individual can do and what the individual needs or wants to do.**

**An individual who is "impaired" is not necessarily "disabled."** Impairment gives rise to disability only when the medical condition limits the individual's capacity to meet demands that pertain to nonmedical fields and activities. On the other hand, if the individual is able to meet a particular set of demands, the individual is *not* "disabled" with respect to those demands, **even though a medical evaluation may reveal impairment.**

\* \* \* \* \* \*

**The physician does not determine industrial loss of use or economic loss for the purpose of paying a disability benefit.**

*Guides,* at 1–2 (italics in original; boldface added). The footnote at the second sentence of the second quoted paragraph reads: "The commonly used example of the impact of the loss of the fifth finger of the left hand illustrates the point. If the individual is a bank president, the occupational impact is likely to be negligible. On the other hand, a concert pianist is likely to be totally disabled."

The disability/impairment distinction is critical when the historical purpose of workers' compensation statutes is examined. As described by the National Commission on State Workmen's Laws in a report utilized by the legislature, "[t]he primary purpose of these benefits is to replace some proportion of wage loss, actual or potential." The Report of the National Commission on State Workmen's Compensation Laws at 33 (1972) (hereinafter, National Commission Report). Thus, one of the Commission's five objectives for a modern workers' compensation system is that "cash benefits should be closely tied to [the disabled worker's] loss of income.... Workmen's compensation should replace a substantial proportion of the worker's lost remuneration." National Commission Report at 36–37.

The Joint Select Committee recognized this objective. "The purpose of most systems, both originally and currently, is to deal with the consequences of work-related injuries including loss of employment due to the injury." *Research Papers of the Joint Select Committee on Workers' Compensation Insurance,* Chapter 4 at 115 (Sept. 1988) (hereinafter, Research Papers). Thus the Joint Select Committee adopted as a policy objective a system that would provide "(a) temporary benefits that replace a high proportion of after-tax lost earnings, and (b) benefits for permanent disability that substantially alleviate the economic duress that occurs or may be expected to occur because of the disability." Joint Select Committee Report at 6.

As described by the Joint Select Committee, "the basic theory of workers' compensation, therefore, is that the cost of personal injuries sustained in the course of employment should be borne by the industry itself, regardless of who was at fault." Research Papers, Chapter 1 at 3. Workers' compensation is a trade-off.

Replacement of a substantial proportion [of lost income] is justified by a feature of workmen's compensation which distinguishes the program from other forms of social insurance. In exchange for the benefits of workmen's compensation, workers renounced their right to seek redress for economic damages and pain and suffering under the common law. In no other social insurance program, such as Social Security or unemployment compensation, did workers surrender any right of value in exchange for benefits.

National Commission Report at 37. This universal principle is acknowledged by our supreme court. "In providing the worker a form of prompt remuneration *for loss of earning capacity,* the statutory scheme is in lieu of common law liability based on negligence." *Paradissis v. Royal Indem. Co.,* 507 S.W.2d 526, 529 (Tex.1974) (emphasis added). *See also Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 667 (Tex.1987) ("The avowed purpose of workers' compensation is to compensate injured individuals for their loss of earning capacity. It was not designed to compensate an employee for his lost earnings *or for the injury itself.*") (citations omitted) (emphasis added).

The former Act accomplished this purpose.

This compensation, fixed by the Act on the basis of the employee's average weekly wages, accrues to him absolutely upon his suffering any personal injury in the course of his employment which incapacitates him from earning full wages ... whether or not due to the negligence of the employer.... It is the substitute intended and provided by the Act for damages ordinarily recoverable at common law or by statute on account of injuries suffered by an employee or because of his death, when due to the negligence of the employer....

*Middleton,* 185 S.W. at 558.

Thus, under workers' compensation schemes, workers have given up their com-

mon law right to sue their employers for negligence in exchange for a system that is supposed to compensate them at least partially for loss of earning capacity as the result of an industrial injury. The Act does not do this, at least in regard to impairment and supplemental income benefits. It compensates not on the basis of disability, loss of income, or loss of earning capacity, but solely on the basis of impairment, which may or may not be related to the worker's lost earning capacity or ability to obtain and retain employment.

The Joint Select Committee recognized that impairment alone was not a sufficient measure of compensation for an injured worker. It designated as "critical" its recommendation to "[c]hange the basis for permanency benefits to impairment *with a formula adjustment for age, education, and type of work.*" Joint Select Committee Report at 14 (emphasis added). An alternative to that recommendation was to change the basis to impairment *"with subsequent adjustment for actual loss of wages or lost earning capacity available for claimants whose wages remain significantly below the preinjury level for an extended time."* *Id.* (emphasis added).

These critical recommendations were not implemented in the Act. The Act takes the physician's impairment rating and translates it directly into a benefit without considering the worker's age, occupation, education, training, experience, earning capacity, ability to perform the job, employability, or any other relevant disability factors.

The editors of the *Guides* foresaw their potential misuse. The first chapter includes the following admonition:

Each administrative or legal system that uses permanent impairment as a basis for disability rating needs to define its own process for translating knowledge of a medical condition into an estimate of the degree to which the individual's capacity to meet personal, social, or occupational demands, or to meet statutory or regulatory requirements, is limited by the impairment. **We encourage each system *not* to make a "one-to-one" translation of impairment to disability, in essence creat-**

ing a use of the *Guides* which is not intended.

*Guides,* at 6 (emphasis added).

Defendants argue that the scheduled injuries under the former Act constituted an impairment system. Under the *former Act,* workers who sustained an injury to a specific body member were limited to the recovery provided in the schedule of injuries in article 8306, section 12. Such workers, however, could also recover for total incapacity if they could prove that the injury to the particular member also extended to and affected other portions of their bodies, or impaired their general health to such an extent as to totally and permanently incapacitate them. *Argonaut Ins. Co. v. Newman,* 361 S.W.2d 871 (Tex.1962); *Consolidated Underwriters v. Langley,* 141 Tex. 78, 170 S.W.2d 463 (1943). Even if the injury was limited to the specific member, the worker had two options to recover compensation for total loss of use of the member. The worker could seek to establish either that the member no longer had any substantial utility as part of the body, or that it was so injured that the worker could not procure and retain employment requiring the use of that member. Evidence supporting either of these definitions would support a recovery for total loss of use. *Travelers Ins. Co. v. Seabolt,* 361 S.W.2d 204 (Tex. 1962); *Texas Employer's Ins. Ass'n v. Sauceda,* 636 S.W.2d 494 (Tex.App.—San Antonio 1982, no writ). *See also* 2 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 25.05 (1989). The second option, described in *Seabolt* as more favorable to the injured worker, allowed proof of the disability-type consideration of whether the worker's employability had been affected by the injury.

Even in cases of partial incapacity, disability considerations played a part in determining the amount of recovery.

In all other cases of partial incapacity, including any disfigurement which will impair the future usefulness *or occupational opportunities* of the injured employee, compensation shall be determined according to the percentage of incapacity, taking into account among other things *any previous incapacity, the nature of the physical injury or disfigurement, the occupa-*

*tion of the injured employee, and the age at the time of the injury.*

Act of April 3, 1923, 38th Leg., R.S., ch. 177, 1923 Tex.Gen.Laws 384 (formerly art. 8306, § 12) (emphasis added).

> In Texas, the rating for Section 12 injuries can be influenced by the impact that the injury has on the injured workers' ability to perform his or her usual work. The result is that a Texas worker with a Section 12 specific injury can under appropriate circumstances receive a rating, and benefits, greater than that generated by a pure impairment rating, based to some extent upon the injury's possible economic impact.

Research Papers, ch. 9, at 52.

Thus, even under the article 8306, section 12 schedule of injuries, the worker could seek to prove to a fact-finder that the injury was more severe than the scheduled recovery allowed by proof of how the injury affected his or her earning capacity. The new Act, concerning second- and third-tier benefits, permits no consideration of individualized medical conditions, earning capacities, work histories, or a myriad of other relevant compensation factors.

In an effort to achieve predictability, objectivity, efficiency, and lower workers' compensation insurance rates, the legislature has failed to provide injured workers an adequate substitute to obtain redress for their injuries.[8] The supplemental benefits provisions of the Act are intended to provide extra compensation to the most seriously injured workers. But, the medical and legal testimony is overwhelming that many, if not most, of the most seriously injured workers who will be disabled from performing their job will be ineligible for supplemental benefits. The evidence also indicates that many, if not most, of these workers will not receive sufficient benefits under the impairment income provisions to replace the lost earning capacity they will suffer due to their inability to return to work. Damages in a negligence action are intended to indemnify injured persons for the pecuniary losses they have suffered, in order to place them in as nearly the same position they would have occupied but for the injury. *See Nelson v. Krusen,* 678 S.W.2d at 924–25; *Burlington–Rock Island R. Co. v. Newsom,* 239 S.W.2d 734, 736 (Tex. Civ.App.—Waco 1951, no writ). The pure impairment-based system is not an adequate or reasonable substitute for workers' common law negligence actions. It is arbitrary and unreasonable to limit the recovery of seriously injured workers in an experiment to lower compensation rates. *See Lucas,* 757 S.W.2d at 691. For this reason the Act's use of the *Guides* violates the open courts and due course provisions of our constitution.[9]

Defendants argue that because the legislature has provided *a* substitute, our inquiry is at an end. According to this argument, any substitute will do. To take an extreme example, the legislature could decree that a worker will be paid $100, or even one dollar, for any injury sustained, no matter how severe. Obviously, this would be an inadequate substitute for the workers' common law rights to sue their employers for negligence damages. The test calls for an *adequate* or *reasonable* substitute, not merely *a* substitute.

Defendants argue that the legislature is free to use any rational system for the delivery of benefits, and that the use of the *Guides* for this purpose is rational. The defendants cite medical testimony, some from plaintiff's witnesses, indicating that the

---

8. *See* Ellen Smith Pryor, *Flawed Promises: A Critical Evaluation of the American Medical Association's "Guides to the Evaluation of Permanent Impairment,"* 103 HARV.L.REV. 964, 976 (1990) (book review) ("[P]olicy makers should appreciate that the search for an 'objective,' 'accurate,' or purely 'medical' system is and always will be fruitless. And they must resist the seductive but false hope that use of a scientifically or medically authored ratings system can bypass the need to make the hard choices necessary for any loss assessment system.") (footnote omitted).

9. The dissent argues that we have given short shrift to goals other than lowering rates and increasing benefits, and that the Act's use of the *Guides* is rationally related to the goals of consistency, objectivity, and uniform treatment of similarly situated workers. It ignores, however, what to us is the plain fact that the legislature has sacrificed its goal of providing increased benefits to injured workers in order to achieve these other goals. In doing so, it has failed to provide workers an adequate substitute for their common law rights.

*Guides* are the most accurate evaluation of medical impairment available. However, a system that does not adequately compensate workers for the loss of their common law rights is not rational.

■ The Act's use of the *Guides* violates the equal protection provision of the Texas Constitution in at least three ways. In addition to the 15 percent classification, which will be discussed below, the Act unreasonably classifies injured workers whose injuries are recognized by the *Guides*, and those whose injuries are not so recognized. This classification is not rationally related to the Act's purpose of increasing benefits for workers.

Third, the Act also creates an irrebuttable presumption that maximum medical improvement has occurred by the expiration of 104 weeks. The Act offers no opportunity for injured workers to rebut the presumption. The problem with this presumption is not its duration. It is that the *Guides* require maximum medical improvement to be reached before an impairment rating is given. This ensures that the worker's condition will have stabilized before an impairment rating is assigned. In those cases, and there will be some, in which maximum medical improvement is not reached by the end of 104 weeks, a doctor is required, contrary to the dictates of the *Guides*, to render an impairment rating anyway. This classification does not further the purposes of the Act.

Plaintiffs cite us to the Supreme Court case of *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990), while amici argue forcefully that that case is of no relevance to the determination of whether the Act may constitutionally incorporate the *Guides*. The issue in *Zebley* was whether regulations promulgated by the Secretary of Health and Human Services to determine child disability properly carried out the command of a statute enacted by Congress. The statute awarded benefits under the Supplemental Security Income Program to disabled persons. The statute defined "disability" in terms of an individualized, functional inquiry into the effect of medical problems on an adult's ability to work. The statutory standard for child disability was explicitly linked to the standard for adult disability; "a child

is entitled to benefits if his impairment is as severe as one that would prevent an adult from working." *Id.* at 529, 110 S.Ct. at 890. Under the Secretary's regulations, however, a child could show entitlement to benefits only when his or her impairment corresponded in all specified medical criteria to one appearing on a list of impairments presumed severe enough to preclude any gainful work. The Supreme Court determined that the Secretary's method of determining child disability failed to conform to the statutory standard. *Id.* at 541–42, 110 S.Ct. at 897. In reaching this conclusion, the Court stated:

> No decision process restricted to comparing claimants' medical evidence to a fixed, finite set of medical criteria can respond adequately to the infinite variety of medical conditions and combinations thereof, the varying impact of such conditions due to the claimant's individual characteristics, and the constant evolution of medical diagnostic techniques.

*Id.* at 539, 110 S.Ct. at 896.

While we realize that *Zebley* does not condemn every utilization of a fixed set of medical criteria in dispensing benefits, it is illustrative of the problems inherent in applying rigid impairment listings to the infinite variety of medical conditions and individual characteristics. For example, the Court stated that shortcomings in the listings are remedied for adults by additional steps in the Secretary's test. Adult claimants who do not qualify for benefits under the listings still have the opportunity to show that their impairments in fact prevent them from working. *Id.* at 533, 110 S.Ct. at 893.

> For children, however, there is no similar opportunity. Children whose impairments are not quite severe enough to rise to the presumptively disabling level set by the listings; children with impairments that might not disable any and all children, but which actually disable *them*, due to symptomatic effects such as pain, nausea, side effects of medication, etc., or due to their particular age, educational background, and circumstances; and children with unlisted impairments or combinations of impairments that are not equivalent to any one listing—all these categories of

child claimants are simply denied benefits, even if their impairments are of "comparable severity" to ones that would actually (though not presumptively) render an adult disabled.

*Id.* at 535–36, 110 S.Ct. at 894 (emphasis in original) (footnotes omitted).

The Act's application of the *Guides* suffers from the same shortcomings. There is no opportunity for workers who cannot qualify as impaired under the *Guides* to show that they in fact have lost wage earning capacity; workers with unlisted impairments, no matter how severe or disabling, are ineligible for any benefits; workers with injuries not quite severe enough to rise to the presumptively severe level of a 15 percent rating might, due to individual factors, actually be more severely disabled. Most significantly, the Act does not allow any adjustment for individualized factors relating to loss of wage earning capacity.

### B. Fifteen Percent Threshold

■ The trial court also found that the 15 percent impairment rating threshold as a qualification for supplemental benefits "is arbitrary in and of itself, and further that it is based upon an impermissible and arbitrary use of the AMA Guides." The court found that the utilization of the threshold will result in denial of benefits to many, if not most, significantly disabled workers and "creates an unreasonable and arbitrary classification which serves no legitimate state purpose...."

Defendants argue that the Act's limitation of supplemental income benefits to those workers who have received an impairment rating of 15 percent or greater is not unconstitutional because it is the legislature's prerogative to draw that line. Because supplemental income benefits are designed only for those employees who are permanently and seriously impaired after maximum medical recovery, the argument goes, it is perfectly reasonable for the legislature to limit those benefits to the workers with the most serious bodily impairments. Without such limitation, it is argued, the availability of long-term income benefits would provide an undesirable incentive for workers to malinger or otherwise avoid returning to work. Defendants argue that so long as this rationale is reasonable and not purely arbitrary, the decision to draw the line at greater than 15 percent impairment is purely a legislative function.

The 15 percent threshold determines entitlement to any long-term benefits under the Act. Defendants offered no explanation of the source of the 15 percent figure. Witnesses who were directly involved in the legislative process leading up to the Act had no idea where this number came from. We have been cited to absolutely no evidence before the legislature upon which the 15 percent figure could be based. For instance, there is no indication in the legislative record that once a 15 percent impairment rating is reached, significant numbers of workers are so disabled as to require long-term benefits. Likewise, there is no indication that significant numbers of workers who will not reach the 15 percent level have no need of long-term benefits. The medical testimony at trial condemned the number as arbitrary and the concept as an inappropriate use of the *Guides*, and we must agree.

The trial court in its findings noticed and gave credence to a Florida study that showed that only seven percent of injured workers obtain impairment ratings in excess of 15 percent. Attorney Phil Hardberger, a recognized expert in Texas workers' compensation law, estimated that in his experience, 95 percent of all injured workers would be ineligible for supplemental income benefits. Attorney Frank Southers, another workers' compensation law expert, confirmed this testimony. He described the 15 percent threshold as the "centerpiece" of the Act because it determines entitlement to long-term benefits under the Act.

Each witness, including defendants',[10] acknowledged there would be severely disabled

---

**10.** One defendants' witness, Dr. Peter S. Barth, an economics professor, testified that the 15 percent threshold is reasonable because impairments below 15 percent generally are not very

serious physical impairments. He indicated that the legislature was justified in reserving limited resources for more seriously injured workers. While the latter statement is certainly true, the

workers who would not reach the 15 percent threshold. The trial court found that, "[t]he utilization of this threshold test will result in denial of benefits to many, if not most, significantly disabled workers." Dr. Gutzman, an orthopedic surgeon, testified that serious back problems, including herniated disks, both with and without surgical intervention, would fail to meet the 15 percent threshold. He testified that these individuals can be totally disabled.

Dr. Engleberg gave numerous examples of types of injuries that can result in less than a 15 percent rating, or even a zero percent rating, yet result in significant disabilities that would prevent the worker from performing his or her job. These included skin disorders, respiratory conditions, pulmonary injuries, speech impairments, visual problems, epilepsy resulting from employment, and injuries to the nervous system. He also provided two detailed case studies showing one person who received a 27 percent impairment rating, yet suffered no disability, and a second person who received a 10 percent impairment rating and suffered disability so significant that his income had diminished.

While the Act contains many changes beneficial to workers, such as improvements in the delivery of benefits, stricter enforcement provisions, lifetime medical benefits for reasonable and necessary medical care related to compensable injuries, and safety features, all of these could have been accomplished without the imposition of the draconian use of the *Guides* and the 15 percent threshold. If the legislature has been successful in its cost-cutting goal, Texas businesses may enjoy lower rates. Legislative history indicates that the legislature was unsure whether the Act would cause insurance rates to come

down, but it hoped it would.[11] But while providing this "hoped for" benefit, the legislature has ensured that many, if not most, of the most profoundly injured Texas workers will be ineligible for the most significant benefits provided by the Act.

In a similar vein, the Texas supreme court held: "In the context of persons catastrophically injured by medical negligence, we believe it is unreasonable *and* arbitrary to limit their recovery in a speculative experiment to determine whether liability insurance rates will decrease." *Lucas,* 757 S.W.2d at 691.

The 15 percent threshold is not rationally related to the statute's purpose to increase compensation for injured workers. Its effect is just the opposite. Further, the classification is arbitrary in that there was absolutely no justification offered for the decision to make those with ratings of 15 percent or more eligible for supplemental income benefits—the only long-term benefits provided by the Act—and those with 14 percent ratings or less ineligible for those benefits.[12] The arbitrariness of this classification is demonstrated by evidence establishing that only a relative handful of the workers who suffer serious injuries that curtail, perhaps significantly, their earning capacities will be eligible for supplemental benefits. It is underscored, too, by the examples of severely disabled workers with ratings below 15 percent, and workers with relatively minor injuries— those that do not affect earning ability—who receive ratings of 15 percent or more.

The effect of the arbitrary 15 percent cutoff is to create an irrebuttable presumption that an injured worker who has received an impairment rating below 15 percent does not need, and is not entitled to supplemental income benefits.[13] It also creates an unrea-

medical testimony was unanimous that many seriously injured workers would not receive a rating of 15 percent or greater. And even Barth admitted that he did not know where the 15 percent figure came from.

11. When this case was tried, it was of course too early to determine the Act's affect on insurance rates.

12. While the *Guides* suggest that impairment ratings be rounded up to the nearest five percent, it is not a requirement of the *Guides*, and it certainly is not a requirement of the Act.

13. If a worker's impairment rating is disputed, the dispute is resolved by the "presumptive weight" given to the testimony of a designated doctor. The findings of the commission and the trial court, in case of judicial review, must be based on the designated doctor's evidence unless the great weight of other medical testimony is to the contrary. Even if an individual worker is able to overcome these presumptions and have his or her impairment rating adjusted upward to 15 percent or more, that does not destroy the inherent presumption that all workers who are unable to establish a 15 percent impairment rat-

sonable classification between those workers who receive a 15 percent or more impairment rating and those who do not.

For these reasons, the 15 percent threshold violates the equal protection and due course provisions of our constitution.

### C. Designated Doctor

■ The Act establishes for the first time in Texas a "designated doctor" whose findings are given "presumptive weight" on the issues of impairment ratings and determinations of maximum medical improvement. The trial court found that the effect of the presumptions given the designated doctor's testimony "is to arbitrarily subordinate the diagnosis of the worker's treating doctor and give unreasonable weight to the opinions of the designated doctor who is not the patient's treating doctor." The court found that the "presumption is unsound from a medical point of view and arbitrary from an administrative point of view. This presumption is arbitrary and contrary to reasonable medical standards." The court also found that the designated doctor provision usurps the fact-finding responsibility of the Commission and the courts. The court found the provision violates the due course, equal protection, and trial by jury provisions of the Texas Constitution.

Defendants cite the case of *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). Before the court in that case was a challenge to the constitutionality of statutory presumptions that coal miners with ten years' employment in the mines who suffer from pneumoconiosis—black lung disease—are presumed to have contracted that disease from their employment, and that coal miners with ten years' employment in the mines who die from a respiratory disease will be presumed to have died from pneumoconiosis. In reviewing the presumptions in *Usery,* the Supreme Court relied on the test articulated in *Mobile, J. & K.C.R. Co. v. Turnipseed,* 219 U.S. 35, 43, 31 S.Ct. 136, 138, 55 L.Ed. 78, 80–81 (1910).

That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law, it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate. So, also, it must not, under guise of regulating the presentation of evidence, operate to preclude the party from the right to present his defense to the main fact thus presumed.

We will review the presumption in favor of the designated doctor in light of these factors.

First, a constitutionally valid presumption must be rebuttable by the party it operates against. A law giving the act of a public official the effect of raising a prima facie presumption, which does not deprive the person affected of the right to rebut the presumption, does not deny due process. *Weatherly v. Jackson,* 123 Tex. 213, 71 S.W.2d 259, 267 (1934); *Green v. State,* 272 S.W.2d 133, 135 (Tex.Civ.App.—Beaumont 1954, writ ref'd n.r.e.). The Supreme Court of Florida reached a similar result in *North West Trailer Sales v. McCann,* 217 So.2d 310 (Fla.1968). There the court rejected a challenge to a statute providing for the appointment of a designated doctor when a conflict exists in the medical evidence submitted at the hearing before the commission. It held that there is no due process violation as long as the worker is permitted to cross-examine the designated doctor and to offer rebuttal evidence. *Id.* at 312. The statute at issue in *Usery* explicitly made the presumptions rebuttable, and the Court noted that the effect of the presumptions was simply to shift the burden of going forward with evidence from the claimant to the mine operator. 428 U.S. at 27, 96 S.Ct. at 2898.

---

ing do not need supplemental income benefits. In other words, there is no way to avoid the mechanical application of the *Guides.* If the medical testimony does not support a 15 percent impairment rating, individuals cannot establish a need for supplemental income benefits, no matter how profound and disabling their injuries may be. The testimony was uncontroverted that many individuals will find themselves in this situation.

At the commission hearings, the testimony of the designated doctor is given presumptive weight in the determinations of whether the worker has reached maximum medical improvement, and what impairment rating should be assigned to the injury. §§ 4.25(b), 4.26(g). The commission's determinations in these areas shall be based on the designated doctor's report "unless the great weight of the other medical evidence is to the contrary." §§ 4.25(b), 4.26(g).

In the context of judicial review, if a substantial change of condition has not occurred, the jury may review only the evidence of extent of impairment presented at the commission, and it must adopt one of the impairment ratings made by one of the doctors before the commission. If a substantial change of condition has been found by the court to have occurred, the jury may review the new medical evidence of extent of impairment and must adopt one of the new impairment ratings made by the doctors who originally appeared before the commission. § 6.62(j).

The jury is allowed to choose any one of the impairment ratings made either before the commission or before the court in the case of a substantial change of condition. This indicates that at the stage in the judicial review process when an impairment rating is chosen, the presumptive weight given to the designated doctor no longer applies.[14] The jury may choose any of the ratings already adduced.

Thus, the presumption of the correctness of the designated doctor's report can be rebutted by the great weight of other medical evidence at the commission level, and by a preponderance of the other medical evidence at a substantial change of condition hearing before the court. And since the presumption does not otherwise carry over to the judicial review process, there is no presumption to rebut.

*Turnipseed* requires that there be a rational connection between the fact proved and the fact presumed, and that the inference of one fact from proof of another must not be so unreasonable as to be purely arbitrary. 219 U.S. at 43, 31 S.Ct. at 138. Defendants argue that the presumption in favor of the designated doctor has these rational bases: because designated doctors are not aligned with either party, they are more likely to be objective, and because "it is rational for the trier of fact to give greater weight to the testimony of a disinterested witness than to the testimony of a self-interested one."

In creating the presumption in favor of the designated doctor, the legislature hoped to inject a doctor into the system who was more likely to be objective than the doctors chosen by the workers or the insurance companies. Again, Senator Glasgow:

> GLASGOW: What we're trying to do is get out of this controversy we're in under current law where the injured employee, through his lawyer, gets a doctor, the insurance company gets a doctor, the insurance company says this guy is malingering, there's nothing wrong with him, he can go back to work tomorrow. And the insured—injured worker's doctor and his lawyer's saying this guy's totally permanently disabled and can't ever go to work

---

14. This was also the legislature's understanding:
 MCFARLAND: Once you appeal in the court, the commission's record is admissible, but that presumption [in favor of the designated doctor] terminates in the absence of substantial change of condition no further presumption is given to the designated physician there. And even if the presumption of the designated physician from an evidentiary standpoint on substantial impairment or change of condition exists, that's only for the trier of law. Once that determination is made, that's not carried to the trier of fact.
 \* \* \* \* \* \*
 MCFARLAND: What we're suggesting here is the designated physician's findings are ad-

mitted as part of the record to the trier of fact.... But from the standpoint of giving then, at the appeal level, the judicial review level, a, quote, continuing presumption to that. It's my understanding that is not the case. That is the understanding that has been shared by Representative Smith, Senator Glasgow and Senator Montford.
Debate on Tex.S.B. 1 on the Floor of the Senate, 71st Leg., 2d C.S., Tape 3 at 13 (Dec. 12, 1989) (transcript available from Senate Staff Services Office).

again. . . . So what we're simply trying to do is get out from under this dueling doctor concept. . . . We're trying to find an independent doctor that's not on the payroll of the insurance company, not on the payroll of the lawyer for the injured worker, and he can be somewhat objective. . . .

Debate on Tex.S.B. 1 on the Floor of the Senate, 71st Leg., 2d C.S., Tape 1 at 19 (Dec. 12, 1989) (transcript available from Senate Staff Services Office).

In *Usery,* the fact proved was that a miner with ten years' employment in the mines has pneumoconiosis; the fact presumed was that the miner contacted the disease from his employment. The rational relation between these facts was supported by the agreement of all that pneumoconiosis is caused by breathing coal dust, and that the likelihood of a miner's developing the disease rested upon both the concentration of dust the miner has been exposed to and the duration of exposure to the dust. 428 U.S. at 28, 96 S.Ct. at 2898. It was also supported by the fact that Congress had before it medical evidence indicating the noticeable incidence of pneumoconiosis in cases of miners with ten years' employment in the mines. *Id.* at 29, 96 S.Ct. at 2898. In light of these facts, the Court held:

> Congress was surely entitled to select duration of employment, to the exclusion of the degree of dust exposure and other relevant factors, as signaling the point at which the operator must come forward with evidence of the cause of pneumoconiosis or death, as the case may be. We certainly cannot say that the presumptions, by excluding other relevant factors, operate in a "purely arbitrary" manner.

*Id.* at 29–30, 96 S.Ct. at 2899.

In the Act, the fact "proved" is that the designated doctor reached medical conclusions regarding the injured worker. The fact presumed is that those conclusions are reliable, or at least more reliable than those of the doctors hired by the parties. The legislature wanted to have the opinion of a doctor not aligned with either party in cases where the medical testimony of the parties

conflicted. We cannot say that the presumption of the reliability of the conclusions of the non-aligned doctor, by excluding other factors such as the doctor's medical qualifications, his or her familiarity with the worker's condition, and the nature and extent of the examination, operates in a "purely arbitrary" manner.

We conclude that the Act's designated doctor provision does not violate the due course of law, the equal protection, or the jury trial provisions of our constitution.

### D. Opt Out Provision

■ The trial court concluded that the Act "does not authorize employees of employers who are subscribers of workers compensation insurance on January 1, 1991 to elect to retain their common law rights but does allow employees hired on or after January 1, 1991 to exercise that right pursuant to Section 3.08 of the Act in violation of" the equal protection provision of the Texas Constitution.

The arguments against this finding are twofold: (1) it is not a denial of equal protection to force employees to quit their jobs in order to opt out of the system created by the Act; and (2) employees hired before the effective date of the Act have already had their opportunity to opt out of the workers' compensation system.[15]

In support of the first argument, amici cite *Middleton v. Texas Power & Light Co.,* 249 U.S. 152, 39 S.Ct. 227, 63 L.Ed. 527 (1919), which is not in point. In that case the Supreme Court addressed an equal protection argument vis-a-vis employers and employees, rather than between different classes of employees. The fundamental differences between employers and employees stressed by the court have no application to this case where our concern is different categories of workers.

Amici insist that workers employed prior to 1991 "retain the right to change jobs and thereby secure a new election," and that the difference between the classifications is

---

**15.** *See* Act of Mar. 28, 1917, 35th Leg., R.S., ch. 103, § 3a, 1917 Tex.Gen.Laws 269, 270–71, *repealed by* Texas Workers' Compensation Act, 71st Leg., 2d C.S., ch. 1, § 16.01, 1989 Tex.Gen.Laws 1, 114 (formerly art. 8306 § 3a).

merely the method required to make the election. This cynical suggestion fails to consider that most workers have, through continued employment with their present employers, acquired seniority, promotions, pay increases, greater responsibilities, and increased insurance, retirement, vacation, and other benefits. Workers who quit their jobs to opt out of the new workers' compensation system would lose these valuable benefits. The suggestion also fails to consider that many workers may find it very difficult to secure new employment equivalent to the job they must leave, even in the best economic climates. The result is that most workers, to avoid these losses and difficulties, will be forced to submit to the new system while their more recently employed colleagues may extricate themselves with a simple election. It makes a mockery of equal protection to suggest that a worker who was employed on December 31, 1990 can only opt out of the system by quitting his or her job, while a person hired on January 1, 1991 can exercise that right by a mere election.

The classification created by the Act is not rationally related to the Act's purpose of providing greater benefits to workers. The only "rational basis" asserted by defendants is that the workers employed prior to 1991 have already had a chance to opt out of the former system; once within the workers' compensation system, they have no vested right in the continuance of present laws. *See Middleton*, 185 S.W. at 560. This is not a reason for treating the two groups differently. We are not dealing merely with an amendment of the prior law. As we have already seen, and as all parties proclaim, the new Act is very different from the old one. Changes have been described by defendants as "sweeping." Defendants stated that the legislature has "overhauled" the old system. In fact, the legislature repealed the former Act in its entirety. There may be many workers who were satisfied with the former system, but who examine this Act and conclude that their rights are better served by the common law. Yet pre–1991 employees have never had the opportunity to opt out of this system, short of quitting their jobs. While it is true that those workers do not have a vested right in the continuation of the

former system, if new employees may opt out of the new system, there is no rational basis for denying that right to employees hired before the Act's effective date.

The presumption that pre–1991 workers will find the Act as advantageous as the former one is overbroad, overinclusive, unreasonable, and creates a presumption irrebuttable by any action short of resignation. This provision violates the equal protection and due course provisions of our constitution.

### E. Trial by Jury

■ The trial court found that a trial of issues relating to compensability or eligibility for or the amount of income or death benefits is limited to issues decided by the appeals panel; that except under certain extraordinary circumstances, evidence on these issues is limited to that presented at the administrative level; that the fact finder must adopt an impairment rating previously made under the *Guides;* that with respect to certain determinations, the findings of the designated doctor are presumed correct; that historical factors that have been traditionally considered by juries in workers' compensation cases, such as age, education, and training, may not be considered by the fact finder in determining disability or eligibility for or the amount of benefits to be awarded; that some issues are determined by a preponderance of the evidence and some by substantial evidence; that injured workers may be compelled to engage in repetitive lawsuits before obtaining resolution of a single injury claim; and that 80 to 90 percent of cases were settled under the former Act without going to trial. Based on these findings, the court concluded that the Act's judicial review provisions deny injured workers their traditional right to a jury trial.

The right to trial by jury is secured in the Texas Constitution. "The right to trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency." TEX.CONST. art. I, § 15. "All the constitutions of the Republic and State of Texas have preserved the right of trial by jury, in the same language." *Cock-*

*rill v. Cox,* 65 Tex. 669, 672 (1886). This provision protects the right to trial by jury in those cases where a jury would have been proper at common law, or where that right existed at the time the Constitution was adopted in 1876. *State v. Credit Bureau of Laredo, Inc.,* 530 S.W.2d 288, 291 (Tex.1975).

There is a second jury trial provision found in the judiciary article of our constitution.

> In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury; but no jury shall be empaneled in any civil case unless demanded by a party to the case, and a jury fee be paid by the party demanding a jury, for such sum, and with such exceptions as may be prescribed by the Legislature.

TEX.CONST. art. V, § 10. The two provisions are not identical in meaning. *Credit Bureau,* 530 S.W.2d at 292. The Judiciary Article provision is broader than that found in the Bill of Rights. *Id.* It is not limited to those causes of action where the right of jury trial existed in 1876, but it applies to the trial of "all causes" except those adversary proceedings that have been determined for some special reason to be unsuitable for jury trial. *Id.* at 292–93.

There is no question here that injured workers in 1876 had the right to a jury trial in suits based on their injuries. A litigant is "entitled to a trial by jury, *in the full constitutional sense,* if that practice prevailed in this state, according to then existing laws, at the time of the adoption of . . . our present state Constitution of 1876." *White v. White,* 108 Tex. 570, 196 S.W. 508, 512 (1917) (emphasis added). *See also Credit Bureau,* 530 S.W.2d at 291. The *White* court also said: "In cases where the right existed prior to the Constitution, it cannot be denied, and this applies to cases of a similar character arising under statutes enacted subsequently to the adoption of the Constitution." 196 S.W. at 512.

The constitutional mandate is that "the right of trial by jury shall remain inviolate." The legislature is directed to pass laws to regulate it, "and to maintain its purity and efficiency." It is conceivable that the legislature could create a system called a "jury trial," but withdraw so many issues from the jury's determination that only the shell or form of a jury trial remains. The system created in such a case would be a jury trial in name only. The question is whether this Act has reached that point.

A trial by jury, as described by the supreme court:

> means something more than a hearing before a commission. . . . With us in civil cases it means a due and orderly trial before the statutory number of [persons], properly qualified for such jury service, impartial, residing within the jurisdiction of the court, drawn and selected according to statute, duly impaneled under the direction of a court of competent jurisdiction, and sworn to render an impartial verdict according to the law and the evidence, the hearing to be in the presence and under the supervision of a court duly authorized and empowered to rule on the evidence, and, except in courts of justices of the peace, to charge on the law of the case, and to set aside the verdict if, in the opinion of the court, it is contrary to the law and evidence.

*White,* 196 S.W. at 511–12. Former Chief Justice Pope adds that jurors' qualifications may be challenged by the litigants; jurors are not witnesses or investigators; evidence is presented before them in open court; their function is to decide the facts rather than the law, and in that sphere, their function is independent of the judge; they deliberate in private; and their verdict is returned in open court. Jack Pope, *The Jury,* 39 TEXAS L.REV. 426, 447 (1961).

> The right to jury trial means that the ultimate determination of issues of fact is to be by the jury under proper guidance and direction of the court. . . . The right to jury trial is preserved when each party has one fair opportunity to present to a jury the evidence on which he claims to raise an issue of fact.

47 AM.JUR. 2D *Jury* § 14 (1969). "The right extends to all issues of fact in civil actions at law, at least where such issues involve the merits of the case." 47 AM.JUR. 2D *Jury* § 15 (1969).

The right to a jury trial remains inviolate in civil cases, even though denied in the court of first instance, if the right to appeal and a jury trial on appeal are secured. *Texas Ass'n of Business,* 852 S.W.2d at 450 n. 19; *Cockrill,* 65 Tex. at 674; *Swinford v. Logue,* 313 S.W.2d 547, 550 (Tex.Civ.App.— Waco 1958, orig. proceeding). *Middleton* held that the former workers' compensation act did not impair the right to trial by jury because the act allowed appeals of the Industrial Accident Board's decisions to the courts "where a jury trial of the matters in dispute, under the law as embodied in the Act, may be had." 185 S.W. at 561–62. Thus, access to a jury trial of the disputed issues of fact at some stage of the proceeding is required to satisfy the constitution. *See Cockrill,* 65 Tex. at 673–74 (at some stage of the proceeding a jury must be allowed to pass upon the facts). Our supreme court has recently indicated that the trial must be de novo. "Even if the right to a jury is denied before an administrative agency, *the dispositive question is whether a trial de novo and the corresponding right to a jury trial is constitutionally required upon judicial review of the agency's decision.*" *Texas Ass'n of Business,* 852 S.W.2d at 450 n. 19 (emphasis added).

A limited trial de novo is provided on the issues of compensability, eligibility for income or death benefits, and the amount of income or death benefits. It is not a pure trial de novo. Judicial review is limited to the issues decided by the appeals panel and on which judicial review is sought, the court must inform the jury of the appeals panel's decision, the commission's record is admissible in evidence, the fact finder is limited to the evidence of the extent of impairment presented to the commission except in cases where the trial judge finds a substantial change of condition, and the fact finder must choose an impairment rating given by one of the doctors who appeared before the commission. The evidence is also limited at the substantial change of condition hearing to new evidence or evidence that could not have

been discovered with reasonable diligence and that will likely produce a different result, with the further qualification that medical evidence must come from the doctors whose testimony or opinion was presented to the commission.

"Compensability" presumably refers to issues that would deny the worker any recovery, such as: whether the worker was within the scope of employment when injured, whether the worker was intoxicated or engaged in horseplay, whether the injury arose out of an act or God or the intentional act of a third party, and so on. *See* §§ 3.01, 3.02. The burden of proof for these issues is by preponderance of the evidence. All other issues are to be reviewed under the substantial evidence rule.

Of course, the amount of impairment and supplemental income benefits is directly tied to the worker's impairment rating. Only a limited jury trial is available concerning the extent of impairment. In order to get a higher impairment rating, the worker has to show a substantial change of condition. To do this the worker must have medical evidence of a substantial change of condition from the same doctor or doctors whose opinion was presented to the commission. This evidence must be either new evidence or evidence that was not discoverable earlier with due diligence. The judge has to find that this evidence would produce a different result if it were admitted at trial. If substantial change of condition is disputed, the judge must require the designated doctor to verify that there does exist a substantial change of condition. The designated doctor's findings are presumed correct.[16] If the designated doctor admits to a substantial change of condition, it must be verifiable by recognized laboratory or diagnostic tests, or signs confirmable by a physical examination. The finding of substantial change of condition is an issue for the judge to decide, not the jury. If all these hurdles are met, the judge must, without telling the jury there is a substantial change in condition, submit the question to the jury. The jury does not make an inde-

---

16. It is unclear how substantial change of condition is to be proven if the designated doctor or the other doctors whose findings were presented at the commission are unavailable. There is no provision in the Act for the use of evidence from any other physicians.

pendent decision—its only function is to adopt one of the impairment ratings made by a doctor whose opinion has previously been presented to the commission.

The procedure outlined above for the trial of the extent of impairment does not afford injured workers the right to a jury trial "in the full constitutional sense." *See White*, 196 S.W. at 512. It is the jury's role—not the judge's, not the commission's—to determine the facts. In addition, the court and jury are required to adopt one of the impairment ratings made under section 4.26 or section 6.62, thereby foreclosing any independent review of the medical testimony and foreclosing any consideration of evidence with respect to the true nature of the worker's disability, loss of earning capacity, or future loss of earnings. The *Guides* effectively control the case from start to finish. Judicial review, whether by court or jury, cannot depart from the impairment ratings that were developed in the administrative proceeding or pursuant to a substantial change of condition finding. Traditional jury issues, such as extent of injury, likelihood of future employment, and future loss of earnings cannot be considered in the judicial review process. There is thus no escape from the mechanical application of the *Guides* and the arbitrary 15 percent threshold.

The Act's requirement that the jury must select between predetermined impairment ratings, the arbitrary presumptive effect of the 15 percent threshold, and the Act's repudiation of historical disability considerations by its reliance on the *Guides*, eliminate any meaningful role for the jury and effectively deny workers a jury trial in the full constitutional sense as that right existed at the time of the constitution's adoption.

It is appropriate to reiterate that in exchange for the Act, workers have given up their right to seek economic redress at common law for injuries suffered while on the job. It is also appropriate to observe again that workers compensation is unique in that it is the only social insurance program in which workers surrendered any right of value in exchange for benefits. National Commission Report at 37. At common law injured workers enjoyed the constitutional

right to have their cause of action determined by a jury of their peers—a jury trial in the full constitutional sense. This right is secured by our constitution; it is inviolate; its purity may not be adulterated, or its efficiency compromised. In its pursuit of lower insurance rates, the legislature has neglected its constitutionally-mandated duty to preserve the purity and efficiency of the jury trial in Texas.

We conclude that the Act's provisions regarding the use of the *Guides*, the 15 percent threshold, and its scheme of judicial review violate article I, section 15 and article V, section 10 of our constitution.

### F. Hybrid Judicial Review

■ Closely related to the jury trial question is the issue of hybrid judicial review. The trial court concluded that the Act does not violate the separation of powers provision of the Texas Constitution (TEX.CONST. art. II, § 1) by creating a hybrid system of judicial review. Plaintiffs challenge this finding in their first cross point.

The issues of compensability, eligibility for and the amount of income or death benefits are tried under a preponderance of the evidence standard. § 6.62(c). All "other" issues are subject to review under the substantial evidence test. § 6.64(b).

Hybrid review is impermissible. *Southwestern Bell Tel. Co. v. Public Util. Comm'n*, 571 S.W.2d 503, 511 (Tex.1978); *Southern Canal Co. v. State Board of Water Eng'rs*, 159 Tex. 227, 318 S.W.2d 619, 623 (1958); *Dickerson–Seely & Assocs., Inc. v. Texas Employment Comm'n*, 784 S.W.2d 573, 576 (Tex.App.—Austin 1990, no writ). The dispute in this case is whether hybrid review is impermissible when required by statute in the review of a single case or only when required in the review of a single issue within a case. Defendants distinguish the above three cases by arguing that they prohibit hybrid review only when different standards of review are applied to the same issue within a case.

*Southwestern Bell* was a telephone rate case appealed under the Public Utility Regulatory Act, which provided for de novo review

of one issue—confiscation—and otherwise provided for substantial evidence review. 571 S.W.2d at 506. The court held that the legislature may generally specify the kind and nature of judicial review so long as constitutional safeguards and requirements are not transgressed. They were transgressed in this case, however, by the requirement that some part of the judicial review of an administrative decision be determined by the preponderance of the evidence and another part by substantial evidence. *Id.* at 511.

> The preponderance of the evidence test is a fact-finding test and ordinarily a feature of a trial de novo. The substantial evidence test is one for the determination of a law question. The latter test is a feature of a trial to determine the reasonableness of a agency order or decision where only questions of law are to be determined and a retrial of the fact issues by a judge or jury is avoided. The courts cannot conduct both types of trial, or even a hybrid type of trial *in the same suit.*

*Id.* (emphasis added). The supreme court held that the mixture of standards was "so inharmonious and conflicting as to be impossible of execution. The two types of trial are diametrically opposed to each other." *Id.* at 512. At least four times in the opinion the court emphasized that the two types of trial are not permitted *in the same lawsuit. Id.* at 511–12. Neither the facts, the holding, nor the language of the statute support defendants' argument that the statute was held unenforceable because it required only the confiscation issue to be tried under two internally contradictory methods of review.

The supreme court in *Southwestern Bell* relied on *Southern Canal.* The statute under consideration in *Southern Canal* set out the type of judicial review to be applied to orders of the State Board of Water Engineers. The court found the statute unconstitutional because it attempted to mix the attributes of both trial de novo and substantial evidence in the same lawsuit. 318 S.W.2d at 623–24. "Now, obviously, the courts cannot conduct both types of trial, or even a hybrid type of trial, *in the same suit.* The two are diametrically opposed to each other." *Id.* at 623 (emphasis added). There was no ques-

tion of applying the two standards only to an isolated issue or two; they were to be applied together in "all suits brought to review .. rules and regulations, orders, decisions, or other acts of the Board...." *Id.* at 621.

*Dickerson–Seely* reached the identical result. In that case the Texas Employment Commission ruled that certain persons were Dickerson–Seely's employees, and therefore ordered Dickerson–Seely to pay unemployment compensation contributions, plus interest and penalties, for them. Dickerson–Seely argued that the persons in question were independent contractors for whom no contributions were owed. Dickerson–Seely paid the assessed contributions under protest and appealed the case to the district court. That court held that the Commission's decision was supported by substantial evidence and denied all relief sought. On appeal to the court of appeals, Dickerson–Seely agreed that the manner of judicial review was by trial de novo, but argued that because the legislature gave the Commission the power to determine an applicant's employment status in its discretion, its decision on that issue must be reviewed by the substantial evidence standard. 784 S.W.2d at 575. The court of appeals rejected this argument because it would have it combine two types of review in the same proceeding. *Id.* at 576.

> This would entail (1) a factual determination from a preponderance of the evidence at trial as to all issues except one, but (2) a legal determination of substantial evidence to support the agency's decision as to the question of employment status.... It is well-settled that a court cannot conduct a trial in which both a preponderance of the evidence and a substantial evidence review are utilized.

*Id.* The court held that the fact finder was to determine the question of employment status, like all issues of fact, from a preponderance of the evidence presented in the trial court. *Id.* Thus, the court found fault with Dickerson–Seely's argument, not because it would require a review of the issue of employment status by both standards, but because it would require review of employment status by one standard and all other issues

by the other standard *in the same proceeding.*

We hold that the Act creates an unconstitutional hybrid system of review.

Defendants urge that if we find the hybrid system of review unconstitutional, we apply the Act's severability clause to void only that part of section 6.62 calling for de novo review. This we decline to do for the reasons set out below in our discussion of the severability issue.

### G. Attorney's Fees and Involvement

██ One of the recurring themes of the legislative debate was that "friction" costs were too high and that there was too much controversy and attorney involvement in the system. Legislators complained time and again of the large amount of money going, not to the injured workers, but rather to their attorneys.

To put these complaints into perspective, we will briefly examine the adjudication system under the former Act. A disputed claim was scheduled for a pre-hearing conference. Pre-hearing conferences were informal mediations scheduled at 15 to 20 minute intervals. The purpose of these conferences was "to attempt to adjust and settle the claim amicably . . . ." Act of May 13, 1977, 65th Leg., R.S., ch. 292, 1977 Gen.Laws 770, *repealed by* Texas Workers' Compensation Act, 71st Leg., 2d C.S., ch. 1, § 16.01, 1989 Tex.Gen. Laws 1, 114 (formerly art. 8307, § 10(b)).

If the claim was not resolved at a pre-hearing conference, an award was entered by the Industrial Accident Board. All issues were addressed by the award, including compensability, entitlement to benefits for loss of wage earning capacity, and the reasonableness and necessity of medical care. Either party could appeal the Board's award, and was entitled to a trial de novo on all issues.

Statistically, the system was incredibly efficient and successful in resolving claims. The trial court found that 80 to 90 percent of claims were resolved at the administrative level. Legislative history shows that under the former Act, only three-tenths of one percent of all workers' compensation claims were actually tried to a jury. *House Committee of the Whole on Workers' Compensation,* Tex.H.B. 1, 71st Leg., 1st C.S. 23–24 (Apr. 10, 1989); *Subcommittee on Workers' Compensation,* Tex.S.B. 1, 71st Leg., 1st C.S. 8 (Apr. 11, 1989). Figures introduced at trial suggest an even lower percentage. Evidence showed that of approximately 500,000 claims filed in a year, only 500, or one-tenth of one percent, went to jury trial. Evidence also indicated that of the 13 to 14 percent of costs related to attorney's fees, only five percent went to claimants' attorneys. Floor debates and evidence offered at trial purporting to demonstrate that claimants without lawyers received similar compensation as those with representation suggest the ease with which an unrepresented worker could participate in the former system.

The adjudication system created by the Act, which we have previously reviewed, is in stark contrast to that of the former Act's. Given nothing more than the Act's pertinacious reliance on the *Guides,* the complex process of hearings before the commission, and the myriad possibilities of waiver of vital issues at each step in that process, the average worker, untrained in law and medicine, is well-advised to enter the labyrinth only if accompanied by an attorney.

And yet the Act, as written, discourages participation of attorneys representing injured workers, while it does not discourage representation of attorneys representing carriers and employers. The trial court found that the Act, in this respect, violated the constitutional guarantees of trial by jury, open courts, and due course of law.

The Act provides only limited benefits. The majority of injured workers will never reach the 15 percent threshold necessary to trigger longer-term benefits. Attorneys representing workers are limited to 25 percent of the recovery, capped by time and expenses.[17] When the recovery is low, the 25

---

17. If the carrier disputes a commission determination that the worker is entitled to supplemental income benefits or the amount of those benefits and the worker prevails, the carrier is liable for reasonable and necessary attorney's fees incurred by the worker as a result of the carrier's dispute. These fees are not subject to the 25 percent cap of section 4.09.

percent will limit the amount paid, regardless of how much work has been performed, or how many times the system has been navigated.[18] When there is no recovery, there is no fee. When there is sufficient recovery to justify representation, this may be diluted by either the time and expense cap, or by the number of trips through the system required to obtain recovery.

Employers and carriers are not so limited. Their attorneys will be paid based on the hours worked regardless of how large or small the recovery, regardless of whether they win or lose, and regardless of how many trips through the system are taken.

As an example of the recovery we are talking about we set out an example provided at trial by the plaintiffs. A 32–year–old laborer with a 10th grade education has worked the last two years earning $5 per hour. He suffers a herniated lumbar disc, undergoes one-level laminectomy and discectomy, which is reasonably successful, but is left with some loss of range of motion and radicular symptoms. He reaches maximum medical improvement after one year and receives an impairment rating of 13 percent. He returns to part-time employment, working 20 hours a week for $3.85 per hour, two years after the date of the injury. His recovery is calculated as follows:

Average weekly wage = $5 × 40 hours = $200
Temporary income benefits:
First 26 weeks = 75% of $200 = $150.
$150 × 26 weeks = $ 3,900.00
Second 26 weeks = 70% of $200 = $140.
$140 × 26 weeks = 3,640.00
Impairment income benefits:
13 × 3 weeks = 39 weeks.
$140 × 39 weeks = 5,460.00
TOTAL RECOVERY $13,000.00

---

The maximum attorney fee for this case is $3250. That must cover the attorney's time and expenses for taking the case from the benefit review conference through judicial review. It also assumes the commission approves that amount as reasonable in light of the factors set out at section 4.09(c). Under the former Act, the worker would be entitled to temporary total disability at $153.85 per week for 104 weeks and permanent partial disability benefits at $102.51 per week for 297 weeks, for a total recovery of $46,445.87.

Several attorneys who practice in the workers' compensation field testified. They all agreed that the Act's attorney's fees provisions made it no longer economically feasible for them to handle workers' compensation cases. They also testified that colleagues they had spoken with were of the same opinion.

It is not enough to say, as defendants argue, that the Act does not prevent a worker from hiring an attorney. It is true that it does not. But by reducing the amount attor-

18. Even if a worker has persevered through the entire dispute resolution process and has obtained a satisfactory impairment rating and benefits, he or she must be aware that this process can begin all over again at each three-month interval. Workers receiving supplemental benefits are required to file with the carrier every quarter a report stating (1) that they are earning less than 80 percent of the average weekly wage as a direct result of the impairment; (2) the amount of wages actually earned; and (3) that they have in good faith sought jobs commensurate with their ability to work. § 4.28(k). A carrier disputing the worker's statements on this quarterly report may request a benefit review conference to contest the worker's entitlement to or the amount of supplemental income benefits each quarter. § 4.28(*l*). Thus, the process begins again. From the beginning. It was estimated at trial that a particularly disagreeable carrier can potentially contest a worker's entitlement to benefits 27 times before those benefits finally run out. If the average worker's recovery each quarter is only a couple of thousand dollars, it is certainly a disincentive for any attorney to take a worker, again and again, through this process. Even though a prevailing worker's reasonable and necessary attorney's fees will be paid by the carrier, the attorney for a worker who loses will receive nothing.

neys can collect in fees below that amount justifying the attorney's time and effort, it discourages attorney participation on behalf of injured workers.

Defendants point to the ombudsman program, arguing that it serves to assist those workers not represented by an attorney. *See* § 5.41. They also suggest that the benefit review officer's duty to advise all parties of their rights and responsibilities provides adequate guidance to an unrepresented worker. *See* § 6.13(a)(2). There is no suggestion in the Act that the ombudsman can provide any such assistance at any hearing, and there is no requirement that the ombudsman even be an attorney. While we are certain that most benefit review officers will take their duty to provide information to all parties seriously, that officer also sits in a judicial capacity and must review the parties' contentions impartially. These are poor substitutes for the zealous representation provided by the worker's own attorney, especially when the worker will be opposed throughout the process by a carrier and possibly an employer and their attorneys.

Even if it could be argued that this advice will provide workers with adequate information to represent their own interests, it must be realized that such cases require money to work up. If the injured workers are required to buy any medical reports, where will they get the money to do so? If workers need to investigate the case, where will the money come from? How will they be able to talk to witnesses? If they want to, for example, question whether or not a doctor's impairment rating is correct, where will they get the money to talk to the doctor in order to have a conference with him? How will workers come up with money to pay for depositions or experts? While it is true that a benefit review officer may release benefits to the worker in an interlocutory order, § 6.15(e), it is likely that these funds will be used up in meeting the injured worker's living, rather than litigation, expenses.

Defendants also argue that there is no constitutional right to an attorney in a civil proceeding. We do not hold that an injured worker has a constitutional right to an attorney in a workers' compensation proceeding.

We hold only that it is arbitrary and irrational to discourage legal representation for only one side while doing nothing to prohibit the other side from obtaining representation.

It may be, as the court found, an acceptable goal to maximize an injured worker's portion of recovery and to minimize the worker's attorney's portion. What the Act has accomplished, however, is to strip injured workers of needed representation. This can have no other result in the majority of cases than to reduce or even eliminate the workers' recovery.

The legislature could have denied all parties access to counsel. It could have created a simple, informal system where the commission mediates between unrepresented parties. In reality, it set up a playing field that requires representation and then effectively denies it to workers only. A primary purpose of the Act is to provide more benefits to workers. It strains reason to view such a system and conclude that it will effectuate that purpose. The system enacted is not rationally related to the statutory purpose of increased benefits. We conclude that it violates the equal protection provision of our constitution. Further, the system is arbitrary in its discouragement of attorney representation to one side only, and the means used to redress the problem of delivering greater benefits to injured workers is not reasonably necessary to accomplish that object. The system of attorney compensation therefore also violates the due course of law provision of the constitution.

### H. Impairment of Contracts

 The only provision of the Act found to violate the impairment of contracts provision is section 4.06. That section was also found to violate the due course of law provisions.

 Article I, section 16 of our constitution provides that "[n]o bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." The prohibition is directed against the impairment of the obligation of contracts rather than the contract itself; any law that releases a part of the obligation to perform

the contractual undertaking, or that to any extent amounts to a material change, or modifies it; impairs it. *Cardenas v. State*, 683 S.W.2d 128, 131 (Tex.App.—San Antonio 1984, no writ); TEX.CONST. art. I, § 16, interpretive commentary. The prohibition, however, is not absolute, and must yield to a subsequent valid exercise of the police power. *Texas State Teachers Ass'n v. State*, 711 S.W.2d 421, 424 (Tex.App.—Austin 1986, writ ref'd n.r.e.).

One of the union plaintiffs, Local 2, has in effect a collective bargaining contract that contemplates that the employer will partially supplement injured workers' compensation benefits to cushion their loss of earnings. Under provision 17.0 of that agreement, the employer agrees to pay to an injured worker receiving worker's compensation benefits "the difference between worker's compensation benefits and two-thirds ($\frac{2}{3}$rds) of the employee's weekly salary" up to a maximum of $200 per week for a maximum of six months. Section 4.06 of the Act, as found by the trial court, operates "to penalize employees whose employer, by contract or otherwise, provides wage or benefit programs to supplement benefits under the Act."

The purpose of section 4.06 is to allow an employer to begin payments, including medical benefits, to an injured worker before the compensation carrier has determined compensability. It also allows the employer, with the agreement or at the written request of the employee, to supplement income benefits paid by the carrier by any amount that does not exceed the difference between the level of income benefit payments and the employee's net preinjury pay. If these advances are made, the employer must be reimbursed by the carrier if the injury is found to be compensable and the carrier initiates compensation. The carrier must reduce impairment income benefit payments to the employee by an amount equal to any employer payments made that are not reimbursed or reimbursable, and remit the amount of the reduction to the employer. An employer that does not notify the commission of the injury in compliance with the Act waives reimbursement.

Section 4.06 does not violate the impairment of contracts provision. Section 4.06(d) provides that any payments made do not affect the payment of benefits from any other source, including collective bargaining agreements such as the one involving Local 2. Moreover, if some interpretation of section 4.06 were found to affect a worker's contract rights under a collective bargaining agreement, there is no violation of the impairment of contracts provision because the enactment of a workers' compensation statute is a valid exercise of the police power. *See Grove Mfg. Co. v. Cardinal Constr. Co.*, 534 S.W.2d 153, 155 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.).

Nor does section 4.06 violate the due course of law provisions. Plaintiffs have not shown that a cognizable common law cause of action has been restricted or that section 4.06 operates in an arbitrary or unjust manner.

## I. Low Wage and Seasonal Workers

The court found that the Act creates a classification between employees earning less than $8.50 per hour and those earning above that amount. It also found that the Act calculates the average weekly wage for seasonal workers in a different manner than for non-seasonal workers, and that this method of calculation will reduce the benefits to which seasonal workers are entitled. The court concluded that the Act creates unreasonable classifications between workers earning $8.50 per hour or more and those who do not, and between seasonal and non-seasonal workers. Nevertheless, the court concluded that the Act's methods for computing benefits for workers earning under $8.50 per hour and for seasonal workers do not violate the constitution. In their second cross point, without argument, plaintiffs challenge this conclusion on equal protection grounds.

■■■ Under the Act, all income benefits are payable at some percentage of the worker's average weekly wage ("AWW"). A worker's AWW is calculated according to section 4.10. The formula for calculating the AWW for seasonal workers is different from the formula for calculating the AWW of non-seasonal workers. The AWW for non-seasonal workers, including both full- and part-

time, equals the sum of the wages paid in the 13 weeks immediately preceding the injury divided by 13. If the employee has worked fewer than the 13 weeks immediately preceding the injury, or if the wage at the time of the injury has not been fixed or cannot be determined, the AWW equals "the usual wage that an employer pays a similar employee for similar services." § 4.10(b).

If the worker is a seasonal employee,[19] however, the worker's temporary income benefits are calculated based on a 13–week period, but are "adjusted as often as necessary to reflect the wages the employee could reasonably have expected to earn during the period that temporary income benefits are paid." § 4.10(d). For purposes of determining other income benefits or death benefits, the AWW of the seasonal worker is computed "by dividing the amount of the total wages earned by the employee during the 12 months immediately preceding the injury by 50." *Id.* If the commission determines this computation is impractical, "the commission shall compute the AWW as of the time of the injury in a manner that is fair and just to both parties." *Id.*

With respect to part-time and full-time workers, the Act permits their benefits to be based on the average of their wages for the 13 weeks preceding the injury. With respect to seasonal workers, the measuring period is the wages earned during the 12 months prior to the injury. This distinction is rational because it is based on a clear difference in work patterns between seasonal and non-seasonal workers. Barring unexpected work interruptions, non-seasonal workers would have worked the entire year but for the injury. If an unexpected interruption in employment should occur during the 13 week measuring period, the legislature has provided that the interruption can be bridged by using the wages of a similar worker rendering similar services.

By contrast, seasonal workers would not have worked the full year even if there were no injury and if no unexpected interruptions in work patterns occurred. Furthermore,

there are no workers similar to seasonal workers whose employment pattern could be used as a yardstick to cover unanticipated breaks in employment during the 13–week measuring period because any workers similar to seasonal workers would also have a seasonal work pattern. These are distinctions calling for a different treatment of seasonal workers and non-seasonal workers. The seasonal workers calculation adjusts seasonal workers' wages to more accurately measure their average wages over the course of a work year.

If the legislature had ignored the erratic work pattern of seasonal workers and based the AWW of those workers on wages earned during the weeks when they were working, while ignoring their lack of employment during the off-season, it would have placed seasonal workers in a better income position than they would have been in had they not been injured. Conversely, if seasonal workers were limited to the same 13–week wage period as non-seasonal workers, many seasonal workers would be placed in a *worse* position due to lack of employment during any portion of the 13 weeks immediately preceding the injury.

Accordingly, there is no denial of equal protection in the calculation of benefits for seasonal and non-seasonal workers because the two kinds of workers are not similarly situated, or even if they were, there is a rational basis for treating them differently.

■ The Act also makes a distinction in the calculation of temporary income benefits between workers who earn less than $8.50 per hour and those who earn more. § 4.23. Workers earning $8.50 per hour or more are entitled to receive temporary income benefits at the rate of 70 percent of the difference between the worker's AWW and the worker's weekly earnings after the injury. § 4.23(c). These benefits may not exceed the maximum weekly benefit allowed under section 4.11, which at the time of this suit was $426 per week. Nor may they fall below the minimum weekly benefit provided under section 4.12.

---

**19.** A "seasonal employee" is "an employee who, as a regular course of that employee's conduct, engages in seasonal or cyclical employment that does not continue throughout the year." § 4.10(d).

Workers earning less than $8.50 per hour are entitled to temporary income benefits for the first 26 weeks after the injury at the rate of 75 percent of the difference between the worker's AWW and the worker's weekly earnings after the injury. As with higher-income workers, this amount may not exceed the maximum weekly benefit or be less than the minimum weekly benefit.

There is one other distinction between the treatment of lower- and higher-income workers. The Act contains a second cap or ceiling on temporary income benefits that is applicable only to lower-income workers. In addition to the cap of $426 per week, the Act provides that the benefits received by workers earning less than $8.50 per hour "may not exceed 100 percent of the employee's actual earnings for the previous year." § 4.23(d).

There is a rational basis for the statutory distinction between workers earning more than $8.50 per hour and those earning less than that amount. The distinction is based on a legislative finding that approximately 40 percent of lower-income workers would make more money in workers' compensation benefits than they would earn in wages if an additional cap were not placed on their benefits. As Senator Glasgow stated:

> Low income workers in Texas are treated just exactly like everybody else. We figure their average weekly wage just exactly like everybody else. They're not treated any differently.... The disparity comes, and it looks bad, because the cap was increased.... I don't think it's unreasonable to treat them a little different. So what we did is raise their cut of the average weekly wage from ... seventy percent, to seventy-five percent. And ... what we did in addition to that, we put a cap of one hundred percent on it. *What we found in looking at that, if you don't put a cap on those low income workers, about forty percent of them get on workers' compensation benefits and they make more money on workers' compensation benefits than they do working.* And so what we want those people to do is receive a fair workers' compensation benefit, but we capped it. And the cap is a hundred

percent, and it says you cannot make more money on workers' compensation than you were making while you were working.

Debate on Tex.S.B. 1 on the Floor of the Senate, 71st Leg., 2d C.S., Tape 1 at 14 (Dec. 12, 1989) (transcript available from Senate Staff Services Office) (emphasis added).

The reason higher-income workers are not subject to a cap limiting their benefits to their actual earnings for the previous year is that higher-income workers are more likely to have their weekly benefits limited by the overall statutory cap of $426 per week than lower-income workers. Because of the overall statutory cap, higher-income workers are more likely to prefer actual wages to workers' compensation benefits. Higher paid workers are therefore more likely to return to work because there is little or no economic benefit to stay at home.

By contrast, it would be almost impossible for workers earning only $5 per hour, for example, to work enough hours to ever reach the statutory cap of $426 per week. The statutory cap is therefore ineffective to prevent benefits from exceeding wages for lower-income workers. Consequently, a second cap was needed in order to prevent benefits for lower-income workers from exceeding actual wages. This additional cap of 100 percent of the previous years's wages is a rational method for avoiding what might otherwise have been a statutory disincentive for lower-income workers to return to work.

Thus, there is no denial of equal protection in the calculation of benefits for workers earning more than $8.50 per hour and those earning less.

## VI. SEVERABILITY

■ Section 17.17 of the Act provides:

If any provision of this Act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this Act that can be given effect without the invalid provision or application, and to this end the provisions of this Act are declared to be severable.

Texas Workers' Compensation Act, 71st Leg., 2d C.S., ch. 1, § 17.17, 1989 Tex.Gen. Laws 1, 122.

An entire statute should not be declared unconstitutional:

> unless all the provisions are connected in subject-matter, dependent on each other, operating together for the same purpose, or otherwise so connected in meaning that it cannot be presumed the legislature would have passed the one without the other.... If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must stand.

*Rose,* 801 S.W.2d at 844 (quoting *Western Union Tel. Co. v. State,* 62 Tex. 630, 634 (1884)).

We will look first at two specific provisions we have held unconstitutional—the use of the *Guides,* and the provision compelling hybrid judicial review.

The Act contains a section addressing the use of the *Guides.* If any provision of section 4.24, which adopts the *Guides* in determining impairment, "is held unconstitutional in a final judgment that is not subject to appeal, the Texas Workers' Compensation Commission by rule shall adopt objective impairment guidelines similar to the guidelines published by the American Medical Association." Texas Workers' Compensation Act, 71st Leg., 2d C.S., ch. 1, § 17.171, 1989 Tex. Gen.Laws 1, 122. Defendants argue that this provision should prevent the entire Act from being declared unconstitutional based on a finding that section 4.24 is unconstitutional. This argument prompts several comments. We note first that our judgment is certainly subject to appeal and so section 17.171 is not yet operative. Second, the fact that the commission may be called upon to draft impairment guidelines should have no bearing on the current severability of section 4.24. Third, we have held that many provisions other than section 4.24 are unconstitutional. Even if section 4.24 were not unconstitutional, the remainder of the Act would be so gutted by removal of the unconstitutional provisions, that it could not stand. Fourth, given our analysis of the impairment system established by the Act, it is doubtful that replacing the *Guides* with similar guidelines would salvage section 4.24.

With regard to hybrid review, defendants, relying on *Southwestern Bell* and *Southern Canal,* urge us to strike the Act's de novo review provision and thereby sanction review of all issues under the substantial evidence test. If hybrid review were the only unconstitutional provision, we would perhaps have to consider this argument. It is, however, only one of many. Even if we were to chose a single standard of review, that alone would not save the entire Act.

Removal of the provisions of the Act we have held unconstitutional—reliance on the *Guides,* the 15 percent threshold, the opt out provision, the trial by jury provision, hybrid judicial review, and the provisions regarding attorney's fees and involvement—leaves very little of the operative portions of the Act in effect. If these unconstitutional portions are struck down, we must conclude that that which remains is not, in the words of *Western Union,* "complete in itself" or "capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected." Furthermore, it is apparent that the constitutional and unconstitutional provisions "are connected in subject-matter, dependent on each other, operating together for the same purpose, or otherwise so connected in meaning that it cannot be presumed the legislature would have passed the one without the other." Undoubtedly, the provisions relating to the *Guides* and the 15 percent threshold together form the foundation on which the entire compensation structure created by the Act rests. Without this foundation the benefits system must collapse. And without the benefits system, there is no requirement for an adjudication system. We are forced to conclude, in the language of the severability clause, that the constitutional provisions of the Act cannot be given effect without the invalid provisions.

We therefore hold that the Act, in its entirety, is unconstitutional.

## VII. EXCLUSION OF EVIDENCE AND DENIAL OF LEAVE TO FILE PLEADING

■ Two final matters remain to be discussed. The intervenors argue that the trial court erred in excluding certain evidence and in denying them leave to file a supplemental pleading within seven days of trial.

The trial court excluded the testimony of an actuary and of an actuarial study conducted at the request of the State Board of Insurance, which evaluated the costs and benefits of the Act as compared to the former Act. The study concluded that the Act would provide greater overall benefits at less cost for workers injured in 1991 than would the former Act. Plaintiffs objected on the ground that the evidence was unreliable.

■ Opinions based entirely on inadmissible facts or data may be admitted if the facts or data are of a type reasonably relied upon by experts in the field. TEX.R.CIV. EVID. 703. Even so, the facts or data relied upon must themselves be reliable. The actuary would have testified that the samples and methods used for the study followed accepted actuarial practices and was reviewed by other actuaries. The study itself, however, stated that the data currently available are "far from perfect" and required its preparers to rely on "[n]on-Texas data; outdated information; non-insurance data; and judgment"; that it was not possible to predict the near-term effects of the Act precisely; and that "statistical significance cannot be attributed to the calculations of SB1 benefits." The court excluded both the study and the testimony relying upon the study.

We cannot say the court erred in excluding this evidence. The court must determine, not only that the facts or data are of the type relied upon by experts in the field, but also that such reliance is reasonable. 33 S. GOODE, O. WELLBORN & M. SHARLOT, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 703.3 (Texas Practice 1988). The court could have concluded that the study, and therefore the opinion testimony to be based upon it, were so infected by untrustworthy data that it would not prove helpful to the fact finder. *See Id.; Thompson v. Mayes*, 707 S.W.2d 951, 956 (Tex. App.—Eastland 1986, writ ref'd n.r.e.) (un-

derlying data should be sufficiently reliable for the testimony of the witness to provide assistance to the fact finder).

Even if the trial court erred in excluding this testimony, intervenors have not shown that the error was harmful. TEX.R.APP.P. 81(b)(1).

■ The court also excluded the testimony of a law school professor offered as an expert in constitutional law and on causes of action and defenses available under past and present common law. By bill of exception defendants advised the court that the professor would have testified to the reasonableness and constitutionality of the Act. This testimony was properly excluded under the rule precluding the admission of opinion testimony concerning domestic law. *Carr v. Radkey*, 393 S.W.2d 806, 813 (Tex.1965); *American Nat'l Bank & Trust Co. v. First Wis. Mortgage Trust*, 577 S.W.2d 312, 320 (Tex.Civ.App.—Beaumont 1979, writ ref'd n.r.e.); 2 R. RAY, TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL § 1423 (Texas Practice 1980).

■ Intervenors also complain that the court erred in denying them leave to file a supplemental plea in intervention, motion to transfer venue, and amended answer within seven days of trial. They assert the pleading was needed to answer the allegations of two new plaintiffs added the month before trial. The motion for leave was filed on the second day of trial, April 23, 1991, and presented to the court on the third day of trial. The additional plaintiffs were added in plaintiffs' third amended petition filed March 11, 1991. Plaintiffs' only objection was a continuing one to the participation of the intervenors in the case at all; they did not contend that they were harmed or surprised by the pleading.

Pleadings tendered within seven days of trial shall be filed only after leave of court is obtained, and leave shall be granted unless there is a showing the filing will operate as a surprise to the opposite party. TEX.R.CIV.P. 63. Intervenors' supplemental pleading is largely identical to their previous pleading. In both they move to transfer venue to Tra-

vis County, they move to dismiss due to the lack of a justiciable controversy, they seek to abate because necessary parties have not been joined, they allege plaintiffs lack standing, and they file a general denial. In the supplemental pleading they mention the new plaintiffs specifically in their allegation that plaintiffs lack standing and they add an allegation that Rivero has waived his right to challenge the Act's constitutionality by accepting benefits under it. As mentioned, plaintiffs failed to allege surprise. It is doubtful they could have since the supplemental pleading was so identical to its predecessor. Without a showing of surprise, leave should have been granted to file the pleading. *Goswami v. Metropolitan Sav. & Loan Ass'n*, 751 S.W.2d 487, 490 (Tex.1988).

The error, however, was not harmful. Intervenors' contentions regarding the new plaintiffs were fully litigated.

## VIII. CONCLUSION

The portion of the trial court's judgment holding that the designated doctor provisions of the Act are unconstitutional is reversed, and it is rendered that those provisions are not unconstitutional. The portion of the trial court's judgment holding that the Act does not create an unconstitutional hybrid system of judicial review is reversed, and it is rendered that the Act does create an unconstitutional hybrid system of judicial review. The portion of the trial court's judgment holding that section 4.06 of the Act violates the impairment of contracts and due course provisions of the Texas Constitution is reversed, and it is rendered that section 4.06 does not violate those provisions. In all other respects, the judgment is affirmed.

BIERY, Justice, concurring.

I concur with the opinion of Chief Justice Reeves. As set forth by the majority in Section C of the opinion, the constitutionality of a statute must be viewed from the perspective of whether the means are appropriate and reasonably necessary to accomplish the objective and whether the statute operates in an arbitrary or unjust manner. Ultimately, such a decision is a judgment call upon which reasonable minds will differ. As stated by Justice Cardozo, the social interest served by symmetry or certainty (in this case exemplified by the new Act) must be balanced against the social interest (and in this case the constitutional interest) served by equity and fairness or other elements of social welfare. In making those decisions which seek to insure a level playing field and in drawing those constitutional lines, we do so not in a vacuum, but "from experience and study and reflection; in brief, from life itself." Benjamin N. Cardozo, *The Nature of the Judicial Process*, p. 112–113 (1921). In the many months of the pendency of this appeal, that process has faithfully been adhered to and the result has indeed been that reasonable minds have reached different conclusions about the new Act in relation to the Texas Constitution. In that spirit, I write to complete the partial historical review begun in the opinion of Justice Peeples.

With reference to the issue of attorneys' fees (Section G of the majority and Section F of Justice Peeples' dissent), I agree with Justice Peeples there is nothing constitutionally infirm in the 25% limitation in the new Act, similar to that of the old Act. The infirmity lies in the labyrinth of procedural hoops of the new Act, detailed by the majority, through which injured workers must jump thus creating an unconstitutionally unlevel playing field violative of equal protection. For a historical analogy, we need look only as far as the promise of the right to vote realistically abridged by the barriers of poll taxes and literacy tests. *See Harper v. Virginia State Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966).

While we in the judicial branch should, and do, give great deference to the enactments of the legislative branch, we must never lose sight of the genius of this experiment in self-government: that the people are sovereign, and the will of the sovereign people, as expressed in their constitution and any amendments the people choose to make, is superior to any enactment of the legislative body. "[W]here the will of the legislature, declared in its statutes, stands in opposition to that of the people, declared in the Constitution, the judges ought to be governed by the latter

rather than the former." THE FEDERALIST No. 78 (Alexander Hamilton).

Although much mischief was done in the name of substantive due process, the idea that one may not take another's property without a justifying public purpose is a fundamental liberty. In speaking of the limitations of governmental power to deal with private property, the first Chief Justice Phillips said:

> The powers of government, under our system, are nowhere absolute. They are but grants of authority from the people, and are limited to their true purposes. The fundamental rights of the people are inherent and have not been yielded to governmental authority. They are the subjects of individual authority. Constitutional powers can never transcend constitutional rights. The police power is subject to the limitations imposed by the Constitution upon every power of government; and it will not be suffered to invade or impair the fundamental liberties of the citizen, those natural rights which are the chief concern of the Constitution and for whose protection it was ordained by the people. All grants of power are to be interpreted in the light of the maxims of Magna Charta and the Common Law as transmuted into the Bill of Rights; and those things which those maxims forbid cannot be regarded as within any grant of authority made by the people to their agents.

*Spann v. City of Dallas,* 111 Tex. 350, 235 S.W. 513, 515 (1921) (citations omitted).

That such principles remain vital today is illustrated by *Eggemeyer v. Eggemeyer,* 554 S.W.2d 137 (Tex.1977). There the supreme court, speaking through Justice Pope, held that our due course of law provision prohibits the transfer of one spouse's separate property to the other spouse in a divorce action. Justice Pope said:

> The protection of one's rights to own property is said to be one of the most important purposes of government. That right has been described as fundamental, natural, inherent, inalienable, not derived from the legislature and as preexisting even constitutions. Article I, section 19, of the Texas Constitution explains that no citizen of this state shall be deprived of his property except by the due course of the law of the land. The due course that protects citizens requires not only procedural but also substantive due course.

*Id.* at 140 (citations and footnote omitted). *See also Texas Power & Light Co. v. City of Garland,* 431 S.W.2d 511, 518 (Tex.1968) (ordinance interfering with a private utility's franchise rights stricken); *Falfurrias Creamery Co. v. City of Laredo,* 276 S.W.2d 351, 355 (Tex.Civ.App.—San Antonio 1955, writ ref'd n.r.e.) (portion of milk inspection ordinance stricken as unduly burdensome in light of ends served).

Justice Pope relied in this opinion upon a statement by Justice Brandeis, acknowledged by the dissent as one of the great justices, who, speaking for a unanimous court, said, "[T]his court has many times warned that one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." *Thompson v. Consolidated Gas Co.,* 300 U.S. 55, 80, 57 S.Ct. 364, 376, 81 L.Ed. 510, 524 (1936).

We do not defend the use of substantive due process or any other constitutional doctrine as a subterfuge for the implementation of a court's own social agenda. And yet neither are we, as an intermediate court, free to ignore supreme court mandated constitutional doctrine to satisfy our own philosophy of judicial restraint, our own notions of social policy, or our own selective view of history. This intermediate appellate court must apply the provisions of our constitution as interpreted by our supreme court.

Substantive due process was used by the United States Supreme Court to overturn legislative enactments on the ground they had deprived litigants of property rights without the benefit of due process.[1] *See e.g.*

---

1. Between 1889 and 1918, the Supreme Court approved the exercise of state police power in 369 of 422 cases in which it was challenged. 2 CHARLES WARREN, THE SUPREME COURT IN UNITED STATES HISTORY, 741 (1922). From 1790 through 1972, the Supreme Court struck down as unconstitutional only 106 federal statutes and 803 state statutes out of thousands passed. JETHRO K. LIE-

*Adkins v. Children's Hosp.*, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923) (struck down a District of Columbia minimum wage law for women as a violation of liberty of contract under the due process clause of the Fifth Amendment); *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817 (1922) (overturned Congress's second attempt to regulate child labor, this time using the taxing power, by adding a 10% tax on the net profits of any firm employing child labor; court declared the act an unconstitutional invasion of the reserved powers of the states); *Hammer v. Dagenhart*, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918) (overturned the Child Labor Act of 1916, which prohibited the passage in interstate commerce of goods produced by child labor, as an unconstitutional invasion of state police power); *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (overturned a New York law limiting the working day in the baking industry to ten hours on substantive due process and liberty of contract grounds). Carried to its logical conclusion, substantive due process would not only allow the exploitation of child labor, but, presumably, would overrule legislation prohibiting the ownership of other human beings because such legislation would be a violation of property rights.

Substantive due process is not a part of our federal constitutional jurisprudence today [2] and federal substantive due process is not the basis of our opinion in this case. Our decision in this case does not turn on property rights, liberty of contract, or other catchphrases of substantive due process. Rather, we reviewed the statute in question as it impacts several provisions written by the sovereign people in the Texas Bill of Rights, including equal protection, due course of law,

right to jury trial, and open courts. We found many parts of the statute to be lacking by virtue of their failure to provide an adequate substitute for the relinquishment of workers' common law rights, and in their unreasonableness and arbitrariness when balanced against the purpose of the statute. If historical common law rights are to be abrogated by legislative action, it seems axiomatic that such regulatory schemes should provide a level playing field for all those affected by the statute, and fulfill the covenant in our social contract that all will be treated fairly. Thus, our intellectual parentage is not the federal substantive due process artifice abused by the early twentieth century Supreme Court, but rather, fundamental principles woven into the constitutional fabric of Texas by the sovereign people. Those principles and our history seek not to make democracy mere majoritarianism, but to strike a reasonable balance between the rights of the majority and adequate protection for those who are not a part of the power structure or the majority. Lest we forget, it was the powerless few who fled the despotism of Europe to establish a more just society which attempts to build that level playing field for the few as well as the many. Some of the mechanisms employed are trial by jury, due course of the rule of law, and equal protection, all of which we reaffirm today.

Can a legislature substitute its will, through statute, for that of the sovereign people as expressed in the Constitution? Is the legislature to be the final arbiter of its own powers? Are legislative enactments, which transgress constitutional prohibitions, nevertheless obligatory? In answering these questions in the negative and in speaking against domination by the majority, James

---

BERMAN, THE ENDURING CONSTITUTION, A BICENTENNIAL PERSPECTIVE at 354 (West 1987). After 1941, the totals are only 36 federal and 145 state statutes declared unconstitutional. *Id.* Notwithstanding the demise of substantive due process, the United States Supreme Court has not abandoned its judicial review responsibilities, nor, on the other hand, has it failed in the vast majority of cases to give due deference to legislative enactments.

**2.** An exception to this general rule exists, to a limited extent, in civil rights cases. *See Washington v. Harper*, 494 U.S. 210, 220, 110 S.Ct. 1028,

1035, 108 L.Ed.2d 178 (1990) (treatment of prisoner with antipsychotic drugs against his will implicates potential substantive due process violation); *Ingraham v. Wright*, 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977) (corporal punishment in public schools involves substantive due process issue); but *see Graham v. Connor*, 490 U.S. 386, 392–94, 109 S.Ct. 1865, 1869–70, 104 L.Ed.2d 443 (1989) (rejecting use of substantive due process analysis in 42 U.S.C. 1983 excessive force cases).

Madison said, "The accumulation of all powers ... in the same hands ... may justly be pronounced the very definition of tyranny." THE FEDERALIST No. 47.

The historical intent of the sovereign people was to create an inefficient system of government established on a theory of limited powers and checks and balances. No one branch of government could assume too much power. To Madison "the preservation of liberty requires that the three great departments of power should be separate and distinct." *Id.* That legislatures diffused power among a number of members rather than a few, or that their offices were elective rather than appointive or hereditary, provided no comfort. "An *elective despotism* was not the government we fought for...." THOMAS JEFFERSON, *Notes on the State of Virginia,* in WRITINGS 245 (Library of America 1984) (emphasis in original). In *Democracy in America,* Alexis de Tocqueville saw that democracy is potentially more threatening to liberty than monarchy or aristocracy: "[A] king's power is physical only, controlling actions but not influencing desires, whereas the majority is invested with both physical and moral authority, which acts as much upon the will as upon behavior and at the same moment prevents both the act and the desire to do it." ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA, 254 (J.P. Mayer, ed. & George Lawrence, trans. Perennial Library 1969). "[Democratic despotism] would be more widespread and milder; it would degrade men rather than torment them." *Id.* at 691.

The primary check on legislative encroachment, short of the ballot box and executive veto, is the principle of judicial review. Alexander Hamilton set forth perhaps the most compelling argument for the absolute necessity of judicial review in a government of limited powers:

> No legislative act ... contrary to the Constitution, can be valid. To deny this would be to affirm that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves; that men acting by virtue of

powers, may do not only what their powers do not authorize, but what they forbid.

\* \* \* \* \* \*

> [T]he courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority. The interpretation of the law is the proper and peculiar province of the courts. A constitution is, in fact, and must be regarded by the judges, as a fundamental law. It therefore belongs to them to ascertain its meaning, as well as the meaning of any particular act proceeding from the legislative body. If there should happen to be an irreconcilable variance between the two, ... the Constitution ought to be preferred to the statute, the intention of the people to the intention of their agents. *Nor does this conclusion by any means suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both....*

THE FEDERALIST No. 78 (Alexander Hamilton) (emphasis added).

The dissent contends our opinion prevents the people, acting through their legislative representatives, from governing. Yet when a legislature acts in excess of its constitutional authority, it is not the people who govern; it is the people who are governed. The legislature is not the people, but the servant of the people, acting in their behalf within a limited, delegated authority.

These principles were recognized by Chief Justice John Marshall who echoed Hamilton in his effort to erect our constitutional jurisprudence on the foundation of judicial review. He boldly declared that "an act of the legislature, repugnant to the constitution, is void." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). It is emphatically the province and duty of the judicial department to say what the law is. *Id.* Those who controvert the principle that the constitution is paramount law would give to the legislature "a practical and real omnipotence and would reduce to nothing what we have

deemed the greatest improvement on political institutions, a written constitution."

*Id.* at 178.[3]

Could it be the intention of those who gave this power, to say that in using it the constitution should not be looked into? That a case arising under the constitution should be decided without examining the instrument under which it arises?

This is too extravagant to be maintained.

*Id.* at 179.

If we are to take our constitutional duties seriously we cannot dismiss due course of law, equal protection, and the right to trial by jury guaranteed by the sovereign people to themselves as mere "garb," smoke-screen, or window dressing. Our Texas forbearers were rebelliously emphatic in exercising their sovereignty and placing great value on these liberties:

To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.

TEX. CONST. art. I, § 29.

Were we to be easily seduced into deferring to the legislature in all matters of economic regulation, and were we to fail to review honestly and objectively the constitutionality of any piece of legislation when called upon to do so, we would abdicate our duty to honor the Constitution above any act in conflict with it, and we would repudiate our oath to "preserve, protect, and defend" that Constitution. TEX. CONST. art. XVI, § 1. If the sovereign people of Texas wish to relinquish the fundamental rights of trial by jury, equal protection, due course of law, and open courts, there is, under the rule of our law, an amendment process by which the sovereign people can act. Unless and until

the sovereign people do act, we are bound by our oath and the rule of law to uphold and defend those constitutional guarantees.

CHAPA and GARCIA, JJ., join.

CHAPA, Justice, concurring and dissenting.

I concur with the opinion of Chief Justice Reeves and the response of Justice Biery emphasizing the duty of the judiciary to "preserve, protect, and defend" the state constitution by honestly, objectively, and courageously reviewing the constitutionality of any piece of legislation when called upon to do so. TEX. CONST. art. XVI, § 1. However, I respectfully dissent with the conclusion of the majority that the Act is constitutional as to the provision granting presumptive weight to the opinions of the designated doctor.

The Act establishes for the first time in Texas a "designated doctor" whose findings are given "presumptive weight" on the issues of impairment ratings and determinations of maximum medical improvement. In creating the presumption in favor of the designated doctor, the legislature hoped to inject a doctor into the system who was more likely to be objective than the doctors chosen by the workers or the insurance companies. The question is whether they succeeded in doing it constitutionally.

The trial court found that the effect of the presumptions given the designated doctor's testimony "is to arbitrarily subordinate the diagnosis of the worker's treating doctor and give unreasonable weight to the opinions of the designated doctor who is not the patient's treating doctor." The court found that the "presumption is unsound from a medical point of view and arbitrary from an administrative point of view. This presumption is arbitrary and contrary to reasonable medical standards." The court also found that the designated doctor provision usurps the fact-finding responsibility of the commission and

---

**3.** In *Marbury,* Marshall declared an act of congress unconstitutional even though no one had challenged its constitutionality. Nor was such a declaration necessary to the decision. Marshall needed to say nothing more than, "We lack jurisdiction to issue the writ of mandamus because that authority is not within our original jurisdiction as specified in Article III; writ denied, case

dismissed." Yet he went out of his way to declare unconstitutional an act that no one had before presumed to be outside Congress's authority. While *Marbury v. Madison* can be said to be an example of judicial activism, it does nevertheless form the cornerstone of the judicial branch's obligation to ensure that legislative enactments pass constitutional muster.

the courts. The court found the provision violates the due course, equal protection, and trial by jury provisions of the Texas Constitution.[1] I agree with the trial court for the following reasons.

A constitutionally valid presumption must be fairly rebuttable by the party it operates against. A law giving the act of a public official the effect of raising a prima facie presumption, which does not deprive the person affected of the right to fairly rebut the presumption, does not deny one due process. *Weatherly v. Jackson*, 123 Tex. 213, 71 S.W.2d 259, 267 (1934); *Green v. State*, 272 S.W.2d 133, 135 (Tex.App.—Beaumont 1954, writ ref'd n.r.e.).

In *Mobile, J. & K.C.R. Co. v. Turnipseed*, 219 U.S. 35, 43, 31 S.Ct. 136, 138, 55 L.Ed. 78, 80–81 (1910), the United States Supreme Court established further limitations on legislative presumptions, articulating the following test:

> That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law, it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate. So, also, it must not, under guise of regulating the presentation of evidence, operate to preclude the party from the right to present his defense to the main fact thus presumed.

Thus, we must consider these factors in reviewing whether the presumption in favor of the designated doctors outlined in the Act is constitutional.

At the commission hearings, the testimony of the designated doctor is given presumptive weight in the determination of whether the worker has reached maximum medical improvement and what impairment rating should be assigned to the injury. §§ 4.25(b), 4.26(g). The commission's determinations in these areas is to be based on the designated doctor's report "unless the great weight of the other medical evidence is to the contrary." §§ 4.25(b), 4.26(g). However, the fact that the designated doctor is chosen only when there is a dispute between the doctors hired by the worker and those hired by the carrier or employer guarantees that in the usual case the other medical evidence will not preponderate against the testimony of the designated doctor unless one party is able to obtain sufficient medical evidence to successfully challenge the designated doctor. Thus, the "great weight" burden obviously unfairly favors the party whose greater resources make it possible to consult and obtain the most medical evidence that agrees with the preferred diagnosis. Although it is true that to some degree greater resources in general place one party in a more favorable position than another in most litigations, here by act of the legislature [2] the worker was placed in a less favorable position.

In the context of judicial review, the presumption provision continues to favor the party with the greater resources through the remainder of the adjudication process. In the initial substantial change of condition hearing before the court, the court must accept the presumption in favor of the designated doctor unless rebutted by a preponderance of the medical evidence presented. Thus, the party with the greater resources is again favored at this stage of the process. This initial hearing is critical to the entire judicial process since a condition precedent to the presentation of any new evidence to a jury depends entirely on a substantial change of condition finding by the trial court at this hearing. Consequently, the party with the greater resources has the greater potential to eventually succeed in presenting new evi-

---

1. The majority opinion correctly points out the several reasons why the Texas Constitution offers significantly broader due process protection than the federal constitution, which is clearly recognized by the United States Supreme Court. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152 (1982).

2. We must remain cognizant that the prior law replaced by the Workers' Compensation Act contained no presumptions, and it was the jury that appropriately assessed the credibility of all witnesses, including medical witnesses, and what weight, if any, to be given their testimony.

dence to the jury. Moreover, the Act specifically provides that the commission's evidence and decision be made known to the jury by the court, thus having the effect of notifying the jury of which doctor's findings found favor with the commission and the potential of usurping the fact finding responsibility of the jury. Consequently, this provision of the Act unconstitutionally denies the worker due process by providing a presumption which is unfairly more rebuttable by the party with the most resources and by usurping the fact finder's responsibilities.[3]

Defendants also argue that the presumption in favor of the designated doctor has a rational basis—because designated doctors, who are not aligned with either party, are more likely to be objective and because "it is rational for the trier of the fact to give greater weight to the testimony of a disinterested witness than to the testimony of a self-interested one." While it may be rational for the trier of fact, in the proper discharge of its duties, to give more weight to the testimony of the disinterested witness, *see Tinkle v. Henderson*, 777 S.W.2d 537, 539 (Tex.App.—Tyler 1989, writ denied), it is a usurpation of its responsibilities to have this greater weight legislatively mandated. This is especially so in the present statute when the presumption in favor of the designated doctor is not fairly rebuttable and is, as we shall see, arbitrary and unreasonable because there is no rational connection between the facts proved and the fact presumed.

Defendants argue that the presumption cannot be considered arbitrary or irrational merely because the legislature might have excluded consideration of other relevant factors, such as the doctor's medical qualifications, his or her familiarity with the worker's condition, and the nature and extent of the examination. In support of this argument, defendants rely on *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). Before the court in that case was a challenge to the constitutionality of statutory presumptions that coal miners

with ten years' employment in the mines who suffer from pneumoconiosis are presumed to have contracted that disease from their employment and that coal miners with ten years' employment in the mines who die from a respiratory disease will be presumed to have died from pneumoconiosis. The statute explicitly made these presumptions rebuttable, and their effect was simply to shift the burden of going forward with evidence from the claimant to the mine operator. *Id.*, 428 U.S. at 27, 96 S.Ct. at 2898. It was agreed that pneumoconiosis is caused by breathing coal dust and that the likelihood of a miner's developing the disease rested upon both the concentration of dust the miner has been exposed to and the duration of exposure to the dust. In addition, the United States Congress had before it medical evidence indicating the noticeable incidence of pneumoconiosis in cases of miners with ten years' employment in the mines. In light of these facts, the Court held:

> Congress was surely entitled to select duration of employment, to the exclusion of the degree of dust exposure and other relevant factors, as signaling the point at which the operator must come forward with evidence of the cause of pneumoconiosis or death, as the case may be. We certainly cannot say that the presumptions, by excluding other relevant factors, operate in a "purely arbitrary" manner.

*Id.* at 29–30, 96 S.Ct. at 2899.

We are cited to nothing in the legislative record to indicate that designated doctors will be inherently more accurate in their diagnoses than doctors hired by workers or carriers. We cannot even assume, as we are apparently urged to do, that designated doctors will in every case be impartial or that all hired doctors will abandon their professional responsibilities to please whoever pays them and are therefore unreliable. The presumption is particularly inappropriate when, as in the present case, the procedures adopted

---

**3.** Under our judicial system, it is the primary function of juries to weigh the testimony of various witnesses and assess the credibility of each one. In hearings before the court, the trial judge is charged with the responsibility of gauging the credibility of the witnesses. Thus, all fact finders must be free from any undue influences to exercise their discretion in this respect, or their fact finding responsibilities will be usurped.

make rebuttal unfairly more available to the party with the most resources.

In *Usery,* the Supreme Court held that a presumption does not constitute a denial of due process or equal protection if there is some rational connection between the fact proved and the ultimate fact presumed and that the inference of one fact from proof of another is not so unreasonable as to be a purely arbitrary mandate. *Usery,* 428 U.S. at 28, 96 S.Ct. at 2898.

In the Act, the fact "proved" is that the designated doctor reached medical conclusions regarding the injured worker. The fact presumed is that those conclusions are accurate and, conversely, that the conclusions of the doctors who disagree are inaccurate. There is no rational connection between the fact that the designated doctor diagnosed the injured worker and the accuracy of that diagnosis. The Act creates a "purely arbitrary mandate." *Turnipseed,* 219 U.S. at 43, 31 S.Ct. at 138.

I agree with the trial court that the designated doctor provision is unconstitutional. In addition to the previously discussed constitutional infirmities, the provision violates the open courts, due process, and equal protection requirements of our constitution because it arbitrarily grants conclusive effect to the opinion of one doctor, especially one who is not the treating physician.[4]

GARCIA, J., joins.

PEEPLES, Justice, dissenting.

The core issue in this appeal is not what rules society should provide for workplace accidents, but which branch of government is entitled to make those rules. The court has denied the people of Texas, acting through their legislature and governor, the ability to rewrite an old statute because the 1989

changes stray too far from the common law. That is, *judges* have denied the people the right to make meaningful changes in *judge-made* rules of law. The court says the legislature tried to take away common-law rights without providing an adequate substitute. Then, refusing to consider all the evidence of the statute's adequacy, the court strikes it down. The message? Courts will permit legislative tinkering but not major changes in the common law. For some observers, this is a case about what rules will apply to lawsuits involving on-the-job injuries. But really this case is about who governs.

The court's rationale is twofold. First, the court says the 1989 act alters the common law too much. The act seeks to make wholesale change, which the constitution's open courts provision does not permit. Second, the court says the act does not accomplish all its goals; in particular it does not increase benefits to workers, which was one of several goals. Therefore it is not a rational piece of legislation, and it violates the constitution's equal protection and substantive due process guarantees. This, in a nutshell, is what the court has said. I respectfully dissent from this unwarranted exercise of judicial power.

When the people in a democracy think judges have allowed the common law or a statutory scheme to get out of hand, they are within their rights to seek a cure from the legislature. After all, legislatures are in the business of governing, and governing sometimes calls for a change in court-made rules. "Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances." *Munn v. Illinois,* 94 U.S. 113, 134, 24 L.Ed. 77, 87 (1877).

Of course, such changes may not violate the constitution. Justice Biery's concurrence

---

4. The following colloquy between Senators Parker and Glasgow regarding the presumption provision is instructive:

> PARKER: So is the answer to your question we're not gonna rely on these insurance doctors now, we're gonna rely on this agency designated doctor to tell us when we're well. Is that the difference?
> GLASGOW: Well no. We're going to rely upon that but it's only presumptive and it can be rebutted with anything in the world.

> PARKER: Well, if there's-no, not with anything in the world....
> GLASGOW: Medical testimony, other medical testimony.
> PARKER: Or you got to prove him wrong, clearly wrong, don't you?
> Debate on Tex.S.B. 1 on the Floor of the Senate, 71st Leg., 2d C.S., Tape 1 at 19–20, Tape 2 at 1 (Dec. 12, 1989) (transcript available from Senate Staff Services Office).

goes to some length to make an elementary point that no one disputes: courts have a duty to judicially review statutes and to void them if they violate the constitution. I heartily agree with that proposition. But if the constitution has not clearly been violated, we have an equally important constitutional duty to uphold statutes against constitutional attack by those who were outvoted in the legislature. The legislative majority and the people who elected them are entitled to no less. Judicial review, like all power, can be abused. If we engage in judicial review with hostility instead of deference toward the statute, we abuse our power.

Expansive interpretations of the bill of rights may add to individual rights but they also subtract from the majority's power to legislate. I agree that if the bill of rights makes a topic off-limits to the legislature, courts must stand fast against the legislation. But that begs the question: what limits has the bill of rights set? The court holds that the constitutional guarantee—"All courts shall be open, and every person ... shall have remedy by due course of law"—means the legislature cannot significantly change court-made rules. That is an excessive extension of the judiciary's power to define judicial turf expansively and to declare it off-limits to the legislature.

Let us be very clear: The court's result is not required by precedent. When the Texas Supreme Court upheld the first workers' compensation act in 1916, it stated broadly that individuals have no legal right, enforceable in court, to prevent the legislature from changing common-law rules. *Middleton v. Texas Power & Light Co.*, 108 Tex. 96, 185 S.W. 556, 559 (1916), *aff'd*, 249 U.S. 152, 39 S.Ct. 227, 63 L.Ed. 527 (1919). The United States Supreme Court has always followed the same rule. *See, e.g., Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 87–88 & n. 32, 98 S.Ct. 2620, 2638 & n. 32, 57 L.Ed.2d 595 (1978); *Middleton v. Texas Power & Light Co.*, 249 U.S. 152, 163, 39 S.Ct. 227, 231, 63 L.Ed. 527 (1919); *New York Central R.R. Co. v. White*, 243 U.S. 188, 198–202, 37 S.Ct. 247, 250–52, 61 L.Ed. 667 (1917); *Munn v. Illinois*, 94 U.S. 113, 134, 24 L.Ed. 77 (1877).

Later Texas cases have said in dictum that under *Middleton* the legislature may repeal common-law rules *if an adequate substitute is provided*. *See Lucas v. United States*, 757 S.W.2d 687, 690 (Tex.1988); *Nelson v. Krusen*, 678 S.W.2d 918, 922 (Tex.1984); *Sax v. Votteler*, 648 S.W.2d 661, 667 (Tex.1983); *Lebohm v. City of Galveston*, 154 Tex. 192, 275 S.W.2d 951, 954 (1955). That is not what *Middleton* said,[1] and it is not what the Texas

---

1. "[N]o one has a vested interest in the rules, themselves, of the common law; and it is within the power of the Legislature to change them or entirely repeal them [citations omitted]." *Middleton v. Texas Power & Light Co.*, 108 Tex. 96, 185 S.W. 556, 559 (1916). The court qualified this statement by saying that a legislature could not make a party liable without proof that it breached a legal duty, but the legislature could eliminate an *employer's* defenses. *Id.* The court then made similar statements about the *employee's* loss of his right to bring suit in reliance on common-law causes of action. The court agreed the legislature could not take away a vested right of action that had accrued before its passage, *id.* at 560, but said no one has a right to preserve the common-law rules that might apply to a future injury:

> That which is withdrawn from the employee is merely his right of action against the employer, as determined by the rules of the common law, in the event of his future injury. This is nothing more or less than a denial to him by the Legislature of certain rules of the common law for the future determination of the employer's liability to him for personal injuries incurred in the latter's service, and, in the plan of com-

pensation provided, the substitution by the Legislature of another law governing such liability and providing a different remedy. The question is: Was the Legislature without the power to thus completely change the law upon the subject? This inquiry has no concern in the wisdom of the change; it takes no account of the reason for it; it is limited to the naked question of the Legislature's power.

> That the Legislature possessed the power, must be conceded, unless it be true that the employee is protected by the Constitution in the continuance of the rules of the common law for his benefit in the determination of the employer's liability for such injuries as those with which the Act deals. *That no one has a vested right in the continuance of present laws in relation to a particular subject, is a fundamental proposition; it is not open to challenge.* The laws may be changed by the Legislature so long as they do not destroy or prevent an adequate enforcement of vested rights. *There cannot be a vested right, or a property right, in a mere rule of law.*

185 S.W. at 560 (emphasis added). The court observed that the legislature may change com-

Constitution says. But the "adequate substitute" statement has been repeated in dictum so often that I accept it as binding on this court. Nevertheless, the Texas Supreme Court has never struck down a statute that provides a substitute for common-law rules, especially a comprehensive and well-thought-out scheme such as this statute. The recent supreme court decisions have dealt with statutes that totally withdrew the right to seek damages above a certain limit (*Lucas*) or statutes that set up obstacles that made it impossible to bring a suit on time (*Sax, Nelson*). None of these decisions involved a statutory substitute for common-law rights.

The "adequate substitute" concept seems to have originated in *Lebohm*. There the court struck down a provision of the Galveston charter denying liability for defects on city streets and sidewalks. The court held that a city cannot "arbitrarily" abolish a well-established right to sue. On rehearing the city suggested that under the original opinion the workers' compensation act would also be unconstitutional because it abolished the right to sue in tort for workplace injuries.

The *Lebohm* court's answer on rehearing to the city's suggestion spells out the meaning of the "adequate substitute" principle that we apply today. In its original opinion the supreme court had said legislative bodies may not "arbitrarily abolish causes of action." Perhaps, said the court on rehearing, we should have said that the open courts provision "prohibit[s] legislative bodies from *arbitrarily withdrawing all legal remedies* from one having a cause of action well established and well defined in the common law." 275 S.W.2d at 954 (emphasis added). The court stressed the word "arbitrarily" and noted that the workers' compensation act "simply substituted a different but certain and adequate legal remedy for the one that existed at common law." *Id.*

The court then said that statutes revising and redefining common-law rights may also be justified by public policy and the general welfare. The court summarized its holding as follows:

> Thus it may be seen that legislative action withdrawing common-law remedies for well established common-law causes of action for injuries to one's "lands, goods, person or reputation" is sustained only when [1] it is reasonable in substituting other remedies, or when [2] it is a reasonable exercise of the police power in the interest of the general welfare. Legislative action of this type is not sustained when it is arbitrary or unreasonable.

*Id.* at 955. The court stressed that it was not denying *the legislature* power "by general law [to] abolish all causes of actions against cities for injuries growing out of simple negligence in the maintenance of streets." That question was not before the court; at issue was a *city* provision, and the court could think of no public policy or general welfare reasons to justify such a law only within the city limits of Galveston. *Id.*

Neither *Lebohm* nor *Middleton* nor any other supreme court case suggests that the judiciary strictly weighs the adequacy of a statutory substitute as detailed as the one before us. Instead the cases simply say that a legislature may not be arbitrary in abolishing common-law actions. The court in *Lebohm* cautioned the bench and bar to give proper respect to the emphasis the court placed on the word "arbitrarily" in its holding. 275 S.W.2d at 954. That is, a statutory substitute for the common law will be upheld as constitutional unless it is truly arbitrary.

Today's decision does not follow from these cases. It is a bold, new exertion of judicial hegemony over the legislature in a field where no part of the constitution gives us

---

mon-law *defenses* as well as common-law *rights of action*.

> If it may change defensive common law rules, may it not also change a common law rule of liability? The power of the Legislature cannot exist in the one instance and not in the other.
>
> . . . .
>
> We rest the decision of this question upon what seems to us is the evident proposition that no one has any vested or property interest in the rules of the common law, and therefore no one is deprived of a constitutional right by their change through legislative enactment. . . . *[The constitution]* has not undertaken to preserve inviolate the rules of the common law. That system of rules to the extent that we are governed by it was adopted by the Legislature and the same authority may alter it. *Id.* at 561 (emphasis added).

authority. Because the constitution does not deprive the legislature of power to enact this statute, it is our duty to uphold it.

In holding that the 1989 law is arbitrary the court today has viewed the statute with hostility and not deference. I make that statement for several reasons, which are more fully stated below. (1) The court refuses to address my suggestion that workers can waive any constitutional objections to the act. Even if it would violate the constitutional rights of these particular plaintiffs to force the act on them, there will be workers who do not object to its provisions; by not objecting, they waive any constitutional objections to the act. For such workers, the act may constitutionally apply. The court says this issue was not raised, but no plaintiff has standing to assert that this statute is unconstitutional as to persons who accept its provisions. This is not a private lawsuit; it is a public issue of tremendous importance in which no one has the right to concede the rights of future workers who may want the act to apply to them. (2) The court has stressed the evidence against the legislature's conclusions and downplayed or omitted the evidence supporting the legislature. If we were acting as a jury, that would be a valid approach. But we are a court reviewing an act of the legislature. We owe the legislative judgment a level of deference comparable to the deference we give a jury verdict. The majority opinion reads like a brief against the law instead of the reasoning of a dispassionate court reviewing legislation with deference to the legislature's right to evaluate society's problems differently from us. (3) The court has used arguments that would invalidate much of the old workers' compensation law, enacted in 1913, upheld by the Texas Supreme Court in 1916 and by the United States Supreme Court in 1919, and never seriously challenged since then. Needless to say, it is unsound judicial reasoning that would invalidate legislation that everyone admits is valid. *See, e.g., Lebohm,* 275 S.W.2d at 954–55 (on rehearing) (court implicitly concedes that its original opinion would be unsound if it undermined the admittedly constitutional old workers' compensation act). (4) The court has selectively stated the legislature's goals in enacting this statute. Ignoring other goals that the act clearly furthers (efficiency, objectivity, predictability, uniformity, and consistency in claim assessment), the court holds that the act does not accomplish the goal of increasing benefits and is therefore unconstitutional. (5) The court will not even allow the commission to revise the AMA Guides to meet any judicial objections, even though the legislature expressly said that the commission should be given such an opportunity if a court finds the act invalid.

In addition, there is an assumption pervading the court's opinion that should be identified at the outset—that the 1989 act is an insurer-employer scheme to reduce benefits to workers. One can read the court's opinion without learning one good thing about the act.

The truth is that the act makes many improvements over the common law, whose deficiencies as a remedy for workplace injuries are well known. To begin with, if workers had to resort to common-law suits instead of workers' compensation benefits, they would have to wait months and sometimes years before their suits were tried. "[C]ommon-law remedies [are] not known in modern times for either their speed or economy." *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 92, 98 S.Ct. 2620, 2640, 57 L.Ed.2d 595 (1978). At common law, workers would receive no interim payments while waiting for trial. Frequently they would lose at trial because most workplace injuries are not caused by employer fault. And at common law, workers would not receive benefits while waiting for trial; they would either have to return to work to make ends meet—and risk a lower recovery for lost earning capacity—or else hold out until trial.

The 1989 law is clearly an adequate substitute for this cumbersome common-law remedy. Under the 1989 act:

● Almost every kind of workplace injury will be compensated. Workers need not prove negligence or proximate cause, and comparative negligence is no defense.

- Wage replacement during the temporary-benefit period is increased from a maximum of $252 weekly under the old act (zero under the common law) to $438. Minimum wage replacement increases from $42 weekly to $64.
- Lump-sum settlements are limited. This prevents workers from wasting away a settlement and then having to seek other relief, and prevents them from bargaining away their right to lifetime medical benefits for a larger lump sum.
- The worker cannot contract away too much of the recovery to a lawyer. The legislature was aware that under the old law workers with lawyers recovered an average of $7500 ($10,000 minus $2500 in attorneys' fees), while workers without lawyers recovered an average of $8500.
- Insurers must promptly begin payments or deny compensability. They cannot delay.
- Benefits are more uniform and standard instead of varying with venue and lawyer ability.
- The commission may order benefits advanced in cases of hardship.
- The commission is given the duty and power to ensure workplace safety. Workers who report safety violations are protected from retaliation.
- The commission is given strong enforcement powers.
- An ombudsman office is established to assist workers with all aspects of the system.

A reviewing court should take into account all these improvements over the common law and assess the statute as a whole. Because workers' compensation statutes necessarily rest on trade-offs and compromises, any such statute must be somewhat over- and under-inclusive in individual cases. Inevitably, in some cases a workers' compensation act will be *over*-inclusive in that some employees will recover even though their suit would not have succeeded at common law; an example would be an employee injured through his own negligence, or injured by something else that was not the employer's fault. (Many, many injuries occur when an employee strains his back lifting, or negligently performs his work. Those injuries would not be compensated in a common-law negligence lawsuit, but they are compensated under workers' compensation statutes.) In other cases the act will be *under*-inclusive because some employees will recover less than they could have recovered at common law; an example would be a worker who suffers mental trauma and loss of consortium, compensable at common law but not under the workers' compensation system. Similarly, pain is not compensable in most workers' compensation statutes, but is compensable at common law.

Legislative substitutes for common-law actions *must* be judged as a whole or they will *always* be held unconstitutional. It is not proper to take isolated parts of the law and judge them separately; we should judge the whole law, which (like the old statute) consists of compromises and trade-offs. It is true that a general societal interest in saving money did not justify the cap on damages at issue in *Lucas v. United States,* 757 S.W.2d 687, 691 (Tex.1988). But here we are considering a detailed statutory scheme that makes trade-offs, not a simple cap on damages. The supreme court in *Lebohm* expressly held that public policy and the general welfare may justify a statutory substitute for the common law. 275 S.W.2d at 954–55.

Workers' compensation statutes have always been considered proper and valid exercises of the legislature's right to compromise and balance different interests. Employers give up common-law defenses and the right to insist on proof of negligence; they receive limited but more certain liability. Employees give up the right to common-law damages; they receive more certain but limited recovery based on liability without fault. *See Paradissis v. Royal Indem. Co.,* 507 S.W.2d 526, 529 (Tex.1974); *Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556 (1916). We do not assess the adequacy of the trade-off as it operates in a specific case. There will always be individuals who would have recovered more money at common law than under a statutory system (and employers who would have owed less at common

law), but that does not mean workers' compensation statutes are unconstitutional.

I now turn to a constitutional review of the act and consider the court's analysis on its own terms.

## I. STANDING.

I would hold that plaintiff Rivero has standing to challenge most of the act and that plaintiff Garcia has standing to challenge the opt-out provision. But in my view the other plaintiffs lack standing because they do not even allege that they have been injured.

*Plaintiff Rivero has standing.* He has been injured and is receiving benefits under the new act. Though his temporary benefits are greater than his pre-injury salary (and the reader should remember this when considering the court's characterization of the act as "draconian"), the trial court found that his injury probably will not be compensable under the impairment guidelines and he will probably not qualify for supplementary benefits.[2] This is an *adjudicative* factfinding that this court must accept, unlike the other findings of *legislative* facts that prompted the legislature to enact the statute. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981); *Vance v. Bradley,* 440 U.S. 93, 110–11, 99 S.Ct. 939, 949–50, 59 L.Ed.2d 171 (1979); *Retail Merchants Ass'n v. Handy Dan Hardware, Inc.,* 696 S.W.2d 44, 54–55 (Tex.App.—Houston [1st Dist.] 1985, no writ).

The court holds Rivero is estopped from challenging the act because he has accepted temporary benefits. I disagree. He *should* be able to accept the initial round of temporary benefits and challenge the next levels of impairment and supplemental benefits as unconstitutional. Neither Rivero nor any other plaintiff attacks the statute's system of temporary benefits, which seem to be much more beneficent than the old statute and the common law.

Though plaintiff Garcia has not yet been injured, he faces the decision whether to try to preserve his common-law rights by quitting his job and taking on new employment, or staying with his existing job and possibly losing his common-law rights. I think this gives him standing to challenge the opt-out provisions as they apply to workers employed by subscribing employers before the act's effective date.[3] Because Garcia has not been injured, I think he lacks standing to challenge any other provision of the act.

The union plaintiffs should not have standing to challenge a statute's constitutionality without alleging that even one of their members has suffered injury. I do not interpret the cases cited by the majority to hold that a union may challenge any statute's constitutionality by simply alleging that some of its many members may one day be affected.

Because Rivero and Garcia have standing to challenge the heart of the act, I agree it is proper for us to consider its constitutionality.

## II. CONSTITUTIONALITY OF THE ACT.

### A. AMA GUIDES.

Under certain portions of the act, benefits are determined by ratings based on the American Medical Association's Guides concerning physical impairment instead of lost earning capacity. The court's argument for invalidating the use of the AMA Guides goes essentially like this: (1) the legislature had only two real goals, which were to increase benefits and to decrease costs; all other goals (such as efficiency, objectivity, predictability, uniformity, and consistency) are just subspecies of these two, and it does not really matter whether the act achieves these latter goals. (2) The use of an impairment system (focusing on physical impairment to the body) instead of a disability system (focusing on loss of earning capacity) does not increase benefits and therefore fails to achieve one of the legislature's two "primary" goals. (3) Use of the AMA Guides is unconstitutional, says the court, because "The pure impairment-based system is not an adequate or reasonable substitute for workers' common law negligence actions. . . . [A] system that does not adequately compensate work-

---

2. These terms are explained in section II(A)(2) of this dissent.

3. The opt-out provision is discussed in section II(C) of this dissent.

ers for the loss of their common law rights is not rational." "[T]he legislature has sacrificed its goal of providing increased benefits to injured workers in order to achieve these other goals [efficiency, consistency, objectivity, predictability, uniform treatment]. In doing so, it has failed to provide workers an adequate substitute for their common law rights."

In reaching these conclusions, the court has relied on the evidence offered by those attacking the statute and has not even mentioned much of the evidence supporting the legislature's choice of this statutory method of achieving its goals and reforming the law.

**1. Goals of the 1989 act.** The court canvasses the many statements of legislative intent, which show that the legislature had several goals in enacting this statute. The court identifies the various goals stated in the act and the legislative history: (1) adjudicating claims more *efficiently* (one legislator spoke of streamlining the delivery of benefits); (2) increasing *objectivity, predictability, uniformity, and consistency* in claim assessment (that is, similarly-situated employees should receive similar benefits; benefits should not vary with race or gender, or with different venue or lawyer skill); (3) increasing *benefits;* (4) containing and controlling *litigation costs;* and (5) containing rising *rates.* Concerning the last two goals, several legislators expressed the desire to reduce "transaction costs."

The court refers to and documents all these goals and then says two are "primary": increasing benefits and decreasing costs. Having redefined *consistency, predictability, objectivity, uniformity, and efficiency* to mean only *decreasing costs,* the opinion then reasons that the AMA Guides, being impairment-oriented and not oriented to assessing disability, do not increase benefits. Because the act does not achieve one of its two main goals, says the court, it follows that the guidelines violate the constitution.

The key flaw in this reasoning is the elimination of the goals of consistency, uniformity, objectivity, predictability, and streamlining procedure. Having collapsed those goals into decreasing costs, the court then equates increasing benefits and decreasing costs as

the overriding goals, and is able to reason that the AMA Guides do not achieve the legislature's purpose. But consistency, uniformity, predictability, and objectivity are themselves laudable goals that are not necessarily linked to lowering costs or increasing benefits.

The record supports the legislature's concern that the old system produced inconsistent results in similarly-situated cases; the old system rested on subjective evaluations of cases. One goal of equal justice under law is the equal treatment of similarly-situated persons. That is a valid goal—indeed, a worthy goal—which the legislature was entitled to pursue.

Another flaw in the court's analysis is the apparent assumption that a statute must meet *all* its goals. On the contrary, if a statute rationally furthers *any* of its several purposes, it satisfies the rational-basis test. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 465, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981); *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979). The authorities cited by the court do not convince me that Texas has a much stricter equal protection standard than the federal rational-basis standard in a case such as this, which does not involve a suspect classification or fundamental right.

The act is rationally related to the legislature's goals of increasing objectivity and consistency and streamlining the process. I grant that the statute, like all statutes (and judicial decisions), may not be perfect. Of course it is too soon to tell whether premiums and litigation costs will decrease, because the statute has not been given a chance. "Whether *in fact* the Act will promote [one of several goals] is not the question: the Equal Protection Clause is satisfied by our conclusion that the [legislature] *could rationally have decided*" that it might. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. at 466, 101 S.Ct. at 725 (emphasis in original).

The court mentions that some people would be better off under the old statute or the common law. But that is true of every workers' compensation system. It is true of

the old Texas statute; under the old statute some workers fared better and some worse than they would have fared under common-law rules. On this point the evidence shows that the legislature knew that in many workers' compensation cases there is no employer negligence or other liability, which means that such workers would receive no compensation at all under common-law rules.

The court's analysis means that whenever a statute attempts to strike a balance among conflicting goals, a court may void the statute because it does not achieve one of the goals. But this analysis ignores the fact that when a statute seeks to strike a balance between goals that pull in different directions, it is impossible to achieve all of them.

The use of the AMA Guides is rationally related to the goals of consistency, predictability, efficiency, objectivity, and uniform treatment of similarly-situated workers. Only by unfairly characterizing the act's goals does the court conclude it is unconstitutional.

**2. Impairment versus disability.** The crux of the court's opinion is its holding that the 1989 law does not allow adjustment for individualized factors relating to an employee's loss of wage-earning capacity; instead the act focuses on impairment to the body. In essence, the court says it is unconstitutional to have an *impairment* system (which focuses on damage to the body, or physical loss) and not a *disability* system (which focuses on inability to work, or wage loss). The court says it is improper for a legislature to compensate primarily for physical impairment; the constitution's open-courts provision requires that workers' compensation statutes focus on loss of earning capacity.

The court's reasoning is this: The act is an impairment system, which focuses on injury to the body, not on loss of earning capacity; one of the act's two primary goals is to increase benefits; the act's impairment system does not rationally further its goal of increasing benefits because it does not adequately compensate for lost earning capacity; thus it violates the constitution.

As I have argued in the preceding section, this analysis is faulty from the beginning

because it rests on a misstatement of the act's goals. The court mentions that impairment is only part of the whole system, but it then condemns the statute as being essentially an impairment statute.

In truth, the statute uses a mix of approaches: (1) *Temporary benefits.* These are assessed by looking at disability, not impairment. They last until the worker has reached maximum recovery or until 104 weeks have passed, whichever occurs sooner. § 4.23. The temporary benefit ordinarily begins within seven days of injury, and the maximum benefit is raised from $252 under the old act to $438 (a 74 percent increase). (2) *Impairment benefits.* After temporary benefits end, the employee may receive additional benefits based on his impairment *and* wage level. § 4.26. (3) *Supplemental benefits.* Those workers whose impairment exceeds 15 percent are given supplemental long-term benefits based on impairment and wage loss. Here the legislature simply decided that more seriously injured workers could get supplementary benefits and less seriously injured workers could not.

With these three tiers of compensation, the statute provides a mix of benefits based on wage loss, physical impairment, and medical expenses. The same is true of the statutes in many other states. The court errs in condemning this law as nothing more than an impairment statute.

In my view, there is nothing irrational or unconstitutional about using impairment as part of a workers' compensation system instead of using a disability approach entirely. Perhaps we as legislators would have preferred to emphasize wage loss more and physical impairment less. But that is a *policy* difference. It does not rise to the level of a *constitutional* violation.

The old statute's specific-injury scheme is for the most part an impairment system, but no one has seriously suggested that it is unconstitutional. Yet under the court's analysis, the old law would also be unconstitutional because under today's decision impairment systems cannot be valid. That speaks volumes about how far today's decision departs from the mainstream.

The court is aware that any rationale for condemning the 1989 law which also would doom the old law cannot be sound. Having held that impairment systems are unconstitutional, the court tries to show that the old law's specific-injury approach was not an impairment system. To be precise, the court recognizes that *if* parts of the old law were impairment-based, then the old law's specific-injury scheme would also be unconstitutional, because under today's decision impairment-based compensation systems are unconstitutional. The court therefore argues that under the old law a worker with only a specific injury could nevertheless recover general-injury benefits. The court summarizes this part of its argument as follows: "Thus, even under the article 8306, § 12 schedule of injuries, the worker could seek to prove to a fact-finder that the injury was more severe than the scheduled recovery allowed by proof of how the injury affected his or her earning capacity." With the utmost respect, I must say this is incorrect and shows a disturbing failure to grasp a fundamental feature of the old workers' compensation law.

The *specific-injury* set-up of the old law was essentially an impairment system, not a disability system. That is, it focused on physical harm to certain members of the body, not overall harm in doing a job and earning wages. The supreme court summarized this well-settled principle of the specific-injury system in these words:

> When an injury has been sustained by a particular member of the body for which the Workmen's Compensation Act provides a specific measure of compensation [i.e., a specific injury], the liability of the insurance carrier is limited to the statutory amount, *even though the loss of or injury to that particular member actually results in total and permanent incapacity of the employee to work.* [citations of three supreme court cases omitted].

*Texas Employers Ins. Ass'n v. Wilson,* 522 S.W.2d 192, 194 (Tex.1975) (emphasis added). Thus, under the old law, even if a specific injury totally and permanently disabled a worker from working, he could receive only the scheduled benefits (for example, 200 weeks for loss of a leg below the knee, 60 weeks for loss of a thumb, etc). Article 8306, § 12 of the repealed old law contains an extensive list of specific injuries. These scheduled benefits were multiplied by a percentage of the worker's wage rate to determine his net recovery.

The *Wilson* court went on to say that in certain circumstances a specific injury case could be expanded into a general-injury case, in which the employee might recover for disability beyond the scheduled benefits for the particular injured member:

> An injured employee, however, is not precluded from the [sic] recovering for total incapacity if he alleges and proves that the injury to the particular member also [1] extended to and affected other portions of his body or [2] has impaired his general health to such an extent as to totally and permanently incapacitate him. [citations of three supreme court cases omitted].

522 S.W.2d at 194. The fact remains that if a specific injury did not extend to and affect the body generally or impair the employee's general health, the employee had only a specific-injury case, and he was limited to the scheduled benefits. It was not sufficient to show that the *specific injury* caused total disability; the evidence had to show that the injury's affect on the body generally or the impairment of general health caused total disability. That is, the evidence had to show that beyond the specific injury there was an impairment to the body generally. Without such evidence, the scheduled benefits were limited according to what part of the body was injured, even if there was a much greater effect on the employee's earning capacity.

It is true that under the old law disability, or inability to work, could be considered in assessing the extensiveness of loss of use of a specific member. In other words, in considering whether a particular member was partially lost or totally lost, a jury could consider either the *physical harm* done to it (its diminished usefulness as a member of the body) or the *loss of utility* in employment caused by the injury. *See Travelers Ins. Co. v. Seabolt,* 361 S.W.2d 204 (Tex.1962); 2 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 25.05 (1989). But even if there was total loss of the specific member, or total

impairment of it, or the injury to it caused total disability, the employee could recover only the limited, scheduled benefits. He could not recover for all his lost earning capacity. To put it differently, injuries to specific members were compensated according to what member of the body was injured (i.e., an impairment system), not according to the amount of disability the injury caused (i.e., a disability system). A totally disabling loss (or loss of use) of a specific member was compensated at a fixed scheduled rate under old article 8306, § 12. *This was a physical impairment system,* though the benefits varied with the employee's wage rate, as they do under the 1989 act.

Unless we are prepared to say that the old law's specific injury set-up is unconstitutional, how can we say that the 1989 law's impairment provisions—used when calculating benefits beyond the temporary period—are unconstitutional? The court does not answer. Its rationale for striking down the 1989 law would also invalidate the old law's specific-injury provisions, which says something about the soundness of the rationale.

**3. Disregard of evidence supporting statute's reasonableness.** The court correctly says that courts do not defer to a trial court's findings of fact concerning the reasonableness of legislation. Appellate courts defer to a trial court's finding of *adjudicative* facts (facts concerning private issues, such as negligence) but defer to the *legislature's* findings on *legislative* facts (facts underlying policy choices). A lone trial court does not have the same discretion to determine the reasonableness of the legislature's goals as it has in finding the facts in ordinary private litigation.

Nevertheless, much of the court's discussion of the act's goals seems to defer to the trial court's findings instead of to those of the legislature. The court has stressed the evidence *against* the reasonableness of the statute and downgraded the evidence supporting it, as though we were simply reviewing an ordinary judgment in which we give deference to the trial court's findings. That is an erroneous approach. When reviewing the constitutionality of a statute, we give deference to the *legislature's* implied findings, not

those of the *trial court.* *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 470, 101 S.Ct. 715, 724, 727, 66 L.Ed.2d 659 (1981) ("States are not required to convince the courts of the correctness of their legislative judgments.... it is not the function of the courts to substitute their evaluation of legislative facts for that of the legislature"); *Vance v. Bradley,* 440 U.S. 93, 110–12, 99 S.Ct. 939, 949–50, 59 L.Ed.2d 171 (1979); *Retail Merchants Ass'n v. Handy Dan Hardware, Inc.,* 696 S.W.2d 44, 54–55 (Tex. App.—Houston [1st Dist.] 1985, no writ).

Legislation is presumed to be constitutional and the burden is on the one attacking it to show unconstitutionality. *Spring Branch Indep. Sch. Dist. v. Stamos,* 695 S.W.2d 556, 558 (Tex.1985); *Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983); *Texas State Bd. of Barber Exam'rs v. Beaumont Barber College, Inc.,* 454 S.W.2d 729, 732 (Tex.1970); *Smith v. Davis,* 426 S.W.2d 827, 831 (Tex.1968); *Texas Nat'l Guard Armory Bd. v. McCraw,* 132 Tex. 613, 126 S.W.2d 627, 634 (1939). Thus, we judges at all levels do not decide whether the legislative judgment is a good one, or whether we agree with it personally. And appellate courts do not simply ask whether there was some evidence to support the trial judge's findings in this case. Instead we determine whether the forces that lost the legislative vote have demonstrated that the legislative judgment was beyond the pale.

The court purports to give proper deference to the legislature's right to make judgments, but it then proceeds to credit the testimony of witnesses (and the findings of the trial court) which differ from the evidence supporting the legislature. The opinion goes on for page after page detailing testimony from those who testified against the statute. The court highlights evidence from four witnesses against the use of the AMA Guides without mentioning one argument in favor of them. The court's recognition of arguments in support of the guidelines is found in this one sentence: "The defendants cite medical testimony, some from plaintiff's witnesses, indicating that the *Guides* are the most accurate evaluation of medical impairment available." This is the

work of a court hell-bent on striking down the act, not a court dispassionately reviewing a statute from a coordinate branch of government to see if it is rationally related to valid goals.

Because we should defer to the legislature's decision about the need for this legislation and not the trial court's, the court is incorrect to cite and give weight to evidence criticizing the AMA Guides without fairly giving weight to the evidence supporting their use. For example, fifteen other states have *adopted* the guidelines by statute in their workers' compensation systems, and twenty-one others *use* them in determining impairment. By giving the impression that Texas has gone off the deep end and stands alone in using the AMA Guides, the court has not given proper deference to the legislature's judgment, which has considerable factual support.

To begin with, the Guides promote predictability, consistency, and uniformity by using more objective methods of measuring injury. Those should be goals in any rational adjudication system.

In addition, there was evidence supporting the AMA Guides from several doctors. Three doctors termed the Guides "state of the art" and several agreed that there is no better written study or text for determining impairment. An expert for the plaintiffs (Dr. George Smith) admitted that it is proper to use the AMA Guides to determine the extent and degree of impairment. There was evidence that the Guides are the best impairment evaluation available. Courts are not at liberty to decide that a reasonable legislature should have believed other witnesses instead of these.

The old Texas act was the nation's fifth most expensive, while providing benefits at the tenth or fifteenth lowest level in the nation. Because of high premiums employers were "going bare"—choosing not to have insurance coverage and taking their chances with the common-law system. Insurers were abandoning the Texas market because of high losses.

The court has completely ignored this situation and also the evidence before the legisla-

ture that most injuries on the job do not involve employer negligence. The act would give most or many of those employees a remedy that the common law would not give them. Perhaps the trial court did not credit this evidence. But the legislature was entitled to consider it and conclude that the act strikes a sensible balance: some workers give up large tort recoveries, while many others (who would recover nothing in their tort lawsuits) obtain a modest but predictable recovery.

In sum, I disagree with the court's invalidation of the AMA Guides, which rests on (1) a narrow, incomplete statement of the act's goals, (2) an erroneous condemnation of the act as an impairment system, even though the same analysis would also condemn the old law's specific-injury features, and (3) disregard of the evidence that supports the legislature's enactment. I would sustain the legislature's right to use the AMA Guides as it did.

## B. FIFTEEN PERCENT THRESHOLD.

As stated in section II(A)(2), the statute authorizes three sequences of benefits. *Temporary* benefits are received for 104 weeks or until the employee has reached maximum recovery, whichever event occurs first. When these temporary benefits terminate, an employee may receive *impairment* benefits. Afterward, the employee may receive *supplemental* benefits if his impairment exceeds 15 percent. The court strikes down this 15 percent threshold for supplementary benefits because (1) it is "an unreasonable classification" of workers who have the 15 percent impairment and those who do not, and (2) it creates an "irrebuttable presumption" that workers below the threshold do not need supplemental benefits.

The court reasons that many workers with disabling injuries will not satisfy the 15 percent impairment threshold and therefore will not receive supplemental benefits. The court also argues that there is no basis for picking the figure fifteen instead of some other number. It calls this part of the statute "draconian."

Concerning the selection of 15 percent rather than some other number, Dr. Peter

Barth testified that 15 percent was a sensible cutoff line because impairments below 15 percent are generally not very serious. In addition, the act allows doctors to round up to the nearest five percent, which would mean that a twelve and one-half percent impairment could be rounded to fifteen, qualifying the worker for additional benefits. The court does not mention this evidence or say why a court is justified in rejecting the legislature's acceptance of it.

*Any* threshold or other classification will be somewhat over-inclusive and somewhat under-inclusive. If the legislature had drawn the line at fourteen percent, or ten percent, that would change the numbers of people on each side of the line; but there would still be some who would "improperly" be denied supplemental benefits and others who would "improperly" receive them. Justice Douglas once observed for the Court that "every line drawn by a legislature leaves some out that might well have been included." *Village of Belle Terre v. Boraas,* 416 U.S. 1, 8, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797 (1974). That is inevitable if there is to be line-drawing.[4] Nevertheless, the court says, "Defendants offered no explanation of the source of the 15 percent figure. Witnesses who were directly involved in the legislative process leading up to the Act had no idea where this number came from."

In effect, the court has said that as a matter of constitutional law each workers' compensation case must be evaluated subjectively, ad hoc, case-by-case without using objective standards. The legislature thought otherwise, and nothing in the constitution denies it that power.

## C. OPT-OUT PROVISION.

Under § 3.08 of the act, employees waive their common-law rights of action against subscribing employers unless they give the employer written notice within five days of beginning their employment. Section 3.08 simply carries forward a similar provision in the old law. No one suggests it is unconstitutional to put the burden on workers to preserve their common-law rights in writing.

But the court voids the provision that denies old workers a new chance to opt out because its "classification" of pre– and post–1992 employees is "not rationally related to the act's purpose of providing greater benefits to workers." That holding completely misses the mark. Section 3.08 is not a substantive provision but a procedural one. It makes no sense to strike down procedural-retroactivity provisions because they do not serve one of the act's several purposes.

The court's opt-out holding skirts a more fundamental question: on what basis can the court invalidate this statute as it might apply to employees who do not opt out but choose its provisions instead of the common law? To put it differently, why do any of the plaintiffs have standing to attack this law as it might apply to some future worker who waives his common-law rights by failing to preserve them in writing within five days of his employment date?

As time goes by there will be more and more employees who come under the act's provisions, having waived the right to preserve their common-law rights. Without doubt, there will be workers who waive their bill-of-rights objections to the 1989 act. Sub-

---

4. The Court has often quoted with approval Justice Holmes's explanation of the necessity and inevitability of legislative line-drawing:

> When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logi-

cal way of fixing it precisely, the decision of the Legislature must be accepted unless we can say that it is very wide of any reasonable mark." *Louisville Gas & Elec. Co. v. Coleman,* 277 U.S. 32, 41, 48 S.Ct. 423, 426, 72 L.Ed. 770 (1928) (Holmes, J., dissenting).

*See, e.g., Schweiker v. Wilson,* 450 U.S. 221, 238 n. 23, 101 S.Ct. 1074, 1085 n. 23, 67 L.Ed.2d 186 (1981); *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 593 n. 41, 99 S.Ct. 1355, 1370 n. 41, 59 L.Ed.2d 587 (1979); *Buckley v. Valeo,* 424 U.S. 1, 83 n. 111, 96 S.Ct. 612, 665 n. 111, 46 L.Ed.2d 659 (1976); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 8 n. 5, 94 S.Ct. 1536, 1540 n. 5, 39 L.Ed.2d 797 (1974).

ject to very few exceptions, persons may waive statutory and constitutional rights. *See Little v. State,* 758 S.W.2d 551, 563 (Tex. Crim.App.), *cert. denied,* 488 U.S. 934, 109 S.Ct. 328, 102 L.Ed.2d 346 (1988); WAYNE R. LAFAVE & JEROLD H. ISRAEL, CRIMINAL PROCEDURE §§ 7.3(d), 8.10(e), 10.2, 11.3, 15.1(d), 20.6, 21.1(h), 26.5(c) (1984). Litigants may, for example, waive their *Miranda* rights, their right to grand jury indictment, and their right to trial by jury (by guilty plea, acquiescence in nonjury trial, and by voluntary binding arbitration). By consent, they may waive their objection to an otherwise unconstitutional search and seizure. Most constitutional rights may be waived by failure to preserve them at the proper time. If persons may waive important rights in criminal cases, they may certainly waive their right to have the common law apply to their civil lawsuits.

The court has stricken this law because it violates the open courts, equal protection, and due course of law provisions of the Texas Bill of Rights. But individuals may waive those protections. In particular, they may waive their right to litigate work-related injury suits at common law by not preserving those rights within five days of beginning employment.

Those workers who waive their right to opt out of this statute may not make the complaints this court has sustained. As time goes by there will be more and more workers who began their jobs after January 1, 1991. The act can constitutionally apply to them because nothing in the constitution prevents them from waiving their common-law rights. Workers may opt out of the common-law tort system in the same way that litigants generally may opt out of the court system by agreeing to binding arbitration. *See, e.g.,* Texas General Arbitration Act, TEX.REV.CIV. STAT.ANN. arts. 224 et seq. (Vernon 1973 & Supp.1993); *L.H. Lacy Co. v. City of Lubbock,* 559 S.W.2d 348 (Tex.1977); *Brazoria County v. Knutson,* 142 Tex. 172, 176 S.W.2d 740, 743 (1943).

Even though the court has held the statute unconstitutional, that holding should not apply to those workers who give up their right to complain about it. As to those workers who do not acquiesce in the new law, the old law will still apply. But the court should permit the new act to remain operative as to those workers who do not preserve their right to litigate under the common law—that is, those workers who begin employment on or after January 1, 1991 and do not give written notice under § 3.08.

The court says that no one has raised this issue. That is true, but the court must deal with it because we must decide how to write our judgment. No plaintiff in this case has standing to urge that this statute is unconstitutional as to persons who waive their common-law rights and acquiesce in the statute. I would state expressly that the law remains in place and applies to workers hired after January 1, 1991 who do not preserve their common-law rights in writing.

**D. RIGHT TO JURY TRIAL.**

In holding that the act violates the Texas Constitution's jury trial guarantees, the court has quoted but failed to follow *Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556, 559 (1916), *aff'd,* 249 U.S. 152, 39 S.Ct. 227, 63 L.Ed. 527 (1919). The *Middleton* court rejected a similar attack on the original statute because the old act allowed litigants to appeal to district court and have a jury trial *under the substantive rules of the statute:*

> The Act authorizes appeals from the decisions of the Board to the courts, where *a jury trial of the matters in dispute, under the law as embodied in the Act,* may be had.

*Middleton,* 185 S.W. at 562 (emphasis added). The court in *Middleton* said this was an adequate jury trial.

When all the legal veneer is peeled away, the court today has simply held that the act improperly prevents juries from applying traditional common-law rules in workers' compensation cases. The court says, "There is no escape from the mechanical application of the *Guides* and the arbitrary 15 percent threshold." The act "repudiat[es] historical disability considerations by its reliance on the *Guides.*"

I will agree that *if* the substantive rules of the act (such as use of the AMA Guides) are constitutionally invalid, and workers have a constitutional right to litigate under common-law rules, then it follows that the act may not require juries to apply the statute. But if the act's substantive rules of recovery are valid, then surely the legislature acted constitutionally when it required that courts and juries apply them faithfully when cases are reviewed in court.

The court has not honored what seems to me a truism: if the substantive rules of recovery are valid, a law requiring courts and juries to apply those rules to the facts is also valid and does not violate jury trial guarantees. After all, in certain cases juries must follow the law of negligence per se instead of common-law negligence. Pursuant to statute, juries may not find a plaintiff negligent for failing to wear a seat belt. In DTPA cases juries find whether a defendant violated the laundry list, which is different from the common law.

Jury trials under the old act, of course, did not give the jury free rein in deciding the issues without regard to the act's substantive rules. On the contrary, courts and juries applied the old act's rules (including its specific-injury impairment provisions), which varied from the common law. The rules of procedure have always required courts to instruct juries about the substantive elements that must be proved to establish a ground of recovery or defense. *See* Tex. R.Civ.P. 277. In fact it would violate due process to let a jury make findings that deny a litigant of life, liberty, or property without a finding and evidence that the substantive elements of the claim had been established. *See Jackson v. Virginia,* 443 U.S. 307, 314, 99 S.Ct. 2781, 2786, 61 L.Ed.2d 560 (1979).

The court criticizes the act because juries are not allowed to consider cases de novo. Instead, they are limited to the issues (and usually the evidence) presented to the commission; the jury is told of the appeals panel's decision; and the administrative record is admissible in court. Another way to look

at these procedures is to say that the act strengthens the administrative process and makes it significant and not just a meaningless prelude to litigation. And concerning the weight that must be given to a designated doctor's opinions in a jury trial, surely it was proper for the legislature to try to minimize the use of hired-gun, dueling doctors.

I dissent from the court's holding that the act violates the constitution's jury trial guarantees separately and apart from the validity of the substantive rules.

### E. HYBRID JUDICIAL REVIEW.

The court sustains appellees' cross-point and holds that a statute may not provide for different kinds of review—e.g., substantial evidence review and de novo review—in the same case. The opinion says flatly, "Hybrid review is impermissible." I disagree with that reading of the authorities, which hold only that to have *contradictory* types of review of the *same issue* is impermissible. A workers' compensation case can involve several distinct issues. This statute permits judicial review of the commission's decisions, and simply permits courts to engage in substantial-evidence review of some issues and de novo review of others.[5] There is nothing wrong with providing for different kinds of judicial review of different issues.

The court cites two supreme court cases. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 571 S.W.2d 503 (Tex.1978); *Southern Canal Co. v. State Bd. of Water Eng'rs,* 159 Tex. 227, 318 S.W.2d 619 (1958). But each of those cases involved judicial review of one issue. In *Southwestern Bell* the issue was whether publicly mandated rates were confiscatory. In *Southern Canal* the issue was whether the board's order was reasonable.

In *Southern Canal* one part of the controlling statute directed courts to try the case de novo; another section directed the court to determine the reasonableness of an order under the substantial-evidence rule. The two kinds of judicial review are utterly incon-

---

**5.** The act mandates trial de novo, using specified procedures, for issues of "compensability or eligibility for or the amount of income or death benefits." § 6.62. Judicial review of all other issues is governed by the substantial evidence rule. § 6.64.

sistent with each other and the court found the statute "so inharmonious and conflicting as to render it impossible of execution." 318 S.W.2d at 624. *Southwestern Bell* presented a similar conflict. There the court interpreted two statutes, concluding that each mandated a different kind of review of the same issue, confiscation. The court struck the provisions of one statute because it was impossible for a trial court to use contradictory types of review of the same issue.

There is no indication in either opinion that it is unconstitutional to have one kind of review for one issue and another kind of review for a second issue. It is true that the twelve-page opinion in *Southwestern Bell* used the phrase "in the same case" several times. But the most cursory reading of the opinion shows that the case involved review of one issue and the court condemned the use of *contradictory* standards for reviewing that lone issue.

## F. ATTORNEYS' FEES.

The court invalidates the act's attorneys' fees provisions on the following reasoning: the attorney for a worker may recover hourly fees but in no event more than 25 percent of the recovery; the worker's recovery will usually be small, which means the attorneys' fee will also be small; there is no comparable ceiling on defense attorneys' fees; some plaintiffs' attorneys testified that it would not be economical for them to handle workers' compensation cases under this fee system; this provision is therefore unconstitutional because "it is arbitrary and irrational to discourage legal representation for only one side while doing nothing to prohibit the other side from obtaining representation." The court also says this provision is "not rationally related to the statutory purpose of increased benefits."

I disagree with this reasoning for several reasons. First of all, it is rational for the legislature to protect workers by limiting the amount of the recovery that they can contract away for attorneys' fees. The old act also has a 25 percent cap on attorneys' fees. Insurers do not need comparable protection; they can take care of themselves. It would, of course, be unworkable to limit a defense

counsel's fee by linking it to the employee's recovery; that would create a conflict of interest by giving defense counsel an incentive to increase his fee by increasing the award his client has to pay. Apparently the court's position is that it is arbitrary and irrational to protect individuals from excessive attorneys' fees while not protecting insurers in the same way. If the court is saying that plaintiff and defense fees must be treated identically, shouldn't it tell us how it could be done?

The legislature had evidence before it—not mentioned by the court—that lawyers received yearly fees of some $400,000,000 from the workers' compensation system and that only 40 percent of the total amount paid in claims went to workers. The legislature acted rationally in seeking to reduce the amount of system costs siphoned off by attorneys' fees and to maximize the proportion of the recovery kept by the worker. How can it be termed unconstitutional to require that attorneys' fees be assessed on an hourly basis?

The court's unstated assumption is that workers will recover a greater net award with an attorney. But there was evidence before the legislature that under the old law workers who had attorneys netted an average of $7500 while those who did not use attorneys netted an average of $8500 (remarks of Senator Leedom). On what authority does this appellate court refuse to defer to the legislature's right to consider that evidence?

Second, the court fails to note that the commission (or court) must approve any attorneys' fee paid by an insurer. *See* § 4.091. And only in a footnote does the court mention § 4.28(*l*)(2), which makes the carrier pay the worker's attorneys' fees if it wrongfully disputes his claim for supplemental benefits. But the worker does not pay *defense* fees if a claim is wrongfully brought. Third, the legislature established an ombudsman program to assist unrepresented workers. § 5.41(b).

In striking down this provision, the court has given no deference whatsoever to the legislature. It has opened itself up to the criticism that the judiciary has protected law-

yers (on both sides of the docket) earning $400,000,000 a year in fees.

In addition, the court's reasoning would probably invalidate the attorneys' fee provision of the old act, which limited the employee's attorneys' fee to 25 percent but did not limit fees for defense attorneys. It is beyond me how the court can hold that the attorneys' fee provisions are hostile to workers, especially when the old law had essentially the same provisions. The law may not be attractive to lawyers who already have a good law practice, but that does not make it unconstitutional. It is also true that the law limits lawyer recovery of fees disproportionate to the time expended, but surely that was within the legislature's power.

The notion that lawyers will not represent workers under the 1989 law is nonsense. Of course, some of the successful lawyers might not, because they make healthy fees in other kinds of cases. But considering the great numbers of lawyers turned out yearly by our law schools, it is preposterous to say that few lawyers would take a workers' compensation case for an hourly fee capped at 25 percent of the recovery. Even if under the 1989 act attorneys would earn only a fraction of the previous $400,000,000, the fees would surely attract sufficient legal talent into the workers' compensation system.

We should state plainly what has happened here. The legislature said that lawyers should not receive more than 25 percent of the worker's net recovery. And if the worker's recovery is large in comparison to the lawyer's time expended, the lawyer should be paid only for time spent, not a straight 25 percent. In other words, the legislature limited the amount of money a lawyer can take from his client in fees. Under the 1989 act, lawyers as a group will not earn the same $400,000,000 they earned in previous years. Brushing aside the legislature's evidence that under the old law workers netted more without lawyers than with them, the court sides with lawyers and voids the law. In my view, the Texas Constitution does not deny the legislature the power to protect individuals in this way. *Cf. Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) (rejecting federal constitutional challenge to strict limit on attorneys' fees in veteran-benefits cases).

## G. SEVERABILITY.

Because I would uphold the entire statute as being within the legislature's authority, I reach the issue of severability only because the court does. The act contains this severability clause:

> If any provision of this Act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this Act that can be given effect without the invalid provision or application, and to this end the provisions of this Act are declared to be severable.

Texas Workers' Compensation Act, 71st Leg., 2d C.S., ch. 1, § 17.17, 1989 Tex.Gen. Laws 1, 122 (not codified).

The court says that under *Rose v. Doctors Hospital,* 801 S.W.2d 841, 844–45 (Tex.1990), the test is whether (1) the legislature would not have passed the valid parts of the statute without the invalid parts, and (2) the remainder of the statute ·can stand by itself and operate independently of the severed part. I do not agree that we ask the first question; the severability clause itself establishes that the legislature would have passed the statute without the stricken portions. The first *Rose* question is not pertinent when there is a severability clause, and I do not interpret *Rose* to deviate from prior law and hold otherwise. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 571 S.W.2d 503, 512 (Tex.1978); *Eades v. Drake,* 160 Tex. 381, 332 S.W.2d 553, 557 (1960); *Jordan v. Crudgington,* 149 Tex. 237, 231 S.W.2d 641, 646–47 (1950).

The severability clause itself states that we *must make an inquiry essentially the same as* the second *Rose* standard; the clause requires us to determine whether the remainder of the act "can be given effect without the invalid provision or application." The court concludes that the remainder is not severable. Its reasoning is as follows: we have struck down the use of the AMA Guides, the 15 percent threshold for supplemental benefits, the opt-out provision, the

jury trial rules, so-called hybrid judicial review, and the attorneys' fee provisions. With so much of the act gone, especially the important AMA Guides and 15 percent threshold, the act is now unworkable and the legislature would not have passed it in this form.

This reasoning fails because the court has been unwilling to give the legislature's fallback position a chance. The statute says that if the AMA Guides are held invalid the commission shall by rule "adopt objective impairment guidelines similar to the guidelines published by the American Medical Association." Texas Workers' Compensation Act, 71st Leg., 2d C.S., ch. 1, § 17.171, 1989 Tex.Gen.Laws 1, 122 (not codified). I would allow the commission to establish such guidelines. The new guidelines would obviously meet the court's objection that the AMA Guides are out of print, copies are hard to find, and they are being used for unintended purposes. Why will the court not even give the commission a chance to satisfy the court's *other objections to the use of impairment guidelines?*

With new, more flexible guidelines in place, the court's objections to the jury trial and attorneys' fees provisions would vanish; those objections rested primarily on the notion that the underlying guidelines were too stingy and inflexible. The opt-out provision has nothing to do with how the act operates and therefore nothing to do with severability. Concerning hybrid judicial review, we should follow the supreme court's example in *Southwestern Bell Telephone Co. v. Public Utility Commission,* 571 S.W.2d 503 (Tex.1978): sever the de novo and substantial evidence review provisions and allow one or the other to apply.

Under this approach, with only the 15 percent threshold provision invalid, the court should uphold the remainder of the act, which is severable under § 17.17 of the act and the *Rose* test.

\* \* \* \* \* \*

Ours is not the first court to grasp for itself a policy decision that belongs to another institution of government and to substitute its judgment for that of the legislature. Today's opinion has an unmistakable, though discredited, intellectual parentage: the old

court's futile and arrogant efforts to prevent the people, acting through legislative institutions, from dealing with economic problems during the first third of this century. Attorney General Robert Jackson, who later sat on the Court, entitled his book about that episode in our history *The Struggle for Judicial Supremacy* (1941). Four of the greatest justices in our history (Holmes, Brandeis, Stone, and Cardozo) consistently dissented from the doctrine of judicial supremacy in economic matters. Not one United States Supreme Court Justice since 1941 has advocated or practiced judicial supremacy over the nation's economic affairs. Both the old court and the modern court agreed that legislatures may enact workers' compensation statutes that totally change the common law unless the statutes are arbitrary and irrational. *See Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976); *New York Central R.R. Co. v. White,* 243 U.S. 188, 202–204, 37 S.Ct. 247, 252–53, 61 L.Ed. 667 (1917).

The old court used the doctrine of substantive due process and a narrow reading of the scope of Congress's enumerated powers to curtail the people's efforts at self-government. Today's court uses the open courts provision of the Texas Constitution to prevent the legislature from reforming court-made law. The court also invokes substantive due process. It says in section III(C), "In contrast to the federal constitution, substantive due process remains a vital doctrine under the Texas Constitution." Of course, federal precedents are not binding on Texas judges when we interpret the Texas Constitution. *See Davenport v. Garcia,* 834 S.W.2d 4 (Tex.1992); *Heitman v. State,* 815 S.W.2d 681 (Tex.Crim.App.1991). But we should learn from, and not repeat, the disastrous federal experience of the old court's vetoing legislation when the constitution did not really require it.

At the height of the old court's emasculation of the New Deal, Stone, Brandeis, and Cardozo protested:

> The power of courts to declare a statute unconstitutional is subject to two guiding principles of decision which ought never to be absent from judicial consciousness. One is that courts are concerned only with the power to enact statutes, not with their

wisdom. The other is that while unconstitutional exercise of power by the executive and legislative branches of the government is subject to judicial restraint, *the only check upon our own exercise of power is our own sense of self-restraint. For the removal of unwise laws from the statute books appeal lies, not to the courts, but to the ballot and to the processes of democratic government.*

. . . .

*Courts are not the only agency of government that must be assumed to have capacity to govern.*

*United States v. Butler,* 297 U.S. 1, 78–79, 87, 56 S.Ct. 312, 325, 329, 80 L.Ed. 477 (1936) (Stone, Brandeis, & Cardozo, JJ., dissenting) (emphasis added).

We must uphold economic legislation unless it clearly violates individual rights or is outside the bounds of legislative authority set by the constitution. Like the legislature, we are duty-bound to stay within our constitutional role. And when we the courts do not stay within the constitutional bounds that limit our authority, there is no one to correct us. We forfeit much of our right to be respected as fair enforcers of the legal rules when we ignore the rules that limit our own power and set aside the decisions of two coordinate branches of government on an issue the constitution committed to them.

In conclusion, I observe that the expansive constitutional doctrine the court employs today must be applied in future cases, and we need to think about where this decision may lead. "One test of the validity of a legal doctrine is the extent and scope with which it may be safely applied." *State ex rel. Edwards v. Reyna,* 160 Tex. 404, 333 S.W.2d 832, 838 (1960).

Would today's majority seriously entertain a constitutional challenge to the wrongful death statute or the Deceptive Trade Practices Act on the ground that they substantially changed the common law? Both statutes drastically changed the common-law rights of defendants without providing a substitute of any kind. And surely the court would agree that the legislature was within its rights in abolishing the common-law actions for alienation of affections and criminal conversation without providing any kind of substitute.[6] How can the legislature's actions in all these instances be upheld under today's decision?[7] This question alone shows how far wrong the court has gone today.

I respectfully dissent from the court's decision holding the workers' compensation act of 1989 unconstitutional.

BUTTS and RICKHOFF, JJ., join this dissenting opinion.

---

**6.** *See Felsenthal v. McMillan,* 493 S.W.2d 729 (Tex.1973) (criminal conversation is part of Texas common law); *Turner v. Turner,* 385 S.W.2d 230 (Tex.1964) (alienation of affections); Tex.Fam. Code Ann. § 4.05 (Vernon 1993) (abolishing action for criminal conversation); *id.* § 4.06 (abolishing action for alienation of affections).

**7.** A hostile reviewing court could even find unconstitutional the legislature's modification of the common-law rule that contributory negligence absolutely bars a negligence suit. The

legislature abolished that rule and adopted comparative negligence in its place. *See* Tex.Civ Prac & Rem.Code Ann. §§ 33.001 et seq. (Vernon Supp. 1993). Without giving defendants anything like an "adequate substitute" in return, that statute took away a right that the common law gave to defendants. Did the legislature exceed its power in abolishing contributory negligence? I think not, but it might be a close question if the analysis of today's decision is faithfully applied.